```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3  KEVIN CERVANKA, individually )
    and on behalf of all others  )
 4  similarly situated,          )
                                 )
 5            Plaintiff,         )
                                 )
 6  vs.                          )Case No. 4:21-cv-00813-SDJ
                                 )
 7  JUMPP LOGISTICS, LLC and     )
    COUCH GOAT QUANDARY, LLC,    )
 8                               )
              Defendants.        )
 9  _____)
```

10                    ORAL DEPOSITION OF

11    CORPORATE REPRESENTATIVE OF JUMPP LOGISTICS, LLC, and

12        COUCH GOAT QUANDARY, LLC, BY AND THROUGH

13                       JOHN KNOPE

14                  FRIDAY, MAY 6, 2022

15

16        ORAL DEPOSITION OF JOHN KNOPE, produced as a

17  witness at the instance of the Plaintiff, and duly

18  sworn, was taken in the above-styled and numbered cause

19  on Friday, May 6, 2022, from 9:09 a.m. to 5:39 p.m.,

20  before Cheryl A. Dixon, RPR, CRR, Notary Public, in and

21  for the State of Texas, reported by machine shorthand,

22  at the offices of Brown Pruitt Wambsganss Dean Forman &

23  Moore, P.C., 201 Main Street, Suite 700, Fort Worth,

24  Texas, 76102, pursuant to the Federal Rules of Civil

25  Procedure.

**Exhibit 1**

KEVIN CERVANKA vs JUMPP LOGISTICS
John Knope May 06, 2022

Job 34822
Pages 2..5

Page 2

```
1            A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        MS. PAMELA G. HERRMANN
         HERRMANN LAW, PLLC
5        801 Cherry Street, Suite 2365
         Fort Worth, Texas 76102
6        817.479.9229
         pamela@herrmannlaw.com
7
         MR. JERRY MURAD
8        LAW OFFICE OF JERRY MURAD
         P.O. Box 470067
9        Fort Worth, Texas 76147
         817.335.5691
10       jerrymurad@mac.com
11
12   FOR THE DEFENDANTS:
13       MR. RANDAL L. DEAN
         MR. TYLER G. SCHOLES
14       BROWN PRUIT WAMBSGANSS DEAN FORMAN & MOORE, P.C.
         201 Main Street, Suite 700
15       Fort Worth, Texas 76102
         817.338.4888
16       rdean@brownpruitt.com
         tscholes@brownpruitt.com
17
18
19   ALSO PRESENT:
20   Whitney Jordan
21
22
23
24
25
```

Page 3

```
1                I N D E X
2                                          PAGE
3    Appearances                           2
4    JOHN KNOPE
5        Examination By Ms. Herrmann       4
6    Witness Errata Sheet                  184
7    Certificate of Shorthand Reporter     186
8             E X H I B I T S
9    NO.          DESCRIPTION              PAGE
10
     Exhibit 4    Spreadsheet, Jummp 0011284   50
11
     Exhibit 5    Spreadsheet, Jummp 0011284   53
12
     Exhibit 6    Spreadsheet, Jummp 0011285   61
13
     Exhibit 7    Independent Contractor Agreement,   90
14                Jummp 000053-54
15   Exhibit 8    Independent Contractor Agreement,   93
                  Jummp 000051-52
16
     Exhibit 9    Settlements Document, Cervenka 0040  101
17
     Exhibit 10   Logistics-Carrier Agreement, Jummp   105
18                000055-65
19   Exhibit 11   Same Day Critical Advertisement      144
20
21
22
23
24
25
```

Page 4

```
1            P R O C E E D I N G S
2                --- o0o ---
3                JOHN KNOPE,
4    having been first duly sworn, testified as follows:
5                EXAMINATION
6    BY MS. HERRMANN:
7        Q.   Can you please state your full name for the
8    record, please?
9        A.   Sure.  John Lawrence Knope.
10       Q.   And what is your current position with Jummp
11   Logistics?
12       A.   I'm a vice president.
13       Q.   And what is your position with Couch Goat?  I
14   had to think about that a little bit.
15       A.   It's the same.
16       Q.   And vice president?
17       A.   Correct.
18       Q.   Can you tell me what you do as vice president
19   for -- if it's the same, so for both Jummp and Couch
20   Goat?
21       A.   Sure.  Predominantly marketing and I guess
22   I'd say whatever else my boss asks of me.
23       Q.   And who's your boss?
24       A.   Larry Jordan.
25       Q.   So other than marketing, what other duties do
```

Page 5

```
1    you perform?
2        A.   I help with recruiting, built the web page.
3        Q.   With regards to recruiting, recruiting for --
4    tell me what positions that you recruit for.
5        A.   Drivers.
6        Q.   And how do you recruit drivers?
7        A.   We have a couple of different methods.  We
8    either use Indeed or we have some drivers that are
9    referred from existing drivers.
10       Q.   Do you offer a referral bonus?
11       A.   Not to my knowledge.
12       Q.   Have you ever offered a referral bonus?
13       A.   Not that I'm aware of.  I think that could be
14   different from one dispatcher to another.
15       Q.   So tell me about that.
16       A.   A dispatcher in Dallas may offer a reward.
17   I'm not aware.  It's their discretion.
18       Q.   And you mentioned recruiting through
19   Indeed?
20       A.   Mm-hmm.
21       Q.   Did you mention any other platforms?
22       A.   We've done a little bit in Facebook.  I think
23   that's all, though.
24       Q.   And what is it that you do on Facebook for
25   recruiting?
```

KEVIN CERVANKA vs JUMPP LOGISTICS                                          Job 34822
John Knope May 06, 2022                                                    Pages 6..9

Page 6

1   A.   We would place an ad.
2   Q.   And what kind of ad?
3   A.   Just an ad that we had openings.
4   Q.   Who drafts the content of the ads?
5   A.   Who -- I'm sorry?
6   Q.   Drafts the contents, so the words on the
7   ad?
8   A.   I would draft it and then it would be
9   reviewed by our team.
10  Q.   And who's part of that team?
11  A.   Larry Jordan, John Centala.
12  Q.   You said John?
13  A.   C-e-n-t-a-l-a.
14  Q.   And what is Centala's position?
15  A.   I believe he's a president.
16  Q.   Of which company?
17  A.   Of both.
18  Q.   So other than recruiting, marketing, what
19  other duties do you perform?
20  A.   That would be the majority.
21  Q.   And how long have you been with companies?
22  A.   Just over a year.
23  Q.   Prior to joining Jumpp and Goat --
24  A.   Jumpp and Couch Goat.
25  Q.   Couch Goat, where were you employed?

Page 7

1   A.   I was employed at a mailing business,
2   Complete Mailing Partners.
3   Q.   I'm assuming Complete Mailing Partners is the
4   name?
5   A.   Yes.
6   Q.   And what did you do there?
7   A.   I was vice president of sales and marketing.
8   Q.   And how long were you there?
9   A.   Year and a half.
10  Q.   I'm going to assume that you did some type of
11  mailing, but I'm going to ask you, what type of business
12  they were?
13  A.   They sell and service mailing equipment.  So
14  any business that does a lot of mail uses a postage
15  meter, other equipment related to it.
16  Q.   Are you talking about like when you weigh the
17  envelopes --
18  A.   Mm-hmm, exactly.
19  Q.   -- and calculate?
20       And did you meet with the attorneys prior
21  to prepare for this deposition?
22  A.   Did I meet with the attorneys to prepare for
23  this deposition?
24  Q.   Yes.
25  A.   This morning.

Page 8

1   Q.   Is that the only time you met?
2   A.   We met last week.
3   Q.   So let's first talk about last week?
4   A.   Okay.
5   Q.   How long did you meet?
6        MR. DEAN:  I'm going to object and
7   instruct the witness not to answer that question
8   regarding the duration of conferences with counsel.
9        MS. HERRMANN:  So he can --
10       MR. DEAN:  I'm instructing this witness
11  not to answer that question.
12  BY MS. HERRMANN:
13  Q.   So you can actually tell me the time, whether
14  it was an hour or 30 minutes, you just can't tell me --
15  well, actually, any conversation preparation of the
16  deposition is actually discoverable.  It's not
17  privileged, especially Rule 30(b)(6) deposition, so --
18  and I'm just asking the time.  So how long --
19  approximately how long did you meet for?
20       MR. DEAN:  You can answer.
21       THE WITNESS:  I don't recall exactly, but
22  I think it was about an hour, hour and a half.
23  BY MS. HERRMANN:
24  Q.   And what type of documents did you review?
25  A.   We reviewed the -- I believe you called it

Page 9

1   the 30(b)(6) and we reviewed -- I don't recall reviewing
2   any other documents at that time.
3   Q.   And the Rule 30(b)(6) notice for both Coach
4   and Jumpp?
5   A.   Couch Goat and Jumpp.
6   Q.   Couch?
7   A.   Yes.
8   Q.   I'm going to get it right --
9   A.   It's okay.
10  Q.   -- towards the end.
11       Did you prepare the document production
12  that was turned over to the attorneys who then produced
13  it to plaintiffs?
14  A.   I'm sorry, repeat that one more.
15  Q.   The document production -- let me start
16  first.  Did you review the document production that was
17  produced in this litigation?
18  A.   Yes.
19  Q.   Did you prepare the document production that
20  was then handed over?
21  A.   Some of the materials I prepared.
22  Q.   Can you tell me what are some of those
23  materials that you prepared?
24  A.   Anything pertaining to recruiting, so all of
25  the Indeed ads.  Many of the text messages I helped

Page 10

1  prepare. I believe I also downloaded some of the
2  information out of Openforce.
3      Q.   So I want to talk about Openforce and Gig
4  Wage, timeline wise.
5      A.   Okay.
6      Q.   I know that was discussed in yesterday's
7  deposition, just to get a clarification on some time
8  frames. What came first, Gig Wage or Openforce?
9      A.   Well, Gig Wage came before Openforce.
10     Q.   Okay.
11     A.   But there was paper checks before Gig Wage.
12     Q.   So paper checks first and those were
13 issued -- who issued the paper checks?
14     A.   Whitney.
15     Q.   Whitney Jordan?
16     A.   Yes.
17     Q.   And then next was Gig Wage?
18     A.   Gig Wage, correct.
19     Q.   And who is -- let me start by asking who is
20 point of contact from defendants to Gig Wage?
21     A.   Whitney Jordan.
22     Q.   And then after Gig Wage, Openforce?
23     A.   Correct.
24     Q.   And again, who's the point of contact from --
25     A.   Whitney Jordan.

Page 11

1      Q.   So let's talk about Gig Wage. What did Gig
2  Wage provide other than payroll services?
3      A.   That's outside of my area of expertise.
4  That's all I know it does.
5      Q.   And when you say "outside of your area of
6  expertise," what do you mean by that?
7      A.   I don't have anything to do with payroll.
8      Q.   And who presents the agreements to the
9  drivers?
10     A.   I'm assuming you're talking about the
11 independent contractor agreement?
12     Q.   There's multiple versions, depending on
13 whether it was Openforce or Gig Wage, so for right now
14 let's say any agreement.
15     A.   The person that's recruiting that driver
16 would provide them with either the agreement or a link
17 to complete the agreement.
18     Q.   Is there a designated group of individuals
19 that recruit and provide these agreements or how does
20 that work?
21     A.   Dispatchers also do recruiting, so anyone
22 that is a dispatcher could be trying to get more drivers
23 and they would share the same materials.
24     Q.   And this is just an example:  dispatcher
25 recruits a driver, presents the materials today through

Page 12

1  Openforce?
2      A.   Correct.
3      Q.   And then before Openforce through Gig Wage?
4      A.   I -- I'm not sure if the document was
5  presented through Gig Wage or if it was presented in
6  Docusign.
7      Q.   Okay.
8      A.   I believe that Docusign was actually the
9  vehicle for signing the agreement. Gig Wage was the
10 payment method.
11     Q.   Okay. And so in both manners, recruiter
12 would then present the agreement?
13     A.   Correct.
14     Q.   Through some form?
15     A.   Correct, right.
16     Q.   Okay. And who maintains these agreements?
17     A.   I'm not sure I understand what you mean when
18 you say "maintains."
19     Q.   So where are they stored?
20     A.   Now they're stored in the cloud.
21     Q.   There's so many different types. Is this
22 Google Cloud or are we talking more about the
23 defendants, so Jumpp's cloud or Couch?
24     A.   Couch Goat?
25     Q.   Yes.

Page 13

1      A.   I believe that these are all -- I would have
2  to talk to our systems people for certainty here, but I
3  believe that these are stored in Openforce's cloud.
4      Q.   And how do you track the drivers? So let
5  me -- it's going to be a little bit tricky to ask.
6  Defendants produce lists of drivers, how is that -- how
7  are those created? How is that list created?
8      A.   You're talking about the list of what we --
9      Q.   Yeah, so you have drivers and then you have
10 routes. I'm not looking at the delivery routes or the
11 assignments right now. I'm just looking at how do you
12 know -- if someone wants to say "I want a list of all of
13 your drivers," how would you present that information?
14     A.   I would go into our dispatching software,
15 CXT, and I would extract a list of active drivers.
16     Q.   Are there functions to be able to exclude
17 certain drivers from the active list? Let's say I know
18 yesterday we were discussing -- or yesterday during the
19 deposition -- that some individuals may operate under an
20 LLC. Would you be able to exclude those individuals?
21     A.   I'm not aware of any method to do that. I
22 just don't know.
23     Q.   Okay. And you said CXT?
24     A.   Mm-hmm.
25     Q.   Is that the abbreviation or?

Page 14

1    A.   I think that's the software name, the maker
2  of the software.  I think X Dispatch is actually the
3  name of the program that we run on the dispatch side.
4    Q.   So I'm going to have to ask you, CXT and X
5  Dispatch?
6    A.   X Dispatch.
7    Q.   Two separate?
8    A.   X Dispatch is the dispatching part of the
9  program that CXT makes.
10   Q.   So all CXT; X Dispatch is part of CXT?
11   A.   Yes, right.
12   Q.   I don't know if technology has made it easier
13 or harder.
14   A.   Right.
15   Q.   Is CXT or the X Dispatch under CXT used for
16 payroll?
17   A.   I would say it's not used for payroll but it
18 produces data to show us what drivers did what
19 deliveries, so I don't know that you could do payroll
20 without it.
21   Q.   You need one or the other?
22   A.   Right.
23   Q.   Understandably.
24        That's where you track, so the driver,
25 delivery, customer route?

Page 15

1    A.   Mm-hmm.
2    Q.   Base pay?
3    A.   I believe all of that is in CXT or in X
4  Dispatch, yes.
5    Q.   X Dispatch within CXT?
6    A.   Correct.
7    Q.   And that works with the payroll where you cut
8  the checks from, which would now be Openforce?
9    A.   That is correct.
10   Q.   Okay.  Who inputs the information into -- so
11 I'm going to start with X dispatch.
12   A.   Okay.
13   Q.   Who inputs the information in that system?
14 Or explain to me how it works.
15   A.   It's -- okay.  A new driver is entered into
16 CXT and then orders are fed into X Dispatch -- I'm
17 sorry, I should have said drivers are entered into X
18 Dispatch, so a new driver is created in X Dispatch.
19 Orders are loaded into X Dispatch and then a dispatcher
20 selects an order and offers it to a driver.
21   Q.   Let's say order is accepted, what happens
22 next?
23   A.   The driver picks up the order, makes the
24 delivery and records that -- those steps are finished
25 and potentially does a proof of delivery in the system.

Page 16

1  Some of those requirements or some of those functions
2  can vary from one customer to another.
3    Q.   So depending on the customer's instructions
4  on what they require --
5    A.   Correct.
6    Q.   -- depends on the order?
7    A.   Right.
8    Q.   Regardless of the customer instructions, do
9  you have to confirm that the delivery has been picked
10 up?
11   A.   I don't know if that's a requirement.
12   Q.   Okay.  So if you don't know if it's been
13 picked up or delivered, how does the driver get paid?
14   A.   The driver would need to notify us that the
15 delivery has been made to get compensated.  I just don't
16 know if it's -- I don't know if every customer requires
17 us to say when it was picked up or, yes, it was picked
18 up.
19   Q.   Fair.  So there has to be some confirmation,
20 regardless of the customer, that the delivery was
21 complete?
22   A.   Yes.
23   Q.   And then confirmation is provided -- I think
24 this is a little bit different -- provided to the
25 dispatcher?

Page 17

1    A.   No.  The driver would indicate that he's
2  completed the delivery, either in the software or by
3  contacting his dispatcher.
4    Q.   Regardless of contacting dispatcher directly
5  or inputting it, it has to be recorded in the software
6  at some point?
7    A.   Yes.
8    Q.   Thank you for bearing with me, I'm just
9  trying to get there.
10   A.   No problem.
11   Q.   I know you mentioned X Dispatch is part of
12 CXT.  Are there any other similar subs?
13   A.   The drivers use a software called Nextstop,
14 so Nextstop is also made by CXT.  So CXT is the software
15 manufacturer.
16   Q.   Okay.
17   A.   And X Dispatch is what the dispatchers use,
18 and that communicates with Nextstop.
19   Q.   And what is Nextstop used for?
20   A.   It's what shows a driver the orders that they
21 can accept and once they've accepted them, it provides
22 them with information about how to complete the
23 delivery.
24   Q.   Other than that information, what else does
25 Nextstop provide?

Page 18

1    A.   It can provide navigation, but I believe it
2  actually launches the smartphone into another app.  So I
3  think what happens is, it has the address of where that
4  delivery is to be made and if they choose to use the
5  navigation, it will launch them into I believe it's
6  Apple Maps on an iPhone.
7    Q.   And then so we have X Dispatch, Nextstop.
8  Any other parts to CXT that are similar to X Dispatch?
9    A.   Not that I'm aware of.
10   Q.   Other than CXT, are there any other softwares
11 that are used?
12   A.   In the company or?
13   Q.   Yes.
14   A.   Outside of -- we've already talked about
15 Openforce.  We've talked about Gig Wage.  We mentioned
16 Docusign; these are all going back in time.  Today
17 it's -- to my knowledge, we may have some accounting
18 software that we use for other things that I don't have
19 any exposure to, but for the most part it is CXT
20 software for the dispatching and Openforce for payment.
21   Q.   And regarding the instruction videos on
22 Nextstop, who creates those instruction videos?
23   A.   There are two that I'm aware of, basically an
24 older version and a newer version, so there's really
25 one, it's just a matter of which version are we looking

Page 19

1  at.  The prior version was created before I started
2  working for Jumpp; I don't recall who created that, and
3  I created the second version.
4    Q.   Can you tell me about the one you created?
5    A.   What would you like me to tell you?
6    Q.   When did you create it?
7    A.   I don't recall the date specifically.  I
8  would have to pull it up and look on YouTube.  I would
9  say it's been in the last eight months.
10   Q.   Are there any significant differences between
11 the older and new version?
12   A.   Can I say the quality?
13   Q.   Yes, you can say quality, that's absolutely
14 fine.
15   A.   What I would say is the content in large is
16 much the same.  The only thing that I notice that is
17 drastically different is that it was captured where it's
18 easier to see the screen, versus in the past it was
19 someone holding a phone recording another phone, so it
20 was just very difficult to really watch.
21   Q.   Okay.  That's like the new function they have
22 on the Apple iPhone where you can actually record the
23 steps, so --
24   A.   Mm-hmm.
25   Q.   And what -- it's going to be tricky because

Page 20

1  the way it was done phone over phone for the display.
2  What is it displaying?
3    A.   It shows a driver how to utilize the software
4  to improve their efficiency.
5    Q.   And the software, CXT?
6    A.   I'm sorry, actually Nextstop.  It is a
7  Nextstop quick overview of how to use Nextstop.
8    Q.   And next part is part of CXT?
9    A.   Yes.
10   Q.   Okay.  I just want to make sure we're talking
11 about the same software.
12        Other than using the software more
13 efficiently, what else does it display to the driver?
14   A.   Well, it shows them how they can use the
15 navigation and how to capture a proof of delivery.
16   Q.   And what do you mean "capture a proof of
17 delivery"?
18   A.   Some clients require that we take a picture
19 of where a shipment was delivered, so it shows them how
20 they can capture that image:  put the box in front of
21 the house, take the image, and it imbeds that into the
22 order.
23   Q.   Does it provide any -- or does it display any
24 instructions regarding confirming a completed
25 delivery?

Page 21

1    A.   Does the video show that?
2    Q.   So the video displays how to use the
3  software?
4    A.   Mm-hmm.
5    Q.   So does it display how to confirm?
6    A.   I believe it's in there as well, yes.
7    Q.   Okay.  And that would entail the steps on how
8  to input, that it's been completed, and the information
9  whatever may be necessary?
10   A.   Yes.
11   Q.   And who provides the app instructions to the
12 drivers?
13   A.   I believe the dispatchers do while they're
14 going through that onboarding process.
15   Q.   What does the onboarding process entail?
16   A.   Sending them links to complete their
17 Openforce enrollment, and largely just answering
18 questions about what does the job entail, how do they
19 get paid, that type of thing.
20   Q.   The app instructions and the display and the
21 Nextstop videos are displayed during the onboarding?
22   A.   I believe after a driver completes his
23 Openforce enrollment and he is now a contracted
24 individual, I believe that's when they would send the
25 information -- a link to "Here's a video.  If you'd like

Page 22

1  to watch this, that might help you with using our
2  software."
3      Q.   And other than the links and instructions,
4  what else is encompassed with that onboarding process?
5      A.   That's largely it.
6      Q.   Do the dispatchers communicate with the
7  drivers through some component of CXT?
8      A.   Not that I'm aware of.
9      Q.   I should probably be a little bit more
10 specific.  So regarding the orders or deliveries, those
11 are inputted through CXT and that's how the driver is
12 aware?
13     A.   Yes.  A dispatcher also may call or text and
14 ask if they're interested in a particular order.
15     Q.   And what are the hours of operation?
16     A.   Honestly, I don't know.  They seem to vary
17 from one day to the next.  There are some deliveries
18 that are done in the middle of the night.
19     Q.   Do they vary based on demand?
20     A.   Of course, yes.
21     Q.   But whether demand is high or low, it's the
22 same process that we were talking about, CXT, placed in
23 the system?
24     A.   To all of my knowledge, yes.  I don't know of
25 any exceptions.

Page 23

1      Q.   Same question, regardless of the customer?
2      A.   Some customers may have more specific
3  delivery requirements but the process remains the same.
4      Q.   And do you know or recall the agreement that
5  is provided through Openforce?
6      A.   Do I know or recall the agreement?
7      Q.   Mm-hmm.
8      A.   I'm familiar with the agreement.
9      Q.   Can you tell me what that agreement is?
10     A.   It's essentially an independent contractor
11 agreement and it is between Jummp or Couch Goat and the
12 independent contractor.
13     Q.   And who is Christopher George?
14     A.   Chris George is the team lead and a
15 dispatcher for Couch Goat.
16     Q.   Team lead and dispatcher?
17     A.   Mm-hmm.
18     Q.   Can you tell me what a team lead is?
19     A.   He has other dispatchers that work for him.
20     Q.   Oversees other dispatchers?
21     A.   Mm-hmm.
22     Q.   And then he is also a dispatcher?
23     A.   Correct.
24     Q.   How long has he been with or does he work for
25 both Jummp and Couch Goat?

Page 24

1      A.   Yes.  I don't know his tenure, I'm sorry, I
2  have no idea.  I'm sure it's more than 10 years, but I
3  have no idea how many.
4      Q.   Okay.  Is he related to Larry Jordan?
5      A.   No.
6      Q.   Is he related to Whitney Jordan?
7      A.   No.
8      Q.   And who's Andrew Hawkins?
9      A.   I believe he's an attorney, but I've not met
10 him.
11     Q.   And when individuals sign the agreement we're
12 talking about through Openforce, and for now I'm going
13 to stick to Openforce, so if I talk about a different
14 time or different platform like Gig Wage, I'll let you
15 know.
16     A.   Okay.
17     Q.   So for now Openforce, the agreement, the
18 enrollment, how do you confirm that somebody has signed
19 other than the actual agreement?  Is there a list of
20 individuals with dates that they sign an agreement?
21     A.   I'm sorry, repeat the question one more time.
22     Q.   So other than the signed agreement, is there
23 a list identifying the individuals that have signed the
24 agreement and the date the agreement is signed?
25     A.   I don't know of any list.  I know that we can

Page 25

1  see in Openforce which drivers are contracted and when
2  they completed their contract.
3      Q.   Okay.  And completed, signed?
4      A.   There's multiple steps to the whole process
5  so it's difficult to explain, but I believe in the audit
6  trail, if you will, of a particular driver and his
7  agreement, we can see when he signed it, as well as when
8  it was contracted, when it was completed, when everyone
9  blessed it and it was done.
10     Q.   So there might be a little bit of a variance
11 between signature on the contract and complete?
12     A.   Correct.
13     Q.   All documents have been reviewed and
14 processed and such?
15     A.   Correct.
16     Q.   And what type of insurance are -- now what
17 type of insurance are the drivers required to have?
18     A.   Vehicle insurance.
19     Q.   What coverage amount?
20     A.   I'm sorry, I don't know off the top of my
21 head.
22     Q.   And have they always been required to have
23 insurance?
24     A.   To my knowledge, yes.  I don't know how well
25 that's been monitored, enforced, policed, whatever term

Page 26

1  you'd like to use.

2      Q.   During the enrollment process -- I know you

3  mentioned you don't know how well it's been enforced,

4  but during the enrollment process, is it a requirement

5  to show coverage?

6      A.   I don't know.  I'm not sure if insurance

7  verification is part of that enrollment or not.

8      Q.   Is it part of the agreement?

9      A.   Yes.

10      Q.   And the agreement is part of the enrollment

11  process?

12      A.   Yes.

13      Q.   And I might have asked you, the agreement on

14  Openforce, did you have any part with that agreement?

15      A.   We -- a very, very small part.  We added a

16  social media clause to the confidentiality section.

17      Q.   When was that added?

18      A.   I believe it was summer of 2021.  I'm not

19  really sure of the exact date, but prior to people

20  starting to enroll with Openforce.

21      Q.   And who added that social media part to the

22  confidentiality cause?

23      A.   Who added it?  We provided suggested language

24  and Openforce came back and made minor modifications to

25  the language, but they updated the agreement to include

Page 27

1  what we asked.

2      Q.   And can you tell me the purpose of adding

3  that social media part to the confidentiality clause?

4      A.   We wanted to protect the company and its

5  reputation from defamation through social media.

6      Q.   And defamation from -- I know you say

7  defamation through social media but from who?

8      A.   Disgruntled drivers.

9      Q.   Other than that defamation clause, was there

10  anything else added to the agreement?

11      A.   Not that I'm aware of.

12      Q.   Any other modifications or revisions?

13      A.   No.

14      Q.   And who is the point of contact with

15  Openforce?

16      A.   Are you asking at our company or at

17  Openforce?

18      Q.   At Openforce.

19      A.   I don't know who our primary point of contact

20  would be.  I think it varies by topic.

21      Q.   Okay.  So regarding the additional social

22  media language that we were discussing, how was that

23  provided to Openforce?

24      A.   We emailed it to them.

25      Q.   Openforce makes the requested addition,

Page 28

1  revision?

2      A.   They suggested I think it was just a change

3  in language, but for the most part it was they took it

4  and added it.

5      Q.   Have you had an issue with disgruntled

6  drivers?

7          MR. DEAN:  Objection, form.

8          THE WITNESS:  No.

9  BY MS. HERRMANN:

10      Q.   What prompted the social media language?

11      A.   When I joined we didn't have social media

12  accounts or if we did, they weren't active; and there

13  was a concern that as we -- if we started using more

14  social media that it could be a risky avenue to open up

15  that ability to message.

16      Q.   Private message or comments on Facebook?

17      A.   I think -- well, public is really the only

18  one that would be of any concern.

19      Q.   I say that because there's so many that we

20  have.

21      A.   Right.

22      Q.   Messages inside internally, and those drivers

23  didn't have access to those internal private messages

24  that you have to log in, put credentials.  We're talking

25  about comments that are public?

Page 29

1      A.   Correct.

2      Q.   And I'm just trying to associate what that

3  clause was pertaining to?

4      A.   Understood.

5      Q.   Making sure I keep that separately.

6          What kind of comments would you consider

7  to be a violation of that additional language?

8      A.   I would need to reread the exact language.  I

9  don't know how to speculate on that answer.

10      Q.   Okay.  The agreement on Openforce is

11  different -- is different or the same as the agreement

12  that was provided -- I know you said Docusign with Gig

13  Wage earlier -- so provided during the time that Gig

14  Wage was being used?

15      A.   I believe it is different from the previous

16  agreement.

17      Q.   Why did it change?

18      A.   We had customers that required OCC ACC

19  insurance --

20          (Reporter clarification.)

21          THE WITNESS:  Occupational Accidental

22  Insurance, sorry, it's often abbreviated as OCC ACC or

23  O-C-C, A-C-C, and it also adds an arbitration clause to

24  the agreement.  To my nonlegal mind, those are

25  substantial changes.

App. 008

Page 30

1  BY MS. HERRMANN:
2      Q.  And you said occupational health insurance?
3      A.  Occupational accidental insurance.
4      Q.  Accidental.
5          And what is that for?
6      A.  As I understand it, it is to protect a
7  customer in case of a -- an accident that causes an
8  injury at a customer's location.
9      Q.  Would it be fair to say that one of the
10  requirements for drivers would be to have that
11  insurance?
12     A.  Yes.
13         MR. DEAN:  Objection, form.
14  BY MS. HERRMANN:
15     Q.  You understand when I said "that insurance,"
16  I mean the insurance we were just discussing, the
17  occupational accidental insurance?
18     A.  Yes.
19         MR. DEAN:  Same objection.
20  BY MS. HERRMANN:
21     Q.  Is that insurance different than the
22  liability vehicle insurance we were discussing
23  earlier?
24     A.  I believe so.
25     Q.  What kind of business is Tiff's Treats?

Page 31

1      A.  It's cookies delivered hot.
2      Q.  I'm curious, is this the business that has
3  the little milks?
4      A.  I believe they do sell small milk and ice
5  cream.
6      Q.  I've seen it and I thought it was --
7      A.  It's a competitor with Crumbl, if you're
8  familiar with Crumbl.
9      Q.  I was just curious about that.
10         When was the Tiff's Treats -- I'm going
11  to say account -- retained or a customer?
12     A.  Before my time.  I don't know.
13     Q.  Who is responsible for obtaining new
14  customers?
15     A.  I know Larry Jordan.  I don't know if there
16  are others that are operating in a sales capacity, I
17  don't know.
18     Q.  Is there a sales department?
19     A.  Not per se.
20     Q.  Percentagewise of the business, how much does
21  Tiff's Treats encompass of that?
22     A.  I don't know off the top of my hand.  Sorry.
23  I'd have to do some research.
24     Q.  Okay.
25     A.  And I think it varies.

Page 32

1      Q.  It varies on what?
2      A.  From one week to the next, because their
3  business is not steady, nor is our other customers.
4  It's very much supply and demand.
5      Q.  It might sound the same but what I'm trying
6  to get at is, if Tiff's Treats were to be lost,
7  competitor comes in and says "I'll give you a better
8  rate to deliver your cookies," and they say, "See ya,
9  defendants, I don't want to work with you guys," how
10  significant would that loss be?
11         MR. DEAN:  Object to the form of the
12  question.
13         THE WITNESS:  You still want me to answer
14  that?
15         MR. DEAN:  Yes, please.
16  BY MS. HERRMANN:
17     Q.  You can still answer.
18     A.  It would be, I would say, quite significant.
19     Q.  I know there is other customers.  Are there
20  any other customers that would result in a significant
21  loss if they were to leave with a competitor?
22         MR. DEAN:  Same objection.
23         THE WITNESS:  I don't know of other
24  customers that do the same level of volume.
25  BY MS. HERRMANN:

Page 33

1      Q.  So earlier we were talking about -- you
2  mentioned the arbitration agreement.  We were kind of
3  talking about the enrollment and signatures.  I'm not
4  asking you a question, I'm just telling you where I'm
5  going to go next.
6         MR. DEAN:  If you're jumping to a new
7  area, can we take a break?
8         MS. HERRMANN:  It's not a new area, but
9  I'll let you take a break.
10         MR. DEAN:  Okay.  I was very courteous to
11  Jerry yesterday when he asked to take a break, so okay.
12  Thank you.  I didn't know I had to qualify my question.
13         MS. HERRMANN:  No, I'm just giving you a
14  hard time.
15         MR. DEAN:  I'm just being courteous.
16         MS. HERRMANN:  No, you're fine.  We'll go
17  off the record.
18         (Recess taken.)
19  BY MS. HERRMANN:
20     Q.  I'm going to have to ask you, is it Knope?
21     A.  It's Knope.
22     Q.  Mr. Knope, we're back from a short break.
23  You understand you're still under oath?
24     A.  Yes.
25     Q.  Okay.  We were talking about -- we talked

KEVIN CERVANKA vs JUMPP LOGISTICS                                    Job 34822
John Knope May 06, 2022                                              Pages 34..37

Page 34

1  about Larry Jordan, is that Larry Jordan is the owner of
2  both Jummp and coach -- Couch?
3      **A.   I believe he's the president of both.**
4      Q.   Who owns Jummp Logistics?
5      **A.   Sorry, I don't know.**
6      Q.   And who owns Couch Goat?
7      **A.   I don't know that either.**
8      Q.   We talked about Andrew Hawkins and you said
9  he was an attorney?
10     **A.   That's my understanding.**
11     Q.   And who is he a registered agent for?
12     **A.   I don't know.**
13     Q.   You mentioned John Centala, C-e-n-t-a-l-a?
14     **A.   Yes.**
15     Q.   And can you tell me one more time what his
16  job title was?
17     **A.   He's the president of Jummp and Couch Goat.**
18     Q.   Does Mr. Centala have the same authority as
19  Mr. Jordan?
20     **A.   I don't believe so.**
21     Q.   Does he have more or less authority?
22     **A.   Less.**
23     Q.   Can you give me an example of what
24  Mr. Centala cannot do?
25     **A.   I don't know what authority he has been**

Page 35

1  given.
2      Q.   Who gives him authority?
3      **A.   Larry Jordan.**
4      Q.   So Larry Jordan is above Mr. Centala?
5      **A.   Yes.**
6      Q.   I should start with that.
7      **A.   That's okay.**
8      Q.   Is there a difference between administrator
9  and president, between the job titles?
10     **A.   I'm sorry, I don't know who's the**
11  **administrator.**
12     Q.   So that's just a term that was in the
13  defendants' Rule 26 initial disclosures.
14     **A.   I don't know. I'm not sure. I don't know of**
15  **anyone that is assigned that title.**
16     Q.   Okay. And then William Pat -- I'm going to
17  spell his last name -- D-e-r-d-e-n?
18     **A.   Pat Derden.**
19     Q.   What is his role?
20     **A.   I believe he is or was a dispatcher.**
21     Q.   Where you said is or was?
22     **A.   I just don't know what his current -- I don't**
23  **know what he currently does.**
24     Q.   Is he still with the company?
25     **A.   I believe so.**

Page 36

1      Q.   Where is he located?
2      **A.   I don't know.**
3      Q.   Is he located in Dallas?
4      **A.   Sorry, I still don't know.**
5      Q.   So I'm just going to ask, Texas?
6      **A.   I really have no idea where he lives.**
7      Q.   Not lives but where he works or performs his
8  work?
9      **A.   Yeah, I don't know. I've never spoken with**
10  **him -- well, I might have spoken with him once, but I**
11  **don't know where he lives, what he does, or where he's**
12  **working.**
13     Q.   Robbie Saunders?
14     **A.   I'm not familiar with that name.**
15     Q.   That's okay. Christopher George, Chris
16  George, same person?
17     **A.   Mm-hmm, yes.**
18     Q.   I usually like to go through the list that
19  way when we get through the questions.
20          Nicolette Manson, M-a-n-s-o-n.
21     **A.   I don't know Nicolette.**
22     Q.   I'm going to break this up with dispatchers.
23  So dispatchers, are they all located -- I'm going to
24  back up. Do they work remotely or do they work at a
25  physical location or combination?

Page 37

1      **A.   I was going to say yes.**
2      Q.   These days, makes it difficult to ask and
3  answer.
4      **A.   I think the best answer to that is it varies.**
5      Q.   Okay. Regardless of remote or in person,
6  building, your traditional sense of workplace, they all
7  use the same CXT software?
8      **A.   To my knowledge, yes.**
9      Q.   Regarding the recruitment of drivers, where
10  is -- is that directed to solely one location or
11  different locations?
12     **A.   Can you be more specific with your question?**
13     Q.   Yes. So you're part of recruitment; right?
14     **A.   I help with recruiting.**
15     Q.   Okay. So when you post on Indeed, is it
16  Indeed only in Texas or Indeed at other locations
17  outside of Texas?
18     **A.   For Jummp and Couch Goat is only in Texas.**
19     Q.   And you said only for Jummp and Couch Goat?
20     **A.   Correct.**
21     Q.   So I'm going -- "only" meaning who do you
22  direct that to outside of Texas?
23     **A.   Subsidiaries.**
24     Q.   And who are those subsidiaries?
25     **A.   In Texas or out of Texas?**

Page 38

1   Q.   Out of Texas.
2   A.   I'm vaguely familiar with some of these.  I
3   don't have a great grasp of the entire structure,
4   Oaxacan, O-a-x-a-c-a-n, and Peachtree.
5   Q.   And who are they subsidiaries of?
6   A.   I'm not entirely sure, I believe they are
7   subsidiaries of Jumpp.
8   Q.   And who's the -- well, Mr. Jordan is the
9   president of Jumpp.  Is he also the president of the
10  subsidiaries?
11  A.   I don't know.
12  Q.   And that was outside of Texas.  So in
13  Texas?
14  A.   In Texas, it's Couch Goat, Hot Flash, and Las
15  Perlas.
16  Q.   Is that?
17  A.   L-a-s, P-e-r-l-a-s.
18  Q.   Is it "pearls" in Spanish?
19  A.   I'm not sure.
20  Q.   Okay.  Who do you report to?
21  A.   Larry Jordan.
22  Q.   And who reports to you?
23  A.   Nobody.
24  Q.   Who do dispatchers report to?
25  A.   Dispatchers within one market may report to a

Page 39

1   team lead like Chris George.
2   Q.   So what market is Chris George the team lead
3   in?
4   A.   DFW.
5   Q.   So dispatchers in DFW report to Chris
6   George?
7   A.   Correct.
8   Q.   Team lead reports to who?
9   A.   Larry Jordan.
10  Q.   And I'm assuming it stops at Larry Jordan?
11  A.   Yes.
12  Q.   Where does Mr. Centala fit between Larry
13  Jordan and the team lead?
14  A.   I think he works closely with both, but I
15  don't have a great that there's -- I don't know how else to
16  describe that.
17  Q.   Would a team lead report to Mr. Centala?
18  A.   I don't believe so.
19  Q.   Okay.  I'm having trouble understanding
20  Mr. Centala's role.  Is he informed information?  Does
21  he implement the decisions made by Mr. Jordan?
22  A.   I think he helps implement decisions made by
23  Larry Jordan.
24  Q.   Okay.  Dispatcher to team lead, team lead to
25  Mr. Jordan.  Mr. Centala will help effectuate whatever

Page 40

1   Mr. Jordan thinks is best?
2   A.   Correct.
3   Q.   Okay.  And who reports to dispatchers?
4   A.   Nobody really reports to a dispatcher.
5   Q.   So and when I say "report" -- okay.  Well,
6   let me ask it this way.  Who communicates with
7   dispatchers?
8        MR. DEAN:  Objection, form.
9        THE WITNESS:  Drivers communicate with
10  dispatchers.
11  BY MS. HERRMANN:
12  Q.   Regarding the team lead, team lead over
13  dispatchers in a market and then I guess let me ask -- I
14  might have already asked this.  How many team leads are
15  there in DFW?
16  A.   One.
17  Q.   What are the responsibilities of a team -- is
18  it team lead or it team leader, either one?
19  A.   I think it's synonymous.
20  Q.   Okay.  What are their responsibilities?
21  A.   To make sure that our customers' deliveries
22  are performed.
23  Q.   And how do they do that?
24  A.   They work with their drivers to find
25  contractors that are interested in making those

Page 41

1   deliveries.
2   Q.   So other than finding these drivers, how else
3   do they ensure?
4   A.   How else do they ensure?
5   Q.   That -- the customers' deliveries.
6   A.   They monitor the orders.
7   Q.   What else?
8   A.   They would communicate with drivers if an
9   order is not delivered.
10  Q.   Anything else?
11  A.   That's all I know.
12  Q.   And they monitor these orders using CXT
13  software?
14  A.   Yes.
15  Q.   What are team leads' responsibilities
16  regarding dispatchers?
17  A.   They will monitor orders underneath each of
18  their dispatchers beneath them.
19  Q.   How many dispatchers under a team lead?
20  A.   It varies greatly.
21  Q.   More than one?
22  A.   Typically.  It depends.
23  Q.   Would you say on the market?
24  A.   Mm-hmm.
25  Q.   In the DFW market, how many dispatchers under

Page 42

1  Mr. George?
2    **A.   I believe there are -- well, active on any**
3  **given day is also very different, somewhere in the**
4  **neighborhood of six to eight.**
5    Q.   And each dispatcher there's a range, it's
6  going to fluctuate; under each dispatcher, then the
7  drivers.  So they're grouped?
8    **A.   Somewhat.**
9    Q.   I guess when you said "somewhat," they're not
10  assigned a driver, they are all working in the DFW
11  market with the dispatchers?
12   **A.   Yes.**
13   Q.   It's just the dispatchers report to
14  Mr. George?
15   **A.   Yes.**
16   Q.   Okay.  And what are the responsibilities for
17  the dispatchers regarding the drivers?
18   **A.   I don't know of any responsibilities**
19  **pertaining to the driver themselves.  The dispatcher's**
20  **responsibility is to dispatch the orders.**
21   Q.   And they're dispatching the order to who?
22   **A.   A driver that agrees to take that order.**
23   Q.   Other than dispatching the order, what else
24  do they do?
25   **A.   They assist in recruiting.**

Page 43

1    Q.   This includes the onboarding process?
2    **A.   Yes.**
3    Q.   What else do they do?
4    **A.   That's all I know.**
5    Q.   When a customer has specific requirements, I
6  know we were talking about that earlier depending on
7  what they need, if they need a picture, they want a
8  picture to be taken upon delivery, how are those
9  instructions provided to the driver?
10   **A.   The dispatcher will inform the driver of any**
11  **specific requirements.**
12   Q.   When customers update their requirements --
13  let's say on Monday they want pictures but they change
14  their mind on Tuesday -- how do they implement or how do
15  dispatchers then implement that change?
16   **A.   The means that they use to communicate may**
17  **vary by dispatcher.  I would guess it would either be a**
18  **phone call or a text message.**
19   Q.   Regardless of the method of communicating
20  that, the dispatcher would be the person to inform them
21  of that change?
22   **A.   To my knowledge, yes.**
23   Q.   Does Tiff's Treats provide a -- and I'm just
24  going to say rate sheet as general for a breakdown on
25  pricing to either defendant?

Page 44

1    **A.   I don't believe so.**
2    Q.   How does Tiff's Treats set the rate that
3  they're going to pay -- I'm going to say defendants so
4  you understand, or do you understand?  Same?  Both?
5    **A.   Mm-hmm.**
6    Q.   How do they identify the rate that they're
7  going to pay the defendants?
8    **A.   My understanding is that that is an agreement**
9  **based on distance from the store where the order is**
10  **picked up.**
11   Q.   So there's a rate -- and there's going to be
12  several layers here, so bear with me -- a rate that
13  Tiff's Treats tells defendants that they're going to pay
14  for a location pick up.  So let's take Fort Worth, for
15  example, Tiff's Treats in Fort Worth.  Tiff's Treats
16  tells the defendants the rate that they're going to pay
17  for pickups at that location?
18   **A.   I think it's more likely that it's a rate**
19  **that has been negotiated between the two parties.**
20   Q.   Tiff's Treats and the defendants?
21   **A.   Correct.**
22   Q.   Okay.  And how was it negotiated?
23   **A.   I have no idea.**
24   Q.   That's fair.  So then the negotiated rate
25  between Tiff's Treats and defendants, that rate, what is

Page 45

1  it called or what does the defendants call that rate?
2    **A.   I'm not sure I've heard it referred to as**
3  **anything.  I really don't know.  I would assume it's**
4  **just called the -- I don't know what that term would be.**
5    Q.   Okay.  The base amount comes from that rate
6  that was negotiated?
7    **A.   Yes.**
8    Q.   So Tiff's Treats, defendants negotiate a rate
9  and then defendant calculates a base rate -- base
10  amount.  Am I correct?
11   **A.   What base amount?**
12   Q.   So I'm just saying I'm going through the, I
13  guess, parties here.  Tiff's Treats, defendants
14  negotiate, Fort Worth or distance, here it is, defendant
15  now knows this is how much Tiff's Treats is going to pay
16  us for this delivery.  Then the next rate -- and I know
17  I'm saying "next rate," but I'm saying the rate, the
18  base amount, where does that amount come from?
19       MR. DEAN:  Object to the form.
20       **THE WITNESS:  I'm confused how this is**
21   **different than the rate that was negotiated.**
22  BY MS. HERRMANN:
23   Q.   So defendants, do they make a profit?
24   **A.   I hope so.**
25   Q.   Well, that's very true.  Do they make a

KEVIN CERVANKA vs JUMPP LOGISTICS
John Knope May 06, 2022

Job 34822
Pages 46..49

Page 46

1  profit between the rate that they've negotiated with
2  Tiff's Treats and the base amount that they represent to
3  the drivers?
4      **A.   Oh, I'm sorry, now I think I know where**
5  **you're going.**
6          MR. DEAN:  Objection, form.
7          **THE WITNESS:  I don't know of any change**
8  **or difference between the rate that we are paid versus**
9  **the rate that we use to calculate settlement.**
10  BY MS. HERRMANN:
11     Q.   So I'm going to reference rate pay by
12  customers as the rate between Tiff's Treats and
13  defendants.
14     **A.   Okay.**
15     Q.   And then the base amount rate that you
16  identified used for settlements?
17     **A.   Okay.**
18          MR. DEAN:  Objection, form.
19  BY MS. HERRMANN:
20     Q.   And then you stated that you're not sure if
21  there's a difference?
22          MR. DEAN:  Same objection.
23  BY MS. HERRMANN:
24     Q.   What about if I ask you this?  How -- where
25  do defendants' profits come from?

Page 47

1          MR. DEAN:  Objection, form.
2          **THE WITNESS:  We are paid a rate for that**
3  **delivery and we pay each driver a percentage of that**
4  **rate.**
5  BY MS. HERRMANN:
6      Q.   So the profit, defendants' profit is
7  between -- correct me if I'm wrong -- you're paid a rate
8  for each delivery.  Tiff's Treats pays you a rate for
9  each delivery and then defendant makes a profit between
10  the rate, the percentage?
11     **A.   Yes.**
12     Q.   So it's different?
13     **A.   Yes.**
14          MR. DEAN:  Objection, form.
15  BY MS. HERRMANN:
16     Q.   Tiff's Treats is not offering the defendant
17  $13 and the defendant is not asking -- offering the
18  exact same $13 because then there's no profit?
19          MR. DEAN:  Same objection.
20  BY MS. HERRMANN:
21     Q.   That's where I'm getting at?
22     **A.   That is correct.**
23     Q.   I'm plugging in a number because it's easy
24  to...
25          Do you know what the percentage is or

Page 48

1  what is the percentage that is paid to the drivers?
2      **A.   That varies by driver.**
3      Q.   What about for Tiff's Treats?
4      **A.   That also varies by driver.**
5      Q.   And when you say "varies," what do you mean
6  by it "varies"?
7      **A.   The independent contractor has the ability to**
8  **negotiate for what they feel they need to make that**
9  **delivery.**
10     Q.   Do drivers frequently negotiate the rate?
11     **A.   I don't know how common that is.**
12     Q.   How many drivers do you believe negotiate the
13  rates?
14          MR. DEAN:  Objection, form.
15          **THE WITNESS:  I would be completely**
16  **guessing.**
17  BY MS. HERRMANN:
18     Q.   So how do you know that drivers negotiate the
19  rates?
20     **A.   Some drivers that have been contracted**
21  **earlier agreed to a rate in the past, that has since**
22  **changed.**
23     Q.   So is the rate based on seniority?
24     **A.   No.**
25     Q.   So contracted earlier, not willing -- so help

Page 49

1  me understand that?
2          MR. DEAN:  Objection, form.
3          **THE WITNESS:  Can you ask that again?**
4  BY MS. HERRMANN:
5      Q.   So we were talking about and I can have the
6  court reporter or I can ask the question as close as I
7  can to what I just did, is you mentioned contracted
8  earlier there's some individuals, some drivers that are
9  contracted earlier and that has since changed.  And then
10  I asked is that based on seniority.  You said no.
11     **A.   Right.**
12     Q.   And I said, well, help me understand that.
13          MR. DEAN:  Objection, form.
14          **THE WITNESS:  As volume changes, we may**
15  **change the rate to try to get more contractors to accept**
16  **orders, so it's based on supply and demand.**
17  BY MS. HERRMANN:
18     Q.   When a driver delivers to a wrong address, do
19  they still get paid?
20     **A.   That's a good question, I don't know how that**
21  **works.**
22     Q.   Can you tell me when or why a driver would
23  receive zero commission or zero pay for a delivery?
24     **A.   I don't know of any example where they would**
25  **not be compensated.**

App. 013

Page 50

1    Q.   So plaintiffs are going to introduce Exhibit
2  4.
3           (Exhibit 4 marked.)
4  BY MS. HERRMANN:
5    Q.   And I'll represent this is a partial sort --
6  I know it's -- I tried my best to get it as visible as I
7  could.  It's sorted and comes from Jummp 0011284 that
8  was produced by defendants, just so you know.  And --
9           MR. DEAN:  I'm sorry, the Bates number?
10          MS. HERRMANN:  Bates number is Jummp
11  0011284.  It's not stamped since it's been sorted.
12          MR. DEAN:  Thank you.
13  BY MS. HERRMANN:
14    Q.   I know it's very small, but if you look at
15  the -- I guess your right-hand side -- column Z, and it
16  identifies driver commission, zero.  And if you look at
17  column AA -- it's identified as base amount -- it
18  identifies a base amount of 10.  So I guess let me also
19  draw your attention to column K, description, wrong
20  address.
21    A.   Okay.
22    Q.   And just to be clear, is that there is one
23  row -- it's going to be difficult because it's tiny --
24  there's one row -- and I'll identify that it is row
25  864 -- that is different and says "pieces," just so that

Page 51

1  you're aware that there's one in there that's different.
2  So wrong address is identified other than that one
3  "pieces."  So my question is, where does this -- I want
4  to know, how do you determine that the driver's
5  commission was going to be zero based on the wrong
6  address?
7    A.   I would have to research these.  I have no
8  idea.
9    Q.   So I guess the rate of pay, the base
10  commission, zero, it does occur?
11    A.   I don't know if these -- I don't know what
12  the details of these are.  I would have to go look at
13  them.  I'd have to research these with others.
14    Q.   And what do you mean "with others"?
15    A.   I would have to visit with Whitney Jordan.
16    Q.   What instruction applies to wrong address,
17  zero driver commission?
18    A.   I don't know.
19    Q.   What did you do to prepare regarding policies
20  and procedures regarding rates of pay for drivers?
21    A.   We went through and gathered all materials to
22  our best due diligence for all of the requests for
23  production and discovery; and I apologize, I'm not
24  familiar with these details.
25    Q.   Okay.  Are you familiar with drivers' rates

Page 52

1  of pay, policies concerning drivers' rates of pay?
2    A.   Broadly, yes.
3    Q.   Okay.  So if I were to ask you questions
4  regarding different rates of pay or the reasons for
5  those rates of pay, would you be able to answer them?
6          MR. DEAN:  Objection, form.
7          THE WITNESS:  Many of them, yes.
8  BY MS. HERRMANN:
9    Q.   Okay.  So regarding this exhibit, Plaintiff's
10  Exhibit 4, regarding how driver's commission is zero,
11  determining that amount, do you know how that's
12  determined?
13    A.   No.
14    Q.   Who would know?
15    A.   Whitney Jordan.
16    Q.   Other than an individual, are there any
17  documents that you would look at to determine why the
18  driver commission is zero?
19    A.   Not that I'm aware of.
20    Q.   What are drivers told when they receive zero
21  commission for a delivery?
22    A.   I don't know.
23    Q.   And who would know what drivers are told when
24  they receive zero commission?
25    A.   Either Whitney Jordan or their dispatcher.

Page 53

1    Q.   How do dispatchers know what to tell
2  drivers?
3    A.   I don't know how dispatchers are trained.
4    Q.   And earlier you testified that the amount
5  paid is based on distance or it varies?
6    A.   Yes.
7    Q.   Are there any instances where drivers receive
8  the same -- let's say the base amount is $13, the
9  commission, driver pay, driver commission is the same
10  regardless of location?
11    A.   Not that I'm aware of.
12          (Exhibit 5 marked.)
13  BY MS. HERRMANN:
14    Q.   I'm going to introduce Plaintiff's Exhibit 5.
15  And I'll represent that this comes from Jummp 0011284;
16  it's a partial and it has been sorted.
17          So on this sheet I want to call your
18  attention to column Z, which is the driver commission
19  column, and then column AA, which is the base amount.
20  The base amount is 17.5; correct?
21    A.   Yes.
22    Q.   And that's the only base amount that's
23  identified on this?  Within that column?
24    A.   Right, without any heading on the form.
25          MR. DEAN:  Objection to form.

Page 54

1  BY MS. HERRMANN:
2      Q.   Well, yes, and I can -- you can compare
3  actually 4 is the headings for 5?
4      A.   Okay.
5      Q.   So AA identifies 17.5 as the base amount?
6      A.   Okay.
7      Q.   I'm asking you?
8          MR. DEAN:  Objection, form.
9  BY MS. HERRMANN:
10     Q.   Is that correct?
11     A.   That would be my assumption based on the
12  headings from Exhibit 4.
13     Q.   Okay.  Column Z, the driver commission is
14  9.7125?
15     A.   Yes.
16     Q.   That's the only amount identified in that
17  column; correct?
18     A.   Yes.
19     Q.   Okay.  Now, if you look at column N, O, P,
20  and Q, they all identify origin of locations.  There are
21  four different locations being identified.  I'll tell
22  you which ones and you're more than welcome to take your
23  time to confirm what I just stated.  Tiff's Treats,
24  Dallas Firewheel, Garland; Tiff's Treats, Dallas
25  Hillcrest; Tiff's Treats, Highland Village; Tiff's

Page 55

1  Treats Downtown Dallas?
2      A.   Okay.
3      Q.   Regardless of the location, the driver
4  commission is the same; correct?
5      A.   It appears to be.
6      Q.   What do you mean "it appears"?
7      A.   According to this spreadsheet, yes.
8      Q.   Okay.  And this is defendants' spreadsheet?
9      A.   Okay.
10     Q.   I'm asking you.
11     A.   I believe that is correct.
12     Q.   Is there any reason to believe that this is
13  an incorrect document?
14     A.   No.
15     Q.   So regardless of the location and distance,
16  the driver commission is the same?
17         MR. DEAN:  Objection, form.
18  BY MS. HERRMANN:
19     Q.   And you can answer the question.
20     A.   The calculated amount shown appears to be the
21  same, but what this does not tell me is what they've
22  negotiated.
23     Q.   So there's another document that shows
24  something that's been negotiated?
25     A.   I'm not saying that.  What I don't see is the

Page 56

1  distance.
2      Q.   Well, there's four different locations and
3  they're going to different locations, so the distance
4  isn't determining the commission?
5          MR. DEAN:  Objection, form.
6          THE WITNESS:  So to my understanding
7  there are rings of distance where X number of miles from
8  the store has a specific rate, so without knowing what
9  exact definitions of those rings are, and how many miles
10  each of these are, it appears that they're all paid the
11  same; but I'm not seeing that there's an error in that.
12  BY MS. HERRMANN:
13     Q.   And for clarification, rings of distance?  In
14  my head I'm picturing like a bullseye where you have 5
15  miles, 100 miles, 200 miles; is that --
16     A.   In concept, that's exactly right.
17     Q.   Okay.  And these rings of distance, who
18  determines these rings of distance?
19     A.   I don't know.
20     Q.   So how do you know about these rings of
21  distance?
22     A.   I know the pay is based on distance from the
23  store.
24     Q.   They're based on the rings of distance?
25     A.   Yes.

Page 57

1      Q.   How do you know that?
2      A.   That's what I've been told.
3      Q.   Who told you that?
4      A.   Larry Jordan.
5      Q.   So Exhibit 5, if you're looking at Exhibit 5,
6  these are all within the same ring?
7      A.   It would appear that way, yes.
8      Q.   And the ring of distance that Larry Jordan
9  determined; correct?
10     A.   That is my understanding.
11     Q.   Are dispatchers aware of this ring of
12  distance?
13     A.   I don't know.  I would assume yes, but I
14  don't know for certain.
15     Q.   Okay.  Are there any documents reflecting
16  this ring of distance?
17     A.   Not that I've seen.
18     Q.   Can you tell me each ring that's in the ring
19  of distance -- I'm going to refer to it as the ring of
20  distance.  So can you tell me the first, let's start
21  small?
22     A.   I don't know the details.
23     Q.   Tell me what you know about it.
24     A.   All I know is the concept as I've described
25  it to you, where a driver's commission is based on the

Page 58

1  distance from the store where they pick up the order to
2  where it's delivered.
3       Q.   So the driver commission is based on the base
4  amount for that distance?
5            MR. DEAN:  Objection, form.
6            THE WITNESS:  Repeat the question,
7  please.
8  BY MS. HERRMANN:
9       Q.   I'll phrase it this way.  There are four
10  locations identified in Exhibit 5 with different
11  distances; correct?
12      A.   I don't know how to tell that they are
13  different distances.
14      Q.   So if you look at column N in conjunction, so
15  N, O, P, Q, R will tell you where it's coming from, so
16  order name, the address, the city, the state, the ZIP
17  code, and then if you compare that with column S, T, U,
18  V, W, it identifies the location that it's going to be
19  delivered to.  The locations all vary.  So not asking
20  for the distance between, I'm just asking you, there are
21  four different locations with different distances;
22  correct?
23      A.   I think without mapping things it would be
24  impossible for me to know how many miles between where
25  it was picked up and where it was delivered.

Page 59

1       Q.   I'm not asking the number of miles.  I'll ask
2  it this way.  Dallas to Mesquite, Texas, is different
3  than Garland to Rockwall, Texas; correct?
4       A.   I would assume yes, but I don't know.
5       Q.   Okay.  We know that there's an address, a
6  building, because it was one address; correct?
7       A.   Mm-hmm.
8       Q.   So if you look at the first row, it says
9  Tiff's Treats Dallas Firewall [sic] 4280.  You see
10  that?
11      A.   Yes.
12      Q.   It's going to Patricia Davis, 408 East
13  it's -- and it's a little bit cut off -- Rockwall,
14  Texas?
15      A.   Okay.
16      Q.   That's one location -- that's one location,
17  going Garland to Rockwall?
18      A.   Yes.
19      Q.   Okay.  And if you go down, it's going to be a
20  little difficult but I'll just point you to the first
21  row that identifies a different location, Tiff's Treats,
22  Dallas Hillcrest.  Do you see that?
23      A.   Yes.
24      Q.   That is 8611 Hillcrest Road, Dallas, and it's
25  going to Maria Castillo, 1228 Foxboro, Mesquite, Texas.

Page 60

1  The second of the second row I just read you, that
2  delivery is different than the first delivery that I
3  just identified; correct?
4       A.   Yes.
5       Q.   Different locations; correct?
6       A.   Yes.
7       Q.   Different distances; correct?
8       A.   Again, without mapping them, I don't know how
9  to tell that they are different distances.
10      Q.   So I'm going to object, nonresponsive.
11           Between the two addresses, two
12  deliveries, those are different distances, not the
13  number of miles, I'm not asking the number of miles.
14  What I just read, they're both going to different
15  locations?
16      A.   Yes.
17      Q.   Okay.  And regardless of the location of the
18  pickup, and regardless of whether it's Rockwall,
19  Mesquite, Argyle, DeSoto, Dallas, Duncanville, the
20  driver commission is all the same, 9.7125; correct?
21      A.   Yes.
22      Q.   And the base amount 17.5 is all the same;
23  correct?
24           MR. DEAN:  Objection, form.
25           THE WITNESS:  Yes.

Page 61

1  BY MS. HERRMANN:
2       Q.   Thank you.
3            (Exhibit 6 marked.)
4  BY MS. HERRMANN:
5       Q.   So I'm going to introduce Plaintiff's Exhibit
6  6, and I will represent that this is coming from Jummp
7  0011285, and the description defendant provided, I'll
8  provide it to you as well, is RFP2 enrollment elections,
9  Goat.  It has been sorted.  It is a partial from that
10  spreadsheet.
11           Earlier we were talking about the
12  onboarding and Openforce and completion of agreements,
13  and I just wanted to ask, is this list that identifies
14  the individuals who signed the agreement on Openforce?
15      A.   Yes.
16      Q.   So based on this list, these are all the
17  individuals?  There isn't other individuals that have
18  signed the Openforce agreement?
19      A.   This appears to be all of those that have
20  signed within the Couch Goat or in the DFW market.
21      Q.   The new agreement or the most recent
22  Openforce agreement with the arbitration clause?
23      A.   Correct.
24      Q.   Okay.  And when I say "sorted," I mean I
25  didn't put the other columns so I didn't sort it any

Page 62

1  other way.
2      A.   Okay.
3      Q.   So I can -- if I want to exclude these
4  individuals from the definition, I could then exclude
5  them and say "all individuals that have signed this
6  Openforce"?
7          MR. DEAN:  Objection, form.
8  BY MS. HERRMANN:
9      Q.   Let me actually ask it differently.  You just
10 confirmed these are all the individuals that signed the
11 Openforce agreement; correct?
12     A.   In the Dallas/Fort Worth area, yes.
13     Q.   Okay.  And what -- okay.  So in the
14 Dallas/Fort Worth area.  Are there any other markets in
15 Texas?
16     A.   Yes.
17     Q.   What other markets?
18     A.   Specific to Tiff's?
19     Q.   Let's start with that, yes.
20     A.   Houston, San Antonio, Austin, Lubbock, Waco.
21 Each of those came along at different times, so it's
22 difficult for me to know which are during the three-year
23 period.
24     Q.   So the Openforce agreement was, you mentioned
25 earlier, sometime in the summer from what I've seen in

Page 63

1  the production.  It appears that's about right,
2  mid-summer, late summer 2021?
3      A.   Right.
4      Q.   It's the new agreement?  There's been
5  different other versions, but I'm talking about the one
6  Openforce, let's say late summer, that way we can just
7  identify late summer 2021 regarding that agreement.
8      A.   Okay.
9      Q.   So these individuals on this list are
10 representative of the DFW market?
11     A.   Yes.
12     Q.   Okay.  Now, it's going to be a little odd
13 because if you look at the addresses of the cities here,
14 there are different cities.  Is there a list for the
15 other markets?
16     A.   Not that we have produced at this time.
17     Q.   Can you produce a list regarding --
18     A.   Yes.
19     Q.   Okay.  And earlier you said "market"
20 regarding or concerning Tiff's Treats?
21     A.   Mm-hmm.
22     Q.   Are there -- so I'll ask you, the -- it was
23 qualified with Tiff's Treats.  Are there more?
24     A.   Not to my knowledge outside of -- I'm sorry,
25 are we staying in the state of Texas?

Page 64

1      Q.   Yeah, let's focus on Texas first.  So we did
2  Tiff's Treats.  We identified these other markets
3  outside of DFW.  We identified the list regarding or
4  identified individuals who signed that agreement in the
5  other markets -- Houston, San Antonio, Austin, Lubbock
6  and Waco -- can be produced?
7      A.   Mm-hmm.
8      Q.   Now I'm asking --
9          MR. MURAD:  I'm sorry, it's not on the
10 record when you --
11         THE WITNESS:  Yes, sorry.
12         MS. HERRMANN:  Thank you.  I appreciate
13 that.  We start talking and then --
14 BY MS. HERRMANN:
15     Q.   So now I want to ask about other customers.
16     A.   I'm not aware of any other markets outside of
17 those that I've provided you, no.
18     Q.   And when you say "concerning Tiff's Treats,"
19 so these individuals signed this agreement pertaining
20 only to Tiff's Treats?
21     A.   No.
22     Q.   So regardless of the customer, it's not going
23 to change?
24     A.   That is correct.
25     Q.   Okay.  So the customer, that's not

Page 65

1  determinative of -- we're not going to have Tiff's
2  Treats and another customer and then different markets?
3  It's the same enrollment, same agreement, same Open
4  software?  Start with that.
5      A.   Yes, the process is the same.
6      Q.   Same agreement?
7      A.   Yes.
8      Q.   So this list, when it was, I guess, exported,
9  was it sorted by DFW market?
10     A.   I believe -- I think it was produced based on
11 the Couch Goat, LLC.
12     Q.   So this includes everyone in Texas?
13     A.   No.  Couch Goat is primarily North Texas,
14 it's just DFW.
15     Q.   Okay.  North Texas, so DFW market, Couch.
16 Then the other ones, who is the other?
17     A.   There are two other entities that we spoke
18 about.
19     Q.   Oaxacan?
20     A.   Las Perlas and -- forgive me for a second
21 while I think about it.  What is it?  Hot Flash.
22     Q.   Okay.  And these are subsidiaries of coach --
23 Couch?
24     A.   No, they are subsidiaries of Jumpp.
25     Q.   It's probably going to get more complicated.

KEVIN CERVANKA vs JUMPP LOGISTICS
John Knope May 06, 2022

Job 34822
Pages 66..69

Page 66

1  Is Tiff's Treats the customer -- so Tiff's Treats is
2  between Couch Goat?  We've identified a whole --
3  another -- so Las Perlas and Hot Flash and Jumpp
4  Logistics, I just want to make sure that we were talking
5  about Tiff's Treats and their locations.  Is that all
6  just this -- does Tiff's Treats pertain to Couch Goat
7  for this agreement, because there's been a difference?
8      **A.   The same --**
9          MR. DEAN:  Objection, form.
10 BY MS. HERRMANN:
11     Q.   Let me put it to you this way.
12     **A.   Okay.**
13     Q.   Are there other agreements for the other
14 subsidiaries?
15          MR. DEAN:  Objection, form.
16          **THE WITNESS:  To my understanding, the**
17 **only difference is the name that would appear on the**
18 **agreement.**
19 BY MS. HERRMANN:
20     Q.   Okay.  And this list was sorted based on the
21 name appearing on the agreement?
22     **A.   Yes.**
23     Q.   Okay.
24          MS. HERRMANN:  Let's go off the record.
25 We're going to take a break.

Page 67

1          (Recess taken.)
2  BY MS. HERRMANN:
3      Q.   So, Mr. Knope -- did I say that right this
4  time?
5      **A.   You did.**
6      Q.   Perfect.  We just took lunch.  We're back.
7  You understand you're still under oath?
8      **A.   Yes.**
9      Q.   So I want to ask you, before the break you
10 had identified some subsidiaries and I want to go
11 through each one that was previously identified.
12     **A.   Okay.**
13     Q.   If I miss one, let me know.
14     **A.   Okay.**
15     Q.   First one Oaxacan?
16     **A.   Okay.**
17     Q.   Is that correct?
18     **A.   That is a subsidiary that's outside the state**
19 **of Texas.**
20     Q.   Okay.  And it's O-x --
21     **A.   O-a-x-a-c-a-n.**
22     Q.   Okay.  And then Peachtree was also
23 identified?
24     **A.   Yes.**
25     Q.   Okay.

Page 68

1      **A.   Outside the state of Texas as well.**
2      Q.   Okay.  Hot Flash?
3      **A.   Yes.**
4      Q.   And just for the record, was previously
5  identified; correct?
6      **A.   Yes.**
7      Q.   Is outside of Texas?
8      **A.   That's Houston.**
9      Q.   And then Las Perlas?
10     **A.   Correct.**
11     Q.   And that is outside or in?
12     **A.   That's inside Texas, other cities besides**
13 **Houston and DFW.**
14     Q.   What cities?
15     **A.   The cities I mentioned previously, Houston --**
16 **I'm sorry.  Austin, San Antonio, Lubbock, Waco.  I feel**
17 **like I might be forgetting one.**
18     Q.   Austin, San Antonio, Lubbock, Waco?
19     **A.   Austin, San Antonio, Lubbock, Waco, that's --**
20 **off the top of my head, that's all can I come up with.**
21 **If there's another city involved it's very**
22 **insignificant.**
23     Q.   Okay.  So are there any other subsidiaries in
24 Texas?
25     **A.   No.**

Page 69

1      Q.   So I know we just discussed previous ones, so
2  I want you to tell me what are all the subsidiaries in
3  Texas.
4      **A.   Couch Goat, Hot Flash, Las Perlas.**
5      Q.   And what are all the subsidiaries outside of
6  Texas?
7      **A.   Oaxacan, Peachtree, and I'm trying to think**
8  **if I know of any others.  I don't know of any others.**
9      Q.   Are there any others that you just can't
10 identify the name of?
11     **A.   Not that I can think of.  Those are the**
12 **only -- those are the only other LLCs or -- I can't**
13 **think of the word.  That's all I can think of.**
14     Q.   Could there be more than these two?
15     **A.   It's possible.**
16     Q.   And you mentioned could be LLCs.  Are they
17 LLCs are or they subsidiaries?
18     **A.   I honestly don't know the difference.**
19     Q.   And how do you know about -- I'm just going
20 to reference right now outside of Texas -- how do you
21 know about these two subsidiaries?
22     **A.   When we -- when a new driver is enrolling in**
23 **Openforce, they enroll based on what entity they will be**
24 **driving for and paid by.**
25     Q.   And who makes that determination?

App. 018

Page 70

1    A.   I think Larry Jordan does.
2    Q.   And I'm going to take this in steps because I
3    know we talked about Texas and outside, so right now I'm
4    just going to focus on outside of Texas.
5    A.   Okay.
6    Q.   So the two, let's start with Peachtree -- or
7    let me go a little more broad.  That way I can narrow in
8    here.  What markets are outside of Texas?
9    A.   Today?  In the three-year period?  When are
10   we looking for that answer?  Because it changes.
11   Q.   Okay.  So changes, what do you mean by "it
12   changes"?
13   A.   We may open a new market and three months
14   later lose an account and not have drivers in that
15   market.
16   Q.   So let me focus on Texas then.
17   A.   Okay.
18   Q.   Let's identify all the markets in Texas.  We
19   know DFW?
20   A.   Mm-hmm, Houston.
21   Q.   And just for clarification, DFW market is
22   Dallas and Fort Worth?
23   A.   Yes.  And like we saw in the exhibit,
24   surrounding cities in the metroplex.
25   Q.   Plano?

Page 71

1    A.   Mm-hmm.
2    Q.   Denton?
3    A.   Well, are we talking about where we make
4    deliveries?
5    Q.   Markets, based on the references with
6    subsidiaries and markets.
7    A.   We would make deliveries into Plano and
8    Denton.
9    Q.   Would Plano and Denton be encompassed within
10   the DFW?
11   A.   Yes.
12   Q.   Okay.  And then outside of DFW, so what other
13   markets?
14   A.   Houston, Austin, San Antonio, Waco, Lubbock,
15   and I think that's it.
16   Q.   And are there any other subsidiaries in
17   Texas?
18   A.   Not that I'm aware of.
19   Q.   But do you know whether there is or there
20   isn't?
21        MR. DEAN:  Objection, form.
22        THE WITNESS:  I'm trying to figure out
23   how I would know if something was existing that I didn't
24   know about.
25   BY MS. HERRMANN:

Page 72

1    Q.   Well, there could be other subsidiaries;
2    correct?
3    A.   There could be.
4    Q.   How would I find out?
5    A.   We could ask Larry Jordan.
6    Q.   And what about Jummp?  Are there any other
7    subsidiaries involved with Jummp?
8    A.   Outside of those that I've already mentioned,
9    no.
10   Q.   No.  So the only other subsidiaries are
11   limited to the ones you mentioned?
12   A.   That I know of, yes.
13   Q.   And what about Couch Goat?
14   A.   I cannot be an expert on the corporate
15   structure of this entity.  I just don't -- fully don't
16   understand all of the different LLCs and which one is
17   mapped to which, but to my knowledge, there are no LLCs
18   or any other subsidiaries of Couch Goat.
19   Q.   And going back, we were talking about
20   individuals enrolled and I provided a spreadsheet that
21   had individuals' names, enrollment, sign date.  So the
22   list -- and I'm just -- since we took a break, that list
23   encompasses which subsidiary or which company?
24   A.   Couch Goat.
25   Q.   And it includes what markets?

Page 73

1    A.   DFW.
2    Q.   What is the purpose of the multiple
3    subsidiaries in Texas?
4    A.   I don't really know.
5    Q.   What do you know regarding the
6    subsidiaries?
7        MR. DEAN:  Objection, form.
8        THE WITNESS:  All I know is that we group
9    drivers and enroll them based on what geographic market
10   they are in based on those affiliates or LLCs.
11   BY MS. HERRMANN:
12   Q.   So you stated "group drivers" and I just want
13   to get an understanding.  Define "group drivers."
14   A.   Okay.
15   Q.   I know that's not a term, "group drivers,"
16   I'm saying when you group drivers, what does that
17   mean?
18   A.   We enroll drivers in Openforce based on what
19   market they live in, and that market designates which
20   legal entity they are enrolling with, which Openforce
21   enrollment they receive.
22   Q.   Make sure I understood this right.  They
23   enroll to provide delivery services and based on their
24   place they live, the location?
25   A.   Generally, yes, it can be a little bit muddy

Page 74

1  if someone drives between multiple markets.
2      Q.   Okay.
3      A.   But yes, for the most part it's based on
4  where you live.
5      Q.   And based on where you live, is the legal
6  entity that is -- I guess that's where -- that is
7  identified in the agreement?
8      A.   Yes.
9      Q.   And we'll take the individuals that live in
10 one place, stay in one place, in one market; then it's
11 very streamlined in that instance.  If they live in
12 Oklahoma -- and I'm not saying that is a market or
13 anything, I'm just saying for example purposes.  They
14 live in Oklahoma, they don't go anywhere else, they just
15 live there, and they enroll based on their single state;
16 Oklahoma determines if there is an entity in that
17 market, what entity is going to apply?
18     A.   That's correct.
19     Q.   Okay.  And now in the instance where the
20 driver drives in multiple markets, is that driving
21 between states?
22     A.   It could be.
23     Q.   So there are drivers that drive between
24 states or outside?  So if somebody lives in Texas they
25 could drive or deliver in Oklahoma?

Page 75

1      A.   That is possible.
2      Q.   So now regarding drivers that drive in
3  multiple markets, can you explain to me how the
4  assignment and the enrollment works?
5      A.   I don't know.  I think that's an exception to
6  the rule.  The majority live and drive and deliver in
7  one market.
8      Q.   So the individuals that are the exception
9  that do drive in multiple markets or through multiple
10 markets, how does that work?
11     A.   I don't fully know, but I believe they may
12 enroll in more than one market.
13     Q.   So they do -- do they go through the
14 onboarding process multiple times?
15     A.   No.
16     Q.   Okay.  So explain to me --
17     A.   They just receive an agreement for Couch Goat
18 and then another for Hot Flash.
19     Q.   Can you tell me what states you have markets
20 in?
21     A.   Not off the top of my head.
22     Q.   Can you name me five?
23     A.   Texas, Oklahoma, Colorado, Georgia,
24 Tennessee.
25     Q.   What about Atlanta?

Page 76

1      A.   We do have some business in Atlanta.
2      Q.   And there are drivers in Texas that drive to
3  Oklahoma?
4      A.   I don't know that to be true.
5      Q.   And why do you say that you don't know that
6  to be true?
7          MR. DEAN:  Objection, form.
8  BY MS. HERRMANN:
9      Q.   And I'm just -- I'm trying to understand.
10     A.   I don't know with any certainty if we have
11 drivers in DFW crossing into Oklahoma.  I just don't
12 know.
13     Q.   Could you find out?
14     A.   Sure.
15     Q.   How could you find out?
16     A.   We could look at the dispatching system to
17 see if a DFW driver made deliveries into Oklahoma.
18     Q.   Same for Texas to Atlanta, Texas to
19 Tennessee?
20     A.   Mm-hmm, sure.
21     Q.   And since we're sticking to Texas to
22 Oklahoma, and if the driver is in Texas, they would have
23 signed the coach -- Couch Goat agreement?
24     A.   Yes.
25     Q.   Okay.

Page 77

1          MR. DEAN:  Objection, form.
2  BY MS. HERRMANN:
3      Q.   Is there any subsidiary in Oklahoma?
4      A.   There is.  I believe that Oklahoma City is
5  part of Peachtree.
6      Q.   Would that driver have two agreements?
7      A.   I don't know.
8      Q.   And again, who would know?
9      A.   Either the driver's dispatcher or Larry
10 Jordan.
11     Q.   And how would the dispatcher or Larry Jordan
12 know?
13     A.   They would have to pull up that driver in
14 Openforce.
15     Q.   The agreement in Openforce, we were talking
16 about the late 2021 Openforce agreement.  Prior to 2021,
17 the agreement that was used was different?
18     A.   Yes.
19     Q.   And what was different between the agreement
20 before the Openforce agreement?  I'm just going to
21 identify it as the "Openforce agreement."
22     A.   The prior --
23         MR. DEAN:  Objection, form.
24         THE WITNESS:  The prior agreement did not
25 have OCC ACC insurance in it, nor did it have the

Page 78

1  arbitration clause.
2  BY MS. HERRMANN:
3      Q.   Occupational accident insurance?
4      A.   That's it.
5      Q.   And can you tell me what occupational
6  accident insurance is?
7      A.   I can try.  I'm not an insurance person.  My
8  understanding, as I mentioned earlier, is it is intended
9  to protect the customer, and I've actually learned the
10  driver, in case someone was injured performing a
11  delivery.
12      Q.   And you state you "just learned."  When did
13  you just learn that?
14      A.   Earlier today.
15      Q.   When?
16      A.   Do I need to know a time?
17      Q.   No, so I should say this, during a break --
18      A.   During a break.
19      Q.   Okay.  Who told you about that?
20      A.   Whitney Jordan.
21      Q.   What did she tell you?
22      A.   She told me that occupational accidental
23  insurance also protects the driver in cases where if
24  they were injured, it provides them with wages while
25  they're unable to work.

Page 79

1      Q.   What else did Whitney Jordan tell you during
2  the break?
3           MR. DEAN:  Objection, form.
4           THE WITNESS:  That's all I know.
5  BY MS. HERRMANN:
6      Q.   So my question was, what else did she tell
7  you, not what else do you know.  What else did she tell
8  you during the break, regardless of whether it was
9  concerning the occupational accidental insurance or
10  not?
11           MR. DEAN:  Same objection.
12           THE WITNESS:  What else did she tell me?
13  She mentioned a little bit of background information
14  about Exhibit 4, the drivers' -- the orders that show
15  with zero commission.
16  BY MS. HERRMANN:
17      Q.   What did she tell you?  What background?
18      A.   She indicated that the majority of these are
19  test orders entered into the system to train, or they
20  are orders that were closed out because the delivery
21  could not be made.
22      Q.   So when it says "wrong address" it's either
23  test order or closed out?
24      A.   I don't know if that's the only time that we
25  would see that, but that's what she alluded to regarding

Page 80

1  these.
2      Q.   And the only one that identifies zero
3  commission is Exhibit 4?
4      A.   That's to my knowledge, yes.  Yes.
5      Q.   And what do you mean by "closed out" or what
6  does that mean?
7      A.   The only example she could give me that I
8  remember was if a driver picked up an order and the --
9  I'm trying to think of the scenario she described.  If
10  the delivery could not be made today, the driver often
11  is told they can go ahead and keep the cookies, the
12  customer is not there, something along those lines.
13  They are paid for those deliveries.  The only time they
14  wouldn't be is if they were either a dummy order like
15  these or if there was some reason that the driver picked
16  up the order and then refused to make the delivery.
17  That was the only example she could give me.
18      Q.   And you said today that's what that means?
19      A.   Yes.
20      Q.   So today from -- give me a time range.
21      A.   As far as I know, as long as we've used
22  Tiff's or as long as we've been a customer of theirs.
23      Q.   So would zero commission show up in the
24  settlement sheets given to the drivers?
25      A.   I think it's possible, but I think it would

Page 81

1  be very rare.
2      Q.   And why would it be rare?
3      A.   Well, most of the deliveries the driver picks
4  up are actually delivered.  Most drivers don't have test
5  orders entered under their name.  I just -- I think it's
6  just a very rare exception.
7      Q.   And to understand, she explained or she
8  provided information that those were most likely test?
9      A.   Yes.
10      Q.   And then I'm just getting to what I'm going
11  to ask, but most drivers wouldn't have test cases?
12      A.   Mm-hmm.
13      Q.   So why are those identified?
14      A.   I'm sorry, why are they identified?
15      Q.   Yes.
16      A.   I don't know how to answer that.
17      Q.   So if they are a test, why are they
18  identified in conjunction with the other -- so that is
19  part of a spreadsheet that identifies multiple base
20  amounts and commission rates paid.
21      A.   Okay.
22      Q.   And so my question is, if those are tests,
23  why are they reflected on Excel sheets representing the
24  amount paid to drivers?
25      A.   I believe it is because we produced an

Page 82

1  extract of every order, given the time frame and the
2  proposed collective, that was requested and that would
3  have included test orders.
4      Q.   So if it identifies wrong address or pieces,
5  it's a test order?
6      A.   I don't know if that's true of all of these.
7      Q.   So how would I know?  How could I identify
8  what is a test order and what is actually a wrong
9  address, no pay to the driver?
10      A.   I don't know that you could identify it
11  without us going into each individual order and looking
12  at the details.
13      Q.   So how was Ms. Jordan able to tell you that
14  those included test cases?
15          MR. DEAN:  Objection, form.
16          THE WITNESS:  I would be speculating.
17  BY MS. HERRMANN:
18      Q.   So you don't know whether or not those
19  include test cases?
20      A.   With certainty, all I know is that she told
21  me by looking at these, she feels that a majority of
22  these are.  That's all I can tell you.
23      Q.   You don't know?
24      A.   I do not know.
25      Q.   You say a list for production, that's part of

Page 83

1  the list we were talking about that?
2      A.   Mm-hmm.
3      Q.   That list, has it been limited to a market?
4      A.   The materials that we produced were limited
5  to drivers in Jummp and in Couch Goat.
6      Q.   So those are the subsidiaries.  Now, are they
7  limited to the DFW market?
8      A.   No.
9      Q.   Those include all markets in Texas?
10      A.   Which subsidiaries?
11      Q.   I guess that's where it gets tricky.
12          So it may be easier if I ask it like
13  this.  There are individuals who are not included in
14  that list that perform deliveries in Texas; correct?
15      A.   That is correct.
16      Q.   And the individuals that are excluded are the
17  individuals who perform deliveries for which
18  subsidiaries?
19      A.   Hot Flash and Las Perlas.
20      Q.   And who made the decision to exclude the
21  individuals -- to exclude individuals from that list
22  that perform deliveries in Texas?
23      A.   I don't believe anyone made a decision to
24  exclude anyone.  I think we gathered all of the
25  information pertaining to Jummp and Couch Goat during

Page 84

1  the time period; and as you can imagine, with multiple
2  entities and multiple systems over a three-year period
3  of time, that was not an easy undertaking.
4      Q.   So I'll break it up.  Let's break it up to
5  see where we are and what we have?
6      A.   Okay.
7      Q.   So multiple systems, let's start with
8  Openforce.  Is that the system that you're referring to
9  to pull those or is that CXT?
10      A.   Openforce is one of the systems that we use
11  to pull data.
12      Q.   Okay.  I'll let you finish.  Go ahead.
13      A.   We talked about that Openforce was only
14  started in summer of 2021.
15      Q.   Yes.
16      A.   The time period was October of '18 through
17  October of '21, so Openforce only has a few months of
18  time.  So prior to that, we were looking at Gig Wage,
19  Docusign, and before those, we were looking into the
20  accounting systems -- and I'm sorry, I don't know the
21  name of our accounting system -- for those that were cut
22  paper checks.
23      Q.   So the same way that the Excel sheet was
24  sorted or exported, the information was exported
25  pertaining to Jummp and then pertaining to Couch Goat is

Page 85

1  the same way that you can export the information
2  pertaining to Hot Flash, and the same way you can export
3  the information pertaining to Las Perlas; correct?
4      A.   Yes.
5      Q.   Can you pull that information today?
6      A.   I don't know that it could be pulled today
7  only because some of that may require us to work with
8  archived copies from our server and things that may take
9  longer.
10      Q.   Okay.  And when I'm referring to the same
11  information, it would be the same -- reflected in the
12  same manner?
13      A.   I don't know the previous systems intimately,
14  but I would imagine the content would be the same, I
15  just don't know if it's going to look and be organized
16  and called the exact same things.
17      Q.   Display?
18      A.   But I think for all practical purposes, the
19  same data that we provided would be just adding
20  additional locations.
21      Q.   In Texas?
22      A.   Yes.
23      Q.   Okay.  Hot Flash is a subsidiary of which
24  company?
25          MR. DEAN:  Objection, form.

Page 86

1      THE WITNESS:  I mentioned earlier that
2  I'm not really up to date on exactly which entities are
3  tied to which.  I believe it's a subsidiary to Jummp,
4  but I can't confirm that.
5  BY MS. HERRMANN:
6      Q.   Is there a way we can confirm that today?
7           MR. DEAN:  Objection, form.
8           THE WITNESS:  We would have to speak with
9  Larry.
10 BY MS. HERRMANN:
11     Q.   Would you be able to call Larry and
12 confirm?
13          MR. DEAN:  Objection, form.
14          THE WITNESS:  Yes.
15 BY MS. HERRMANN:
16     Q.   And what about Las Perlas?
17          MR. DEAN:  Same objection.
18          THE WITNESS:  Same answer.
19 BY MS. HERRMANN:
20     Q.   We're on a roll; right?
21          And just to confirm same answer, you can
22 call Larry --
23     A.   Yes.
24     Q.   -- and confirm today?
25     A.   Yes.

Page 87

1      Q.   And confirm that which company Las Perlas is
2  a subsidiary to?
3      A.   Yes.
4      Q.   Actually, let's take a break.  I don't have a
5  copy of what I want to show you.
6      A.   Okay.
7      Q.   So let me prepare it so that way I can just I
8  show you.  I don't want to be asking you without you
9  being able to see.
10     A.   Okay.
11     Q.   It's just one of the documents.
12          MS. HERRMANN:  Let's take a break real
13 quickly.
14          (Recess taken.)
15 BY MS. HERRMANN:
16     Q.   Mr. Knope, I'm going to show you, and I'll
17 represent that what I have pulled up on the screen is
18 plaintiff's first request for production, and if you
19 could see the first page, and I want to call your
20 attention to the second page, and the second page you'll
21 notice that it says "definitions" and it goes on to
22 define "defendant"?
23     A.   Yes.
24     Q.   And it defines both; I'll let you take a
25 second and read the definition for defendant --

Page 88

1  defendants.  Let me know once you're done reading that.
2      A.   Okay.
3      Q.   In the definition for defendants it includes
4  Jummp and it includes Couch Goat and all subsidiaries,
5  principals, agents.  Is that --
6      A.   Yes.
7      Q.   Okay.  I just wanted to have you read that.
8      A.   Okay.
9      Q.   And I want to call your attention back to
10 Exhibit 1 and Exhibit 3.  And you were present during
11 Ms. Jordan's deposition yesterday.  These were
12 introduced as 1 and 3.  1 is the Federal Rules of
13 30(b)(6) deposition notice for Jummp and then the
14 deposition notice for Couch Goat.  And if you can flip
15 to 4 and 5 respectively, that will identify -- I believe
16 that is where the topic list is or the definitions --
17 there we go.  Yes, 4 and 5 on each one provides a
18 definition or definitions.
19     A.   Okay.
20     Q.   And you have been designated on behalf of
21 both Jummp and Couch Goat; correct?
22     A.   Yes.
23     Q.   Okay.  And if you can -- I'll have you flip
24 back to 4 and 5 for reference.  That also includes the
25 definition for Jummp, the Defendant Jummp and the

Page 89

1  Defendant Couch Goat?
2      A.   Yes.
3      Q.   Okay.  And in both -- and if you'd like, I
4  can go and turn my screen over as well -- it's the same
5  class, proposed class, collective definition?
6      A.   Okay.
7      Q.   "All individuals who worked for defendants as
8  couriers in Texas who were classified as independent
9  contractors," that's the same definition across all the
10 pleadings I should say?
11     A.   Yes.
12     Q.   And so I'm trying to understand the
13 production and the carve-outs since those identify the
14 subsidiaries, and I want to ensure what -- I just want
15 you to tell me.  So those lists you've stated that they
16 can be provided?
17     A.   Yes.
18     Q.   And we can obtain those?
19     A.   Yes.
20     Q.   Okay.  So will you provide those?
21     A.   Absolutely.
22          MR. DEAN:  Objection, form.
23 BY MS. HERRMANN:
24     Q.   And again, regarding the subsidiaries that we
25 just discussed today, in addition to those because they

Page 90

1  belong under each --
2      A.   Yes.
3      Q.   -- and they're encompassed within the
4  definition?
5      A.   Yes.
6      Q.   And the definition includes Texas?
7          MR. DEAN:  Same objection.
8  BY MS. HERRMANN:
9      Q.   The proposed collective definition, I should
10  say.
11      A.   Yes.
12      Q.   Okay.  Perfect.  Thank you.
13      A.   Mm-hmm.
14      Q.   You can keep those in case we reference back
15  to them.
16          (Exhibit 7 marked.)
17  BY MS. HERRMANN:
18      Q.   I'm going to introduce Plaintiff's Exhibit 7.
19  So -- well, can you tell me what this is?
20      A.   This is a independent contractor agreement
21  prior to our Openforce agreement.
22      Q.   And this identifies Jumpp Logistics?
23      A.   Yes.
24      Q.   Is this the agreement provided through
25  Docusign or Gig Wage?

Page 91

1      A.   I believe that this would have been provided
2  through Docusign.  It says "Docusign" at the top.
3      Q.   Okay.  So this was prior to Gig Wage?
4      A.   Gig Wage is a payment vehicle, not an
5  agreement.
6      Q.   Okay.  And I'm still going to be on 7 for a
7  little bit.  So in Exhibit 7, this is the agreement that
8  the drivers in Texas were presented and signed during
9  the time that this one was the one that was
10  applicable?
11      A.   I believe that to be true, yes.
12      Q.   And this is the only agreement?
13      A.   To my knowledge.
14      Q.   So --
15          MR. DEAN:  Objection, form.
16  BY MS. HERRMANN:
17      Q.   Do you need a few seconds to make sure?  Let
18  me ask you this.  Before -- so I know that there's
19  different time periods --
20      A.   Sure.
21      Q.   -- where they were advised, so we have
22  independent contractor agreements, and then I know along
23  the line Openforce, the one we talked about that has a
24  new provision, so along the line, they've been different
25  but it's been an agreement?

Page 92

1      A.   Yes.
2      Q.   So this is the only agreement during the time
3  that this one was implemented?
4      A.   I would have no way to know if this has been
5  revised during that time.  I don't know if there were
6  multiple versions of this.  In other words, there could
7  have been language that was changed and I would not have
8  any idea.
9      Q.   So not whether or not it's been revised, but
10  this one identifying Jumpp Logistics, this agreement --
11  so, for example, you have the Openforce agreement, you
12  mentioned adding the social media addition, but it's
13  still the agreement?
14      A.   Okay.
15      Q.   That was presented through Openforce?
16      A.   Okay.
17      Q.   Unless there's any other agreement that's
18  been used through Openforce?
19      A.   Okay.
20      Q.   And there is no other agreement through
21  Openforce?
22      A.   Not that I'm aware of, no.
23      Q.   So my question applies during the time that
24  this agreement --
25      A.   It is the only document I'm aware of.

Page 93

1      Q.   Okay.  Do you know whether or not it is the
2  only document -- it's the only agreement?
3          MR. DEAN:  Objection, form.
4          THE WITNESS:  I believe that during the
5  period of time that we used Docusign to enroll
6  independent contractors, this is the only agreement that
7  we had.
8          MS. HERRMANN:  Thank you.
9          (Exhibit 8 marked.)
10  BY MS. HERRMANN:
11      Q.   Plaintiffs are going to introduce Exhibit 8.
12  And as you can see at the bottom corner, Jumpp 000051
13  through 52, and this agreement, was this before or after
14  Exhibit 7?
15      A.   This one is Couch Goat, this one is Jumpp.
16      Q.   Okay.  So same agreement during the time that
17  it was implemented, other than one was for drivers
18  enrolled with Jumpp and drivers enrolled with Couch
19  Goat?
20      A.   That is my understanding, yes.
21      Q.   Prior to Openforce there was no other
22  agreement used by Couch Goat; correct?
23      A.   Correct.
24      Q.   And there was no other agreement used by
25  Jumpp Logistics; correct?

Page 94

1    A.   Correct.
2    Q.   And these two agreements, so Exhibit 7,
3  Exhibit 8, they do not contain an arbitration clause;
4  correct?
5    A.   Correct.
6    Q.   Do these apply to all drivers in all markets
7  in Texas?
8    A.   I believe the only thing that would be
9  different would be the name would be reflective of that
10  LLC for a different market, so it would show Hot Flash
11  or it would show Las Perlas.
12    Q.   Okay.  Do you have the agreements for Las
13  Perlas and Hot Flash?
14    A.   I believe so.  I know that we would go
15  through the exact same process to extract these as we
16  did the prior; so as far as I know, yes, we should have
17  them.
18    Q.   So essentially the same production.  The
19  spreadsheet identifying all the delivery drivers, the
20  agreements provided, the one for Couch Goat and the one
21  for Jumpp Logistics, during the time that these were the
22  only ones used, you could do the same thing for Las
23  Perlas and Hot Flash?
24    A.   Yes.
25    Q.   And it would be this same agreement, same

Page 95

1  terms other than the entity name throughout the
2  agreement?
3    A.   To the best of my knowledge, yes, it's
4  possible; but there could have been something unique in
5  one of these others, but I don't know of anything.
6    Q.   Do you know?
7    A.   No, I don't.
8    Q.   And I'm sure beginning of litigation you were
9  informed to preserve documents, and instructed not to
10  destroy, delete, modify, and such.  I just ask that you
11  continue to do that and adhere to that and also
12  regarding the additional agreements that we've just
13  talked about and any of those documents.  I know I
14  haven't covered that before, but just making you aware
15  that obligation is now existing regarding the other.
16    A.   Absolutely.
17    Q.   Thank you.  I appreciate that.
18         Do you still use Docusign?
19    A.   I don't believe so but I'm not -- that's not
20  my responsibility.
21    Q.   Whose responsibility is that?
22    A.   I think we would have to ask Whitney.
23    Q.   What is a driver's settlement?
24    A.   A driver's settlement is a -- well, it can be
25  used to refer to a report that shows orders that they

Page 96

1  picked up and delivered during a specific time period
2  and it would include the compensation for those
3  deliveries.
4    Q.   Compensation, base amount?
5    A.   I think it just shows their commission.
6    Q.   Can you tell me what a report looks like,
7  driver's settlement report?
8    A.   I haven't seen one in quite a while.  Best I
9  can recall, it just shows pretty much exactly as I
10  described, a scrolling list of on this date you picked
11  up from this location, you delivered to this location,
12  with the address, the commission, and then the next item
13  would be another row of the same information for another
14  order for a week at a time.
15    Q.   And that information that's reflected is
16  pulled from the information on CXT?
17    A.   Yes.
18    Q.   Is Gig Wage being used for anything at this
19  time?
20    A.   Not that I'm aware of.  I don't know that
21  there would be any reason to.  I'm not involved in
22  payroll or in any type of payments to drivers, so I
23  don't know if there's any other payments that are being
24  sent for any other reason or payments for vendors or any
25  other transactions.  I don't know of any reason to use

Page 97

1  it.
2    Q.   And you mentioned "payment for vendors" or to
3  vendors?
4    A.   I don't even know what that would be.  It was
5  just -- I have no idea.
6    Q.   Do you know who you're referring to when you
7  stated "vendors"?
8    A.   I don't know that we purchase from any other
9  vendor.
10    Q.   And maybe we're missing each other.  Any
11  other vendor?  Who are you identifying as the vendor?
12    A.   I can't think of a vendor, I'm sorry.
13    Q.   Okay.
14    A.   I started thinking, is there any part of our
15  accounts payable where we would need to pay an entity
16  and use that vehicle?  I don't know of any reason we
17  would.
18    Q.   And on CXT, the software, there are
19  components -- based on the defendants' production,
20  produced the agreement, the licensing program, there are
21  components that the defendants -- I don't know if
22  "design" is the proper term but I guess design or
23  identify, so they set certain components?
24    A.   I'm sorry, I don't know what you're
25  questioning.

Page 98

1    Q.    Maybe this is a little -- it's a different
2  software.  So let's take the rings of distance
3  identifying the miles, so if it's 50 miles it's paid at
4  a certain rate, if it's at a hundred miles it's paid
5  within a certain rate, that's inputted into the software
6  so it could calculate the base amount which then you
7  would drive the driver commission pay?
8    A.    I don't know that that data is entered into
9  CXT, I'm just thinking this through.  I would assume it
10  is, but I don't know that for sure.  I would think that
11  it is, but I have not seen how distance and commissions
12  are calculated in CXT.
13    Q.    You said distance and?
14    A.    Commission.
15    Q.    And other than the -- I know we talked about
16  the videos on Nextstop.  You mentioned you -- there's a
17  second version you revised, whatever you want to
18  describe that as, and now it looks different based on
19  it's no longer a video of a phone.  Now it's actually a
20  full display?
21    A.    Right.
22    Q.    What else did you revise or change from the
23  first training video to the second one?
24    A.    Without going back and comparing the two, I
25  don't remember what was in the first version.  I don't

Page 99

1  know if it's possible that we made other changes to it,
2  but I don't remember specifically what they were.  I
3  would have to compare them.
4    Q.    There are additional changes?
5    A.    I don't even know that.  It might have just
6  been that we made it cleaner and easier to see.  Sorry,
7  it's been a while since I've seen it.
8    Q.    It's okay.  During Ms. Jordan's deposition
9  yesterday she mentioned some customers, I believe one of
10  them was Zoe's?
11    A.    Mm-hmm.
12    Q.    What is Zoe's?
13    A.    I believe it's a Mediterranean restaurant.
14    Q.    And Ms. Jordan also identified Anixter?
15    A.    I'm not familiar with them.
16    Q.    Okay.  Based on defendants' production
17  another one that was reflected is Dallas Medical.  Are
18  you familiar with them?
19    A.    I've heard of them but I don't know what we
20  do or have done with them.
21    Q.    Can you provide me some other additional
22  customer names?
23    A.    Outside of Tiff's?
24    Q.    Yes.
25    A.    Lab Logistics, that's the only one that's

Page 100

1  coming to mind at the moment.
2    Q.    You might have stated this earlier, just to
3  confirm before is -- you can provide a list identifying
4  individuals who cross state lines; correct?
5    A.    I believe we have that ability.  We would
6  have to identify -- it would take some work, but I think
7  we could pull that together.
8    Q.    And you can produce a list that would
9  identify the pickup and delivery location?  So, for
10  example, a location pickup in Texas and delivery in
11  Oklahoma?
12    A.    Yes.
13    Q.    And you can produce that, plus identifying
14  the delivery drivers crossing state lines for all
15  subsidiaries in all markets in Texas?
16    A.    I believe so.
17    Q.    Is that a yes or no?
18    A.    Unless there's a system limitation I'm
19  unaware of, yes, we can do that.
20    Q.    And what type of limitation would exist that
21  would prevent you from preparing or producing that
22  list?
23    A.    I don't know of any.
24    Q.    Is there any?
25    A.    Not that I'm aware of.

Page 101

1            MR. DEAN:  Objection, form.
2            MS. HERRMANN:  Objection, nonresponsive.
3  BY MS. HERRMANN:
4    Q.    Yes or no?
5            MR. DEAN:  Objection, form.
6            THE WITNESS:  No.
7            (Exhibit 9 marked.)
8  BY MS. HERRMANN:
9    Q.    I'm going to introduce Plaintiff's Exhibit
10  Number 9.  And the Bates number on this -- apologies --
11  it overlapped with the page number of the actual
12  document, so it's Cervenka 0040.  And earlier I asked
13  about driver settlements, is this what you were
14  referring to?
15    A.    Yes.
16    Q.    And these are the driver settlements?
17    A.    Yes.
18    Q.    And these are the same drivers settlements
19  used for all delivery drivers performing delivery
20  services in all markets for all subsidiaries, including
21  defendants in Texas; correct?
22    A.    Yes.
23    Q.    And who is responsible for drafting the app
24  instructions?
25    A.    I'm assuming you're referring to the video?

Page 174

1  be -- we can do it but it's based on if they are named
2  with an LLC. So it is possible that individuals could
3  have an LLC that we are not aware of or that they did
4  not enroll in Openforce with.
5      Q.   Okay. The ones that did enroll and are
6  operating based on that, we can separate them?
7      A.   Yes.
8      Q.   So we can have those separated and then
9  individuals?
10     A.   Yes.
11     Q.   And even though they are operating LLCs,
12 individuals, they're still getting paid base rate based
13 on the compensation? I'm not trying to tie them in, I'm
14 just trying to make sure that I'm trying to kind of
15 carve out here and understand what the differences are.
16     A.   Okay.
17     Q.   So individuals still offer Tiff's Treats, for
18 example, the same thing in that area in Texas, same
19 defendants, everything?
20     A.   Yes.
21     Q.   Same for individuals? The only difference is
22 how they are set up and enrolled and delivered?
23          MR. DEAN: Objection, form.
24 BY MS. HERRMANN:
25     Q.   LLC versus individual?

Page 175

1          MR. DEAN: Objection, form.
2          THE WITNESS: The only difference for us
3  so far that we've spoken about, yes.
4  BY MS. HERRMANN:
5      Q.   So then you have that. Are there any other
6  different type of individuals that are not LLCs and that
7  are not individuals within that definition that would be
8  something different? And I'm asking you because you
9  know the different operations, so I just want to make
10 sure.
11     A.   I don't think so.
12     Q.   Okay.
13     A.   I hate to answer that ambiguously, but I --
14 there's not any other type of classification that I'm
15 aware of. So to my knowledge, it would be, yes, they're
16 either an independent contractor individually or they
17 are set up with an LLC.
18     Q.   Okay. And I don't know, I'm asking, are
19 there any individuals that are -- well, you said that's
20 the only classification, those two that we discussed,
21 and going back now to the individuals set up as
22 individuals. Is there -- I know that there's different
23 customers. We know that, different pick up. So is
24 there anything that is identifying that is different
25 just with individuals?

Page 176

1          Like, are they operating at -- well, not
2  a different agreement. They're all subject to the same
3  agreement, depending on where they enroll. Any other
4  major difference between -- within the individuals that
5  we now have?
6          MR. DEAN: Objection, form.
7          THE WITNESS: No.
8  BY MS. HERRMANN:
9      Q.   And just so we're on the same page. The
10 market or where the agreement doesn't deter -- I'm sure
11 you've already, based on all your responses, is the
12 market, the subsidiary, the agreement, anything that
13 doesn't determine whether or not they're enrolled as an
14 independent contractor? Like, that's not going to
15 change the individual status that enrolled as an
16 individual?
17     A.   No.
18     Q.   Okay. And now if I were to say all
19 individuals who just delivered for Tiff's Treats -- so
20 carve it out, another group of individuals, just
21 individuals -- do you see where I'm going?
22     A.   I think so.
23     Q.   Okay. So all individuals who just delivered
24 for Tiff's Treats, Texas, just those group -- that
25 group, is there any dissimilarities in that group?

Page 177

1          MR. DEAN: Objection, form.
2  BY MS. HERRMANN:
3      Q.   Other than, of course, the location pickup.
4  One might be Irving, one might be Fort Worth, depending
5  on the range, base rate.
6      A.   What do you mean by "dissimilarities"?
7      Q.   Because we identified there's a group of LLC
8  individuals, and that's based on how they're enrolled.
9  It could be identified if there's a list. And I just
10 want to make sure that there are these individuals that
11 we're talking about, there isn't something else like the
12 LLC that makes them different from each other, like some
13 are LLCs, some are not, that's the difference. So I'm
14 taking the individuals and I'm just carving out some
15 groups so that I can make sure that we've covered that
16 group?
17     A.   I don't know --
18          MR. DEAN: Objection, form.
19          THE WITNESS: I don't know of anything
20 else that you could use to group all independent
21 contractors set up as individuals who have delivered to
22 Tiff's. I can't think of anything else that you could
23 segregate them based upon other than their market.
24 BY MS. HERRMANN:
25     Q.   Meaning?

Page 178

**1     A.   This one delivered in DFW, this one in**
**2 Houston.**
3     Q.   And then the other markets, so that could be
4 then -- above that would be, okay, the subsidiary, Hot
5 Flash?
**6     A.   Yes.**
7     Q.   And then Las Perlas and then Couch Goat?
**8     A.   Couch Goat, yes.**
9     Q.   And those three?
**10     A.   Yes, that can be done.**
11     Q.   Okay.  And I'm trying to think if there is --
12 there's other customers but Tiff's Treats is the most
13 identifiable and we have been talking about Tiff's
14 Treats, so...
**15     A.   Right.**
16     Q.   And other than the market and the subsidiary
17 that would then be determined, is there any other
18 aspect, difference that we can look at or that there is
19 to again --
20          MR. DEAN:  Objection, form.
**21          THE WITNESS:  No.**
22 BY MS. HERRMANN:
23     Q.   And within -- so I'll start -- I'll go a
24 little bit more, as we were saying individuals, not
25 LLCs, before we carved out Tiff's Treats, those

Page 179

1 individuals.  We can identify and carve out from the
2 individuals the individuals who then delivered across
3 state lines and the individuals who just delivered
4 within Texas?
**5     A.   I believe that is true, yes.**
6     Q.   And that's based on our conversation --
**7     A.   Correct.**
8     Q.   -- earlier where --
**9     A.   Correct.**
10     Q.   -- there's not a specified list but it says
11 pickup, Texas, location delivery, Oklahoma location?
**12     A.   Yes.**
13     Q.   And now going back to the more narrow
14 subgroup, we can then have individuals who deliver for
15 Tiff's Treats, all the same customer, all the same
16 individuals, Texas only, all -- the markets identified
17 under each subsidiary, and the list of those individuals
18 that delivered across state lines and the individuals
19 that only delivered within Texas?
**20     A.   Yes.**
21     Q.   So each group, each narrow group that we went
22 through and defined right now, are there any other
23 dissimilarities such as -- I don't know because I know
24 we covered the agreements; they're all the same.
25 Anything else that you can identify that would then be

Page 180

1 helpful to say, "You know what?  Yeah, they didn't do
2 the same thing."
3          MR. DEAN:  Objection, form.
**4          THE WITNESS:  No.  Those drivers**
**5 essentially perform the same function, just in different**
**6 locations.**
7 BY MS. HERRMANN:
8     Q.   Okay.  And at the beginning -- I know it's
9 been a long day.  In the beginning of your deposition,
10 so same functions and that includes what we discussed
11 earlier, and I note throughout I showed you an example
12 of a settlement sheet?
**13     A.   Yes.**
14     Q.   Same settlement sheet?
**15     A.   Yes.**
16     Q.   Same software that was used, CXT?
**17     A.   Yes.**
18     Q.   I know within CXT there's the X Dispatch?
**19     A.   Yes.**
20          MR. DEAN:  Objection, form.
21 BY MS. HERRMANN:
22     Q.   And then the Nextstop video.  I should say,
23 yes, correct, under the X Dispatch under CXT; correct?
24          MR. DEAN:  Objection, form.
**25          THE WITNESS:  X Dispatch is software made**

Page 181

1 by CXT.
2 BY MS. HERRMANN:
3     Q.   Sub component or --
**4     A.   Well --**
5          MR. DEAN:  Give me one minute to
6 interject.  Go ahead.
**7          THE WITNESS:  Sure.**
8 BY MS. HERRMANN:
9     Q.   Okay.  So I'll just -- what we discussed
10 earlier, the breakdown, it's all on the transcript so we
11 don't have to go through the whole thing, so same
12 software?
**13     A.   Yes.**
14          MR. DEAN:  Objection, form.
15 BY MS. HERRMANN:
16     Q.   And then we discussed that the difference is
17 that the agreement has changed throughout the periods?
**18     A.   Yes.**
19          MR. DEAN:  Objection, form.
20 BY MS. HERRMANN:
21     Q.   But it's the same agreement, it's only the
22 entity that changes based on the market that they enroll
23 in?
24          MR. DEAN:  Objection, form.
**25          THE WITNESS:  Yes.**

KEVIN CERVANKA vs JUMPP LOGISTICS
John Knope May 06, 2022

Job 34822
Pages 182..185

Page 182

1  BY MS. HERRMANN:
2      Q.   Same terms?
3      A.   **Yes, same terms.  I'm sorry.  I thought you**
4  **said "same germs."**
5      Q.   Oh, okay.
6      A.   **Yes, same terms.**
7      Q.   Okay.  No, you're fine.  You're fine.  It's
8  been a long day.  Okay.  I'm trying to think of anything
9  else.
10          So -- I have to draw it out so excuse me.
11  And each group of individuals, I know we don't have a
12  name of the actual list or spreadsheet, can be the same
13  documents that were produced for the individuals for
14  Jummp and Couch Goat, but then excluding certain
15  categories like we said, let's exclude the LLC
16  individuals and narrow it down to just the individuals
17  who did not enroll, that's possible for each subgroup
18  that we have discussed?
19      A.   **Yes.**
20      Q.   That are similar?
21      A.   **Yes.**
22      Q.   Okay.  I am going to pass the witness.
23          MR. DEAN:  Reserve our questions.
24          THE COURT REPORTER:  Mr. Dean, did you
25  need to order a copy of the transcript?

Page 183

1          MR. DEAN:  Just a signed copy to me,
2  please.
3          (Off record at 5:39 p.m.)

Page 184

1                  WITNESS ERRATA SHEET
2  WITNESS NAME:  JOHN KNOPE      DATE:  MAY 6, 2022
3  CASE NAME:  KEVIN CERVANKA, individually and on behalf
   of others similarly situated vs. JUMPP LOGISTICS, LLC
4  and COUCH GOAT QUANDARY, LLC
5  Reason Codes:  (1) to clarify the record; (2) to conform
   to the facts; (3) to correct a transcription error;
6  (4) other (please explain.)
7  PAGE  LINE    CHANGE                    REASON CODE
8  ____  ____    _____
9  ____  ____    _____
10 ____  ____    _____
11 ____  ____    _____
12 ____  ____    _____
13 ____  ____    _____
14 ____  ____    _____
15 ____  ____    _____
16 ____  ____    _____
17 ____  ____    _____
18 ____  ____    _____
19 ____  ____    _____
20 ____  ____    _____
21 ____  ____    _____
22 ____  ____    _____
23 ____  ____    _____
24 ____  ____    _____
25 ____  ____    _____

Page 185

1          I, JOHN KNOPE, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5                  _____
                            JOHN KNOPE
6
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10      Before me, _____, on
11  this day personally appeared JOHN KNOPE, known to me
12  (or proved to me under oath or through _____)
13  [description of identity card or other document] to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18      Given under my hand and seal of office this _____
19  day of _____, _____.
20
21
22
23
24                  _____
                    NOTARY PUBLIC IN AND FOR
25                  THE STATE OF _____
                    COMMISSION EXPIRES:_____

App. 029

KEVIN CERVANKA vs JUMPP LOGISTICS
John Knope May 06, 2022

Job 34822
Page 186

Page 186

```
 1            I, CHERYL A. DIXON, Registered Professional
      Reporter, Certified Realtime Reporter and Notary Public,
 2    do hereby declare:
 3            That, prior to being examined, the witness
      named in the foregoing deposition was by me duly sworn
 4    pursuant to Section 30(f)(1) of the Federal Rules of
      Civil Procedure and the deposition is a true record of
 5    the testimony given by the witness.
 6            That said deposition was taken down by me in
      shorthand at the time and place therein named and
 7    thereafter reduced to text under my direction.
 8    _____   That the witness was requested to review the
              transcript and make any changes to the
 9            transcript as a result of that review pursuant
              to Section 30(e) of the Federal Rules of Civil
10            Procedure.
11    _____   Signature is waived.
12    _____   The changes made by the witness are appended
              to the transcript.
13
      _____   No request was made that the transcript be
14            reviewed pursuant to Section 30(e) of the
              Federal Rules of Civil Procedure.
15
              I further declare that I have no interest in
16    the event or the action.
17            I declare under penalty of perjury under the
      laws of the United States of America that the foregoing
18    is true and correct.
19            Witness my hand this 23rd day of May, 2022.
20
21
22
23            Cheryl Dixon
              _____
              Cheryl A. Dixon, RPR, CRR
24
25
```

App. 030