```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3   KEVIN CERVANKA, individually )
     and on behalf of all others  )
 4   similarly situated,          )
                                  )
 5            Plaintiff,          )
                                  )
 6   vs.                          )Case No. 4:21-cv-00813-SDJ
                                  )
 7   JUMPP LOGISTICS, LLC and     )
     COUCH GOAT QUANDARY, LLC,    )
 8                                )
              Defendants.         )
 9   _____)

10                     ORAL DEPOSITION OF

11    CORPORATE REPRESENTATIVE OF JUMPP LOGISTICS, LLC, and

12           COUCH GOAT QUANDARY, LLC, BY AND THROUGH

13                        WHITNEY JORDAN

14                    THURSDAY, MAY 5, 2022

15

16      ORAL DEPOSITION OF WHITNEY JORDAN, produced as a

17   witness at the instance of the Plaintiff, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on Thursday, May 5, 2022, from 8:59 a.m. to 11:54 a.m.,

20   before Cheryl A. Dixon, RPR, CRR, Notary Public, in and

21   for the State of Texas, reported by machine shorthand,

22   at the offices of Brown Pruitt Wambsganss Dean Forman &

23   Moore, P.C., 201 Main Street, Suite 700, Fort Worth,

24   Texas, 76102, pursuant to the Federal Rules of Civil

25   Procedure.
```

Exhibit 2

Page 2

```
 1                A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       MS. PAMELA G. HERRMANN
         HERRMANN LAW, PLLC
 5       801 Cherry Street, Suite 2365
         Fort Worth, Texas 76102
 6       817.479.9229
         pamela@herrmannlaw.com
 7
         MR. JERRY MURAD
 8       LAW OFFICE OF JERRY MURAD
         P.O. Box 470067
 9       Fort Worth, Texas 76147
         817.335.5691
10       jerrymurad@mac.com
11
12   FOR THE DEFENDANTS:
13       MR. RANDAL L. DEAN
         MR. TYLER G. SCHOLES
14       BROWN PRUIT WAMBSGANSS DEAN FORMAN & MOORE, P.C.
         201 Main Street, Suite 700
15       Fort Worth, Texas 76102
         817.338.4888
16       rdean@brownpruitt.com
         tscholes@brownpruitt.com
17
18
19   ALSO PRESENT:
20   JOHN KNOPE
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2                                                  PAGE
 3   Appearances                                      2
 4   WHITNEY JORDAN
 5     Examination By Mr. Murad                       4
 6   Witness Errata Sheet                           105
 7   Certificate of Shorthand Reporter              107
 8
 9                   E X H I B I T S
10   NO.          DESCRIPTION                       PAGE
11   Exhibit 1    Deposition Notice                   8
12   Exhibit 2    Defendants' Designations in Response  8
                  to Plaintiff Cervenka's Notices of
13                Intent to Take the Depositions of
                  Defendants
14
     Exhibit 3    Deposition Notice                  101
15
```

Page 4

```
 1              P R O C E E D I N G S
 2                    --- o0o ---
 3                 WHITNEY JORDAN,
 4   having been first duly sworn, testified as follows:
 5                    EXAMINATION
 6   BY MR. MURAD:
 7       Q.   Good morning, Ms. Jordan.
 8       A.   Good morning.
 9       Q.   Could you please state your full name for the
10   record?
11       A.   Whitney Wallach Hughes Jordan.
12       Q.   Okay.  And I'm Jerry Murad, Jr., and this
13   morning right here right now is basically the first time
14   you and I have ever met; correct?
15       A.   That's correct.
16       Q.   And we've never spoken before on the
17   telephone or anything like that?
18       A.   I don't believe so.
19       Q.   And why -- what is your understanding of why
20   you're here today?
21       A.   Your firm has filed a class-action lawsuit
22   against Jumpp Logistics and Couch Goat.
23       Q.   And what is the lawsuit about?
24       A.   The lawsuit is about alleging that Jumpp and
25   Couch Goat misrepresented the classification of certain
```

Page 5

```
 1   people.
 2       Q.   Okay.  And what is your role at either Jumpp
 3   or Couch or both?  What do you do?
 4       A.   I am the vice president at Jumpp.
 5       Q.   Okay.  And have you ever given your
 6   deposition before?
 7       A.   I have not given a deposition related to
 8   anything business.  Long time ago I gave a deposition
 9   regarding something personal.
10       Q.   I see.  Okay.  And was that only one time?
11       A.   Yes.
12       Q.   Have you ever testified in court?
13       A.   No.
14       Q.   And have you executed any declarations or
15   affidavits having to do with this lawsuit?
16       A.   I don't believe so.
17       Q.   Are you aware of any other lawsuits against
18   either Jumpp or Couch Goat?
19       A.   No.
20       Q.   And when did you first learn of this
21   lawsuit?
22       A.   Late last year.
23       Q.   Okay.  And just to be clear, the full name of
24   the defendant is Jumpp Logistics, LLC; is that
25   correct?
```

Page 6

1   A.   Correct.
2   Q.   And the full name of the other defendant is
3   Couch Goat Quandary, LLC; is that correct?
4   A.   Correct.
5   Q.   And can you tell me what the connection is
6   between Jumpp Logistics and Couch Goat?
7   A.   Couch Goat is a subsidiary of Jumpp.
8   Q.   Okay. And a subsidiary in what sense? What
9   do they do? Couch Goat, what does Couch Goat do?
10       MR. DEAN:  Object to the form.
11  BY MR. MURAD:
12  Q.   The objections get ruled on later. And I
13  might point out if I ask a question that you didn't hear
14  or you need to me to repeat or it didn't make sense or
15  whatever, please let me know. Is that fair?
16  A.   (Moving head up and down.) Yes, sorry.
17  Q.   No worries. And is it fair that if you
18  answer a question, is it fair for everyone to assume for
19  the record that you understood the question that was
20  being asked?
21  A.   I believe so.
22  Q.   Okay. You believe so or?
23  A.   Yes.
24  Q.   Okay. So if you don't understand the
25  question, you won't answer it; is that fair?

Page 7

1   A.   I'll ask you if I can.
2   Q.   To clarify?
3   A.   To clarify.
4   Q.   And why don't we back up. The question was
5   objected to, so I'm just going to start out with
6   something completely different. You're vice president
7   with Jumpp; correct?
8   A.   (Moving head up and down.) Yes, sorry.
9   Q.   And as vice president, what are your
10  responsibilities? What are your duties?
11  A.   I work with independent contractors'
12  settlements.
13  Q.   Okay. And when you say "independent
14  contractor settlements," can you explain what that
15  means?
16  A.   Can you be a little bit more specific on that
17  question?
18  Q.   Okay. What is an independent contractor
19  settlement?
20  A.   It is an accounting of the deliveries an
21  independent contractor performed during a certain period
22  of time.
23  Q.   Okay. And how do you keep track of those
24  deliveries?
25  A.   Through our dispatching software.

Page 8

1   Q.   Okay. And I'd like to hand you --
2        (Exhibit 1 marked.)
3   BY MR. MURAD:
4   Q.   Ms. Jordan, I'm going to hand you what's been
5   marked as Depo Exhibit 1, which I'll represent to you is
6   the notice for this deposition. And I'd also would like
7   to have that introduced into the record. And also for
8   the record, if I could, please, I'll hand the witness
9   Depo Exhibit 2.
10       (Exhibit 2 marked.)
11       MR. MURAD:  Hand Mr. Dean Exhibit 2,
12  which is the designation on behalf of defendants for the
13  depos, the one we're taking today and the one that we'll
14  be taking tomorrow with Mr. Knope.
15  BY MR. MURAD:
16  Q.   And I'd ask, as far as Depo Exhibit 1, have
17  you had an opportunity to review that, Ms. Jordan?
18  A.   If this is the same document I saw before,
19  yes; if it has changed in any way, no.
20  Q.   Well, I'd ask that you look at it because if
21  there's another document out there that you looked at or
22  if this is somehow different, if you would let me know.
23  A.   It appears to be same document.
24  Q.   And just to be clear, you're vice president
25  with Jumpp, but you're testifying on behalf of Jumpp as

Page 9

1   well as Couch Goat; is that correct?
2   A.   That's correct.
3   Q.   Okay. And tell me, what is the business of
4   Jumpp Logistics. What do they do?
5   A.   Jummp Logistics helps put independent
6   contractors in touch with Jumpp's customers to provide
7   delivery services for their goods or services.
8   Q.   Okay. So you're saying that Jumpp
9   facilitates relationships between independent
10  contractors and clients of Jumpp; is that right?
11  A.   Jumpp's customers.
12  Q.   Jumpp's customers. And Tiff's Treats, that's
13  a customer of Jumpp's; correct?
14  A.   That is correct.
15  Q.   But the independent contractors don't
16  communicate directly with Tiff's Treats, do they?
17  A.   Not normally.
18  Q.   What is Tiff's Treats? What do they come to
19  you for? What do they come to Jumpp for?
20  A.   They are a customer that wishes to have
21  deliveries made for hot, fresh cookies.
22  Q.   And so what does Jumpp have to do with
23  that?
24  A.   They're our customer; they ask that we help
25  them find people to do deliveries.

Page 10

1  Q.  So Tiff's ask Jumpp to help them find people
2  for deliveries; is that --
3  A.  **Give me a minute.**
4  Q.  Okay.  Take as much time as you need.
5  A.  **Can you ask that one more time?**
6  Q.  Sure.  How about if I phrase it this way?  My
7  understanding is that Tiff's Treats goes to Jummp
8  Logistics to deliver their hot cookies to people who
9  order hot cookies from Tiff's.  Is that a fair
10 assessment?
11 A.  **Yes, some of it.**
12 Q.  Okay.  What did I get wrong?  What's wrong
13 with my assumption or understanding?
14 A.  **We're not the exclusive people that deliver**
15 **their cookies.**
16 Q.  Okay.  So the work that Jumpp does for Tiff's
17 Treats is to deliver cookies; correct?
18 A.  **We work with independent contractors to**
19 **deliver the cookies.  Jumpp doesn't physically deliver**
20 **the cookies.**
21 Q.  And what is the agreement between Tiff's and
22 Jumpp?
23 A.  **There is no agreement.  They're just a**
24 **customer.**
25 Q.  So there's no agreement in writing between

Page 11

1  Tiff's and Jumpp?
2  A.  **There is no agreement.**
3  Q.  None?
4  A.  **None.**
5  Q.  Okay.  Does Jumpp get paid by Tiff's for this
6  or no?
7  A.  **Yes.**
8  Q.  Okay.  Well, there must have been some
9  agreement as to what you'll get paid.
10 A.  **There is not an agreement in writing.  It's**
11 **done on a delivery-by-delivery basis as far as the**
12 **distance.**
13 Q.  Okay.  But Jumpp is an organized LLC for
14 profit; is that correct?
15 A.  **Yes.**
16 Q.  So it's not a charity that you're working
17 with Tiff's; correct?
18 A.  **No.**
19 Q.  And if they wanted you to deliver some
20 cookies, you do that for a price that is agreed upon,
21 whether it's in writing or not, there's an agreed price;
22 isn't that correct?
23 A.  **I assume that there is.**
24 Q.  Okay.  Well, you work with the -- did you say
25 the settlement of these deliveries, of these cookies?

Page 12

1  A.  **Yes.**
2  Q.  And does that involve price?
3  A.  **I only deal with the price that's in the**
4  **system, normally.**
5  Q.  And you say that the end that you work on has
6  to do with the so-called "independent contractors"?
7  A.  **Mm-hmm.**
8  Q.  And who are the independent contractors?  I
9  don't mean a list of names, I mean just generally, can
10 you describe who that is?  Who do you mean by
11 "independent contractor"?
12         Description as a category, I'm not asking
13 for names, I'm just asking a category, the independent
14 contractors are what?  What do they do?
15 A.  **They deliver goods and services.**
16 Q.  So they're couriers or drivers?
17 A.  **Mm-hmm.**
18 Q.  I'm sorry, if you could answer.
19 A.  **I'm sorry for the "mm-hmm."  Please forgive**
20 **me.  Yes.**
21 Q.  Okay.  All right.  So to be clear, the
22 independent contractors you're referring to are couriers
23 and drivers; correct?
24 A.  **Let me think through that.  Yes.**
25 Q.  Okay.  Are there independent contractors who

Page 13

1  are not couriers/drivers?
2  A.  **I'm sorry, are there independent contractors**
3  **that are not couriers or drivers?**
4  Q.  Right.  In the context of Couch Goat and
5  Jumpp?
6  A.  **No.**
7  Q.  Okay.  So when you say "independent
8  contractors," that's synonymous with couriers and
9  drivers that are part of, quote, "Team Jumpp"; is that
10 fair?
11 A.  **Well, there are not independent contractors**
12 **in Jumpp.**
13 Q.  I'm sorry, I don't understand.
14 A.  **There are independent contractors in Couch**
15 **Goat.**
16 Q.  Okay.  So you're saying that Jumpp has no
17 independent contractors?
18 A.  **Currently, no.**
19 Q.  During the relevant time period?
20 A.  **Yes.**
21 Q.  Okay.  So if we're talking about the relevant
22 time period, Jumpp had independent contractors;
23 correct?
24 A.  **Correct.**
25 Q.  And those independent contractors were

Page 14

1  couriers or drivers; correct?
2    A.   Correct.
3    Q.   During the relevant time period, did Couch
4  Goat have independent contractors?
5    A.   Yes.
6    Q.   And those independent contractors, as you
7  maintain, are couriers/drivers; correct?
8    A.   Yes.
9    Q.   And all making deliveries for customers of
10 Jumpp and/or Couch Goat?
11   A.   Yes.
12   Q.   Okay.  And the independent contractors are
13 routinely referred to -- and stop me if I'm saying
14 something that's not correct.  Those drivers are
15 routinely referred to as part of "Team Jumpp" throughout
16 a number of text messages that dispatchers have, that
17 defendants' dispatchers have with -- as you call them --
18 independent contractors?
19   A.   I haven't read those.  I wouldn't know.
20   Q.   Okay.
21   A.   I haven't read what you're talking about.
22   Q.   Okay.  Well, does the company consider the,
23 quote, "independent contractors" as part of Team
24 Jumpp?
25   A.   I don't know that I can answer that because

Page 15

1  my side is not as much operational.  That's referring to
2  operational.  I don't know if you want to show me what
3  you're talking about.  I'm a little confused where
4  you're going.
5    Q.   Have you ever heard the term "Team Jumpp"?
6    A.   I don't know that I have.
7    Q.   Okay.  And do the independent contractors
8  make deliveries for clients other than Tiff's Treats?
9    A.   Yes, they do.
10   Q.   And what clients are those?
11   A.   I have a list.
12   Q.   Okay.
13   A.   Not with -- I mean, I would have to look at
14 the list, I think, to really tell you accurately who
15 that is, but...
16   Q.   Okay.  Well, would you like to take a break
17 and do that and we can resume?
18        MR. DEAN:  We need to press through
19 unless you're alleging that it's part of the -- on the
20 topic list of --
21        MR. MURAD:  No, I am.
22        MR. DEAN:  -- customers.
23        MR. MURAD:  I am because it has to do
24 with the classification of individuals, and I need to
25 know what those individuals are doing to determine

Page 16

1  whether they're similarly situated.  It's item 3.  It's
2  probably related to some other items I can point out as
3  well, but --
4         MR. SCHOLES:  The list was provided in
5  discovery.
6         MR. DEAN:  Tyler, I'll take care of it.
7         So you have a list provided in discovery;
8  right?
9         MR. MURAD:  We're in deposition.  These
10 are the topics.  She said she needs to see a list, I'm
11 happy to accommodate, but --
12        MR. DEAN:  I mean, the list has been
13 produced is the point.
14        MR. MURAD:  Well, I mean, it's the
15 company corporate representative y'all designated on
16 these topics.  Can we take a break and then take --
17        MR. DEAN:  Well, let --
18        MR. MURAD:  I'm asking her --
19        MR. DEAN:  Point to me on the topic list
20 where the list of customers needs to be addressed
21 directly.
22        MR. MURAD:  Well, number 8, "Companies
23 employing or relating to plaintiff and individuals in
24 the proposed collective."  "Proposed Collective" goes on
25 and is defined by these drivers and couriers in Texas

Page 17

1  that are classified as independent contractors.
2         She's testified that the independent
3  contractors are all drivers and couriers.
4         MR. DEAN:  And if you're referencing
5  customers of Jumpp, we provided a list, and if you'd
6  like to review that list with the witness, we're happy
7  to do that.  If you want her best recollection sitting
8  here without the list, you're welcome to ask her.
9         MR. MURAD:  Well, the situation is --
10        MR. DEAN:  What we're not going to do is
11 take a break and go do homework and then come back.
12        MR. MURAD:  Well, when the situation is a
13 30(b)(6), it's expected --
14        MR. DEAN:  I'm aware.
15        MR. MURAD:  -- that the witness would be
16 prepared to discuss the topics that are on the page.
17        MR. DEAN:  Okay.  And I question whether
18 or not customers are specifically identified on your
19 topic list number 8.  If you want to ask her about
20 customers, please do.
21        MR. MURAD:  Sure.
22        MR. DEAN:  And if you want to produce the
23 list and review that, we're happy to do that as well.
24 That has been provided in discovery.
25        MR. MURAD:  Okay.  And as we -- back with

Page 18

1  the witness.
2  BY MR. MURAD:
3     Q.   Ms. Jordan, you said that you reviewed
4  Exhibit 1, correct, the deposition notice?
5     A.   Yes.
6     Q.   And I'd like to direct you to page 6, please.
7     A.   Page 6.
8     Q.   Of Deposition Exhibit 1.
9     A.   Oh, okay.
10    Q.   And what topic -- have you reviewed those
11 topics?
12    A.   Yes.
13    Q.   Okay.  And which topics are you here to
14 discuss today, by number?
15    A.   I believe number 3.  I think number 4.  I
16 think I have number 5.  I don't recall if I have number
17 6.  I think I have number 7.  And I think I have number
18 8.  I may have said a few wrong.  I'm unclear on the
19 last few.  I think I'm definitely 12.  I think I'm 10.
20 That's the best I can tell you.
21    Q.   Are you prepared to discuss these topics?
22 Have you looked into them?
23    A.   Yes.  Sorry.  Sorry.
24    Q.   So back to the clients of your company that
25 you perform delivery services for, you don't know who

Page 19

1  they are?  You'd have to look at a list?
2     A.   I could repeat to you a few of them.  Without
3  a list, I'm not going to get it right.  There's quite a
4  few on that list.
5     Q.   Sure.  Why don't you take your best stab at
6  it, please.
7     A.   Zoe's.
8     Q.   Zoe's, is that the restaurant?
9     A.   Yes.
10    Q.   All right.  Is that the only one you can
11 recall?
12    A.   Oh, I didn't know if you wanted me to keep
13 going.
14    Q.   Yes, please.  No worries.
15    A.   ARC.
16    Q.   What is ARC and how do you spell it?
17    A.   Well, it's abbreviated, A-R-C.
18    Q.   Okay.  And what do they do?
19    A.   I believe they're documents, blueprints.
20    Q.   Okay.  Any other companies or clients?
21    A.   Anixter.
22    Q.   Can you please spell that?
23    A.   A-n-i-x-s-t-e-r [sic], Anixter.
24    Q.   And what does Anixter do?
25    A.   I believe they produce commercial building

Page 20

1  materials, possibly wiring.
2     Q.   And so what do you do for them, for
3  Anixter?
4     A.   They ask us to find people to deliver their
5  products.
6     Q.   Okay.  What other clients do you recall?
7     A.   I can't think of the name of this one.  It's
8  on the tip of my tongue.  There's quite a few different
9  Zoe's, there's quite a few different Tiff's on that list
10 so that constitutes a lot of it.  I'm just blank without
11 looking at that list, I'm so sorry.
12    Q.   Okay.  And obviously Tiff's.  So those are
13 the only four you can think of, which are Zoe's, ARC --
14    A.   I have many in the back of my mind.  The
15 names are not coming to the front of my head right now.
16 Sorry.
17    Q.   Okay.  How about geography?  Let's talk about
18 geography.  Name all the states that these independent
19 contractors that you've been discussing, where all are
20 they located, the operations.
21    A.   I believe we discussed the definition was
22 Texas; right?
23    Q.   Well, that's -- my question is, you just
24 listed four clients -- Tiff's, Anixter, ARC, and
25 Zoe's -- and you said there's others; you don't recall

Page 21

1  the names, and that you deal with the settlements for
2  the independent contractors; correct?
3     A.   Mm-hmm.
4     Q.   Is that a yes?
5     A.   Yes.  Sorry.  Sorry.
6     Q.   Okay.  And all of the independent contractors
7  are drivers or couriers; correct?
8     A.   Yes.
9     Q.   And are there any drivers or couriers that
10 are, quote, not "independent contractors"?
11          MR. DEAN:  Objection, form.
12 BY MR. MURAD:
13    Q.   Do you understand the question?
14    A.   I do understand the question.
15    Q.   Okay.
16          THE WITNESS:  Am I still supposed to
17 answer it?
18          MR. DEAN:  Yes.
19          THE WITNESS:  Oh, I'm sorry, okay.
20 BY MR. MURAD:
21    Q.   I just want to make sure my question is
22 clear -- why don't we start over?
23    A.   Okay.
24    Q.   So you've testified that all independent
25 contracts are drivers/couriers; right?

Page 22

1   MR. DEAN: Objection, form.
2   MR. MURAD: May I ask for a clarification
3   what the problem is?
4   MR. DEAN: It's been asked and answered
5   several times. But you can answer.
6   BY MR. MURAD:
7   Q.  You can answer.
8   **A.  Okay, yes.**
9   Q.  So we know that. So my question then is, are
10  all drivers and couriers independent contractors?
11  **A.  Are you asking are all drivers and couriers**
12  **independent contractors for Jumpp and Couch Goat?**
13  Q.  These questions have to do with you, and
14  "you" is the Defendants Couch Goat and Jumpp. This
15  isn't about this lawsuit. It's about Jumpp and Couch
16  Goat. I'm not talking about --
17  **A.  I'm having a hard time understanding where**
18  **you're trying to take me. I don't --**
19  Q.  I'm not trying to take you anywhere. What
20  I'm trying to determine is, is you've defined
21  "independent contractor" as drivers and couriers. Okay?
22  Now, my question is, are there drivers and couriers
23  working for Couch Goat and/or Jumpp that you classify
24  not as independent contractors --
25  **A.  No.**

Page 23

1   Q.  -- but as employees?
2   **A.  No.**
3   Q.  Okay. So all independent contractors are
4   drivers and couriers, all drivers and couriers are
5   independent contractors; is that a correct statement?
6   **A.  ==All the individuals that perform deliveries==**
7   **==for Couch Goat or performed deliveries for Jumpp are==**
8   **==independent contractors==.**
9   Q.  May I offer a simple analogy just to clarify
10  what I'm asking here? You would agree that all trucks
11  and all cars are all motor vehicles; correct? A truck
12  is a motor vehicle; we can agree on that?
13  **A.  I believe so, yes.**
14  Q.  You believe so? It's a yes; right?
15  **A.  Yeah.**
16  Q.  And all cars are motor vehicles. I'm not
17  talking about electronic, I'm talking about a normal car
18  that we all know; right? You would agree with that;
19  right?
20  **A.  Yes.**
21  Q.  Okay. But that doesn't mean that all motor
22  vehicles are trucks; true? I'm not trying to trick you.
23  This is not a trick question. I'm trying to --
24  **A.  I feel like you are, so --**
25  Q.  I'm not trying to confuse you. All I'm

Page 24

1   saying is -- a truck, we all know what a truck is;
2   right? A normal everyday truck, a truck is a motor
3   vehicle; right?
4   **A.  I'm really not an expert on trucks, sorry.**
5   Q.  Would you like to take a break and maybe we
6   can come back? Why don't we do that? I just feel like
7   we're really getting off on the wrong foot here and this
8   could take a whole lot of time that is really not
9   necessary. But just take a break.
10  MR. DEAN: Would you like to take a
11  break?
12  MR. MURAD: I would like to take a break.
13  MR. DEAN: We can take a break.
14  MR. MURAD: Great. What do you say we
15  come back in 10 minutes? Is that okay?
16  MR. DEAN: Sure.
17  (Recess taken.)
18  BY MR. MURAD:
19  Q.  Ms. Jordan, you know in this deposition you
20  took an oath; right?
21  **A.  Yes.**
22  Q.  And you understand you're still under oath?
23  **A.  Yes.**
24  Q.  Okay. So we took a little break and I was
25  just trying to clarify a couple of points. I am trying

Page 25

1   to offer, by way of an example, what I'm trying to get
2   at here, would you agree that all trucks are motor
3   vehicles?
4   **A.  Yes.**
5   Q.  Okay. And you'd agree that all cars are
6   motor vehicles?
7   **A.  Yes.**
8   Q.  Okay. But you would agree that not all
9   cars -- excuse me, let me back up.
10  You'd agree that not all motor vehicles
11  are trucks, because some are cars; right?
12  **A.  Yes.**
13  Q.  Okay. So with that in mind, are there any
14  drivers or couriers that are not classified during the
15  relevant time period for either defendant as independent
16  contractors?
17  **A.  ==All of the drivers and couriers for Jumpp and==**
18  **==Couch Goat are independent contractors during the==**
19  **==relevant time period.==**
20  Q.  Great. Thank you.
21  **A.  Okay.**
22  Q.  If you would, please, take a look at the Depo
23  Exhibit 1, page 6, please, those topics.
24  **A.  Okay.**
25  Q.  And I just wanted to ask you, topic number 3,

Page 26

1  the defendants have designated you as the designee to
2  testify about topic 3.  Okay?
3       A.   Yes.
4       Q.   Okay.  And have you prepared to testify about
5  topic 3?
6       A.   Yes.
7       Q.   And what did you do to prepare to be deposed
8  on topic 3?
9       A.   I read the definition that was given and seek
10 to find those individuals that met that definition.
11      Q.   Okay.  And what definition are you referring
12 to?
13      A.   Give me a minute.
14      Q.   Sure.
15      A.   In definitions and instructions, page 5C,
16 "'Proposed collective' refers to and is defined as" --
17 do you want me to keep reading?
18      Q.   I think we're on the same page but we may
19 have a pagination issue.
20      A.   I'm sorry.
21      Q.   I'm showing -- what I think you're reading I
22 have as page 4.  Can I ask what you were looking at?
23      A.   This.
24      Q.   Right, and can you tell me the page number of
25 that?

Page 27

1       A.   It says 5.  Mine says 5.
2       Q.   Okay.
3       A.   Might be an older definition page.
4       Q.   So how about we refer back to Depo Exhibit 1,
5  can you tell me --
6       A.   I can also agree that it's page 4 in what you
7  gave me.
8       Q.   How about this, just so we're all on the same
9  page --
10      A.   Sorry.
11      Q.   -- if you will, can we -- can you tell me if
12 the item C on page 4 of Depo Exhibit 1 "proposed
13 collective" that definition in item C, is that the exact
14 definition that you prepared to discuss today?
15      A.   Yes.
16      Q.   Okay.  All right.  Great.  So you've
17 identified the classification of all those individuals
18 as independent contractors; and then it also says
19 "including any claimed exemptions under the Fair Labor
20 Standards Act."
21           Are you claiming any exemptions under the
22 Act other than the classification as "IC," independent
23 contractor?
24      A.   I'm sorry, please ask that again.
25      Q.   Yes, ma'am.  So item 3, the topic has to do

Page 28

1  with we've got the definition for the proposed
2  collective.  You have reviewed that definition, which is
3  Depo Exhibit 1, which is on page 4, item C, "proposed
4  collective," and could you please read that definition
5  into the record?
6       A.   Oh, I just left that page.
7       Q.   No worries.
8       A.   "C, 'proposed collector' refers to and is
9  defined as:  All individuals who work for the defendants
10 as couriers in Texas were classified as independent
11 contractors and compensated via a piece-rate
12 compensation structure within the three-year period
13 preceding the filing of this lawsuit."
14      Q.   Okay.  And you've looked at that definition
15 and your testimony is that all of those individuals
16 identified in that definition are independent
17 contractors?
18      A.   Yes.
19      Q.   Okay.  And other than that, are you claiming
20 any other exemptions under the Fair Labor Standards
21 Act?
22      A.   I don't really understand what you're asking
23 me there.
24      Q.   Okay.
25      A.   But I believe I prepared it correctly for you

Page 29

1  from the definition you asked.
2       Q.   All right.  We'll break it up a little bit
3  and try to break this down.  The first clause says
4  "classification of plaintiff and individuals in the
5  proposed collective."  I believe you completely
6  testified on that.  You said --
7       A.   Yes.
8       Q.   -- those individuals are independent
9  contractors.  So we're done with that portion; fair
10 enough?
11      A.   Yes.
12      Q.   Okay.  So the second portion says "including
13 any claimed exemptions under the Fair Labor Standards
14 Act," and so this is what you're here to testify -- one
15 of the things you're here to testify about today.
16           What I'm trying to find out, other than
17 saying that this group are independent contractors,
18 which is an exemption, are there any other exemptions
19 other than that --
20      A.   No.
21      Q.   -- either defendant, either Couch Goat or
22 Jumpp, are claiming?
23      A.   No.
24      Q.   All right.  Fair enough.  On to topic 4,
25 could you please read topic 4 into the record?

Page 30

1  A.  Number 4, "Tasks and responsibilities
2  performed by plaintiff and individuals in the proposed
3  collective."
4  Q.  Okay.  And have you prepared for number 4?
5  A.  Yes.
6  Q.  And what have you done to prepare for number
7  4?
8  A.  We gathered information and --
9  Q.  May I ask, when you say "we," who is "we"?
10  A.  John Knope and myself.
11  Q.  Okay.  And just for the record, could you
12  please explain who Mr. Knope is?
13  A.  Mr. Knope, who is here with me today, also is
14  the vice president at Jumpp.
15  Q.  And he's here in the deposition with us and
16  has been since the beginning; is that correct?
17  A.  That's correct.
18  Q.  Okay.  So you and Mr. Knope prepared for item
19  4 and you've been designated to talk -- to testify about
20  topic 4; correct?
21  A.  Mm-hmm.  Yes, sorry.
22  Q.  And you're prepared to do that; correct?
23  A.  Yes.
24  Q.  Okay.  Could you please identify the task and
25  responsibilities performed by plaintiff and individuals

Page 31

1  in the proposed collective?
2  A.  The independent contractors were given the
3  opportunity to perform a delivery from our customers and
4  they could accept the delivery or not, and if they did,
5  they performed a delivery, and if they weren't, they
6  were given the option to refuse.
7      Could you be more specific in what else
8  you want from me, please?
9  Q.  Well, let's start out with performing for
10  your customers.
11  A.  Mm-hmm.
12  Q.  When -- one example could be Tiff's.  Could
13  be any of these other companies you've identified;
14  correct?
15  A.  Correct.
16  Q.  And the companies I'm specifically referring
17  to -- and this is not exhaustive, the ones that you've
18  mentioned on the record -- are Zoe's, ARC, Anixter and
19  Tiff's; is that correct?
20  A.  Correct.
21  Q.  Okay.  They would need something delivered?
22  A.  Yes.
23  Q.  Those are clients of the defendants;
24  correct?
25  A.  Yes.

Page 32

1  Q.  And they would contact the defendants to make
2  that happen?
3  A.  Yes.
4  Q.  And then defendants would then contact the
5  alleged independent contractors to pick those items up
6  from the clients and deliver them to wherever they're
7  supposed to go?
8  A.  They would contact -- Jumpp or Couch Goat
9  would contact the independent contractor and say "I have
10  this opportunity, do you wish to accept it or not?"
11  Q.  And the person or the entities responsible
12  for these delivers are the defendants; correct?  That's
13  the defendant's business; is that correct?
14  A.  Yes.
15  Q.  Your client has no contact with the so-called
16  independent contractors; correct?
17  A.  Usually they do not.
18  Q.  Because that's why y'all are in business;
19  right?
20  A.  They do have contact at the point of either
21  pickup or delivery.
22  Q.  Let me ask you this.  Doesn't the defendants,
23  don't they market themselves to clients such as Tiff's
24  and ARC and these other folks as "we can help you out"?
25  "We can solve your delivery problem."  Isn't that what

Page 33

1  you're doing?
2  A.  Yes.
3  Q.  Okay.  And so if you weren't doing that,
4  there wouldn't be any reason for the defendants to be in
5  business; correct?
6  A.  That is our business.
7  Q.  Right.
8  A.  Okay.
9  Q.  And, I mean, I might add, just from what I
10  can see, seems like a very successful business; is that
11  fair?
12  A.  Yes.
13  Q.  Okay.
14  A.  Sometimes.
15  Q.  Well, y'all have been in business for -- what
16  is it -- origins go back to the 1990s; right?  The
17  company was founded in the late '90s or so, early 2000s?
18  When was it founded?
19  A.  I would have to look on Jumpp.  Couch Goat is
20  '20.
21  Q.  And how long have you been with the
22  business -- this company?
23  A.  Since it started.
24  Q.  Okay.  So you've been there since day one?
25  A.  Yes.

Page 34

1  Q.  You've seen it grow?
2  A.  Yes.
3  Q.  Okay.  Successful business; fair?
4  A.  Yes.
5  Q.  Okay.  Well, I presume that the way it's
6  marketed to the customers is it's a successful business
7  and can get the job done for them?
8  A.  I think we do a good job, yes.
9  Q.  I mean, you don't go to the clients and say,
10 "You know, we'll do what we can.  We can't really, you
11 know.  I don't know, we'll try," that's not what you
12 tell them?
13 A.  No.
14 Q.  Okay.  You tell them, "Sure, we can do this
15 for you"; right?
16 A.  Yes.
17 Q.  That's the impression I get from the website;
18 fair enough?
19 A.  (Moving head up and down.)
20 Q.  Okay.  So from the clients' perspective --
21 and the clients I'm talking about, right, Tiff's and the
22 others -- they don't even know these drivers, that's
23 where Jumpp and Couch Goat come in; correct?
24 A.  I believe some of our customers do get to
25 know drivers that perform the deliveries a lot.

Page 35

1  Q.  Sure, because they might come and pick things
2  up at their stores; correct?
3  A.  Yes.
4  Q.  But absent that, they don't recruit these
5  people?
6  A.  No, they do not.
7  Q.  ==The so-called independent contractors, they==
8  ==all have one thing in common, they're all recruited one==
9  ==way or another through an offer by defendants;==
10 ==correct?==
11 A.  ==Correct.==
12 Q.  And the services that you're offering to
13 these companies like Tiff's, ARC and the others, ==you==
14 ==absolutely could not deliver on them without the==
15 ==independent contractors; correct?==
16 A.  ==Correct.==
17 Q.  ==So that goes to the heart of the business==
18 ==service that you are selling and providing to your==
19 ==clients?==
20 A.  Yes.
21 Q.  Okay.  And, in fact, you control many of the
22 aspects in which those delivery services are
23 performed?
24       MR. DEAN:  Object to the form.
25       THE WITNESS:  Do I still answer?

Page 36

1        MR. DEAN:  Yes, you can answer.
2        THE WITNESS:  Sorry.  Our customers
3  specify the way they prefer the deliveries be done.
4  BY MR. MURAD:
5  Q.  What do your customers tell you about how
6  they could be done?  What -- you just mention -- tell me
7  what those things are.
8  A.  They specify when they expect to pick up and
9  when they expect a delivery.
10 Q.  Well, that kind of almost goes without
11 saying; right?
12 A.  Yes.
13       MR. DEAN:  Objection, form.
14 BY MR. MURAD:
15 Q.  Am I correct, if you're in the business --
16 I'm just thinking Tiff's, they make hot cookies;
17 right?
18 A.  Yes.
19 Q.  That's a perishable item?
20 A.  Yes.
21 Q.  They want the pickup when the cookies are
22 ready to go; correct?
23 A.  Yes.
24 Q.  That really has nothing to do with
25 independent-contractor status, employee status, or any

Page 37

1  other kind of status, does it?
2        MR. DEAN:  Objection, form.
3        THE WITNESS:  I don't understand what
4  you're asking me.  Can you say that again?
5  BY MR. MURAD:
6  Q.  Well, of course, the customer wants it picked
7  up -- the client, right, wants it picked up at a certain
8  time?
9  A.  Yes.
10 Q.  That's the nature of the delivery business,
11 is it not?
12 A.  Yes.
13 Q.  You can't pick it up before it's ready;
14 true?
15 A.  True.
16 Q.  And you can't pick it up three hours after
17 its ready, in the case of cookies?
18 A.  True.
19 Q.  And some of these other services, Zoe's,
20 that's get a hot lunch; right?
21 A.  True.
22 Q.  Okay.  So you would agree, that really
23 doesn't have anything to do with anything, does it?
24       MR. DEAN:  Objection, form.
25 BY MR. MURAD:

Page 38

1  Q.  As far as classification if someone is an
2  employee or an independent contractor, that's just
3  irrelevant, isn't it?
4        MR. DEAN:  Same objection.
5        THE WITNESS:  It has a lot to do with it.
6  BY MR. MURAD:
7  Q.  How does it have anything to do with it?
8  A.  I told you, these people, these independent
9  contractors have the right to say if they want to do the
10 delivery or not.
11       MR. MURAD:  Objection, nonresponsive.
12 BY MR. MURAD:
13 Q.  Didn't ask about that.  I was asking about
14 when a customer wants a delivery to be picked up and
15 delivered has nothing to do with your classification
16 system for the employees or independent contractors, as
17 you'd like to say?
18       MR. DEAN:  Objection, form.
19       THE WITNESS:  I'm sorry, I thought you
20 led me down that road and you wish to discuss that,
21 so --
22 BY MR. MURAD:
23 Q.  Just so we're clear, I'm just asking
24 questions and it's up to you how you answer them.  I
25 want to be as clear as possible.  You know, I'm not

Page 39

1  trying to trick you.  I'm trying to be very clear on
2  what happens and what I'll ask next, the fact is, Jumpp
3  and Couch Goat are in the delivery business?
4  A.  Yes.
5  Q.  Right.  In order to be -- to work at Jumpp or
6  Couch Goat there's certain requirements; is that true?
7  A.  In order to perform as a courier, do you
8  mean?
9  Q.  Yeah, let me say this so we're clear, not
10 trying to trick you here.  I understand completely that
11 defendants are saying that this group, this category of
12 people, drivers and couriers, they're not employees,
13 they're independent contractors.  That's defendants'
14 position; right?
15 A.  (The witness moved head up and down.)  Yes,
16 sorry.
17 Q.  And obviously, you know, the plaintiff has a
18 different view on this.  He says, "No, no, no, no, no,
19 they're not independent contractors, they're employees";
20 right?  That's the position of the plaintiffs; right?
21 A.  Yes.
22 Q.  Okay.  So just to be clear, I'm sure that we
23 could go have this deposition for 10 years straight and
24 we'll never going to agree on whether it's one or the
25 other; right?  But we're not the ones deciding that;

Page 40

1  fair?
2  A.  Yes.
3  Q.  So all I'm trying to do is ask questions
4  about what they did, what y'all did, what they didn't
5  do, what y'all didn't do, whatever, without trying to
6  say it's an IC or an employee or not this or not that or
7  this or that.  I just want to talk about the stuff and
8  then whatever that information is, somebody else is
9  going to decide whether they're independent contractors
10 or employees; fair enough?
11 A.  Fair.
12 Q.  Okay.  So having said that, Jumpp recruits
13 the drivers and couriers?
14 A.  Yes.
15 Q.  And that can be done different ways;
16 correct?
17 A.  Yes.
18 Q.  With the same outcome as if they are working
19 for Jumpp?
20 A.  Yes.
21 Q.  Now, some of that is people just respond -- a
22 driver may just see on your website this opportunity to
23 work for Jumpp?
24 A.  Yes.
25 Q.  Other times you have existing drivers who

Page 41

1  tell them about a friend, tell y'all about a friend,
2  relative, whatever, that would like to do this as
3  well?
4  A.  Yes.
5  Q.  There are probably some other ways that you
6  get these folks to work for Jumpp?
7  A.  Yes.
8  Q.  And what are the other ways?
9  A.  I believe there have been ads on Indeed.
10 Q.  And what is Indeed?
11 A.  It's a recruiting site.
12 Q.  Okay.  Does Jumpp or do any of the defendants
13 have any connection with Indeed like an ownership,
14 subsidiary, an interest?
15 A.  No.
16 Q.  Are y'all clients of Indeed?  Do you post
17 something on that?
18 A.  I believe we are clients because we do post
19 on it, yes.
20 Q.  Okay.  So you post job opportunities on
21 indeed and then drivers and couriers respond and some of
22 them you hire and some of them you don't; is that
23 fair?
24 A.  Yes.
25 Q.  All right.  And these postings that you put,

Page 42

1  have y'all produced all that in discovery?
2    A.   Yes.
3    Q.   Okay.  And those postings include what?  I
4  mean, what's the context?
5    A.   I'd have to look at one of the ads.
6    Q.   Okay.  And as far as -- so these drivers and
7  couriers, they get paid by the defendants for the work
8  they perform; is that true?
9    A.   Yes.
10   Q.   Okay.  And who decides that pay?
11   A.   I'm ultimately the one that actually
12 processes it and sends it.  I usually deal with it after
13 the amount has been decided.
14   Q.   And it's a uniform amount; correct?
15   A.   Yes and no.
16   Q.   Is there a uniform-pay policy?
17   A.   It's decided per delivery and I would say
18 it's negotiated.
19   Q.   Who negotiates it?
20   A.   The driver might actually say "I'd like a
21 little bit more for this delivery," if it's --
22   Q.   I didn't know that.  So basically it's the
23 policy of the defendants that the rates are not set,
24 that they're negotiable by the drivers?
25   A.   The rates are base set; usually with Tiff's

Page 43

1  they're decided on the distance of the delivery.
2  Sometimes there may be additional negotiation needed.
3    Q.   What I'm asking is, is there a uniform policy
4  for pay that applies to all drivers/couriers?
5    A.   That can change per customer so -- is that
6  okay?
7    Q.   All right.  So let me ask you that.  So Zoe's
8  might have one pay -- uniform-pay policy -- the
9  defendants may have one uniform pay policy with regard
10 to deliveries dealing with Zoe's; fair?
11   A.   As far as what was agreed upon between Zoe's
12 and Tiff's, I can't really say that they're different.
13 I know that's not what you're asking me, but if that's
14 where you're going, I can't say that they're different.
15   Q.   Well, I don't think you're suggesting that
16 defendants negotiate with the individual driver/couriers
17 about the pay.  It's based upon a policy that's
18 established by defendants, and if the driver/couriers
19 would like to participate in that, they can say "yes" or
20 they can say "no" and do something else with somebody
21 else?
22   A.   True.
23   Q.   Okay.  ==So it's a uniform-pay policy?==
24 ==Whatever the policy is, it's uniform and applied across==
25 ==the board to these drivers/couriers, the group;==

Page 44

1  ==correct?==
2    A.   ==Yes==.
3    Q.   Okay.  There are other policies that are
4  required by defendants to the group; true?
5    A.   I would say there are suggestions.  Could you
6  be specific as to what the difference --
7    Q.   Sure.  I'm going to assert -- and tell me if
8  I'm wrong -- I'm asserting that there are mandatory
9  policies that are applied uniformly to the drivers and
10 couriers of defendants, in particular, the requirement
11 to have insurance on the vehicle that they're operating
12 for these deliveries?
13   A.   I would say yes.
14   Q.   Okay.  There's also a policy that applies to
15 the group.  And when I say "the group," we're talking
16 about -- you understand that we're talking about the
17 definition on page 4 of Depo Exhibit 1, "proposed
18 collective", right, that's so we're all clear?  That's
19 who we're interested in; right?
20   A.   Yes, sorry.
21   Q.   There's a uniform policy with what you
22 wear?
23   A.   I believe currently it's a suggested policy
24 and if there was a document that was ever written and
25 they did not wear what was asked, there was never any

Page 45

1  discipline or anything.
2    Q.   Okay.
3    A.   Just to dress in a certain appropriate manner
4  that makes the customer happy.
5         MR. MURAD:  Objection, nonresponsive.
6  BY MR. MURAD:
7    Q.   During the relevant time period, right,
8  before, not after, relevant time period, that's where
9  these questions are directed; is that fair?
10   A.   Yes.
11   Q.   Because that's what the lawsuit is about, the
12 relevant time period; it's not about other times;
13 fair?
14   A.   Yes.
15   Q.   Okay.  So with that in mind, the
16 drivers/couriers are required to wear -- to adhere to a
17 certain standard.  It is not their option to wear
18 whatever they want, true or false?
19   A.   Once again, I'm going to say if there was a
20 document saying that they should have worn a certain
21 thing, that could have happened, but they wore whatever
22 they wanted and nothing happened.
23        MR. MURAD:  Objection, nonresponsive.
24 BY MR. MURAD:
25   Q.   So I am trying to understand because my

Page 46

1 understanding is that you market yourself to these
2 client companies with certain representations about the
3 drivers that you're putting on the road carrying your
4 customers' products to be delivered; is that true?
5   **A.   That's a lot. Say it one more time, please.**
6   Q.   Sure. The defendants have represented to
7 their clients about certain aspects that the drivers
8 will adhere to in delivering the products of your
9 customers?
10   **A.   We give that impression that our drivers will**
11 **look in a professional manner.**
12   Q.   Is that part of what you're selling, what
13 defendants are selling to their customers?
14   **A.   I feel like it's an assumed. It's not a**
15 **statement anywhere.**
16   Q.   Okay.
17   **A.   It's just an assumed -- I wouldn't show up**
18 **today in a bikini.**
19       MR. MURAD: Objection. Objection,
20 nonresponsive.
21 BY MR. MURAD:
22   Q.   There's kind of a couple different audiences
23 here, and by that I mean you're here. I mean, the
24 company, you're the company and this is what you're
25 saying. What is the company telling its clients in this

Page 47

1 deposition? What is the company telling its drivers in
2 this deposition? I'm assuming it's not the company's
3 policy, but if it is, drivers, don't worry about it. Do
4 what you want. You want to wear open-toed shoes, you
5 want to wear your pants down to your waist and all that,
6 go ahead. We don't enforce any of that stuff. That's
7 not what the company is saying, is it?
8       MR. DEAN: Objection, form.
9       THE WITNESS: The company suggest --
10 **Jumpp, Couch Goat suggest they would like the drivers to**
11 **look nice.**
12       MR. MURAD: Objection, nonresponsive.
13 BY MR. MURAD:
14   Q.   The company is not saying to the drivers
15 "wear whatever you want," are they?
16   **A.   No.**
17   Q.   They have a policy. The companies -- the
18 defendants have a policy of how the drivers and couriers
19 are to be attired and dressed while working for the
20 defendants?
21   **A.   I'm not comfortable calling it a "policy" and**
22 **I think that's where we're hanging up. We have an**
23 **expectation.**
24   Q.   Do expectations have to be met in your
25 business?

Page 48

1   **A.   They're not always met.**
2   Q.   I don't think --
3   **A.   But we would like them to look presentable.**
4   Q.   It's discretionary, is that what you're
5 saying?
6   **A.   It's not discretionary but if you're going to**
7 **ask me, are we going to force them to wear a certain**
8 **thing, no, we don't force them to wear a certain thing.**
9   Q.   Do you force people to work for your
10 company?
11   **A.   No.**
12   Q.   Okay. So if they don't meet the expectations
13 of the company, they may not be working for the company
14 anymore?
15   **A.   What expectations?**
16   Q.   Let's stick with uniform policy. We're
17 talking about dress.
18   **A.   If they -- I wish you would just be more**
19 **specific and go where you're going to go.**
20   Q.   Okay.
21   **A.   Is that okay?**
22   Q.   Sure. I mean, I happen to like uniform
23 policies; I'm talking about the dress. I think it's a
24 good thing. I think it's a real credit to the
25 defendants to have such a policy, but it sounds to me

Page 49

1 like you're saying they really don't have a uniform
2 policy.
3       MR. DEAN: Objection, form.
4 BY MR. MURAD:
5   Q.   Is that what you're saying? Because if
6 you're saying that, then let's be clear, the website is
7 kind of off as to what it represents to the clients out
8 there; and to the drivers, I'm sure they will be anxious
9 to know they don't have to adhere to this stuff.
10       MR. DEAN: Objection, form.
11 BY MR. MURAD:
12   Q.   So which is it, is it required or is it not
13 required?
14   **A.   What are you saying our specific policy is**
15 **that you're asking me about? Because you're being**
16 **broad.**
17   Q.   Okay.
18   **A.   I'm asking that.**
19   Q.   Okay. Why don't we start off with this.
20 There is a policy about how to dress while performing
21 deliveries, yes or no?
22   **A.   There was a piece of paper at one time, and**
23 **I'm going to assume that's what you're referring to?**
24   Q.   Actually, no. What I'm referring to is this.
25 Here again, we're talking about the relevant time

Page 50

1  period. During the relevant time period, there was a
2  dress code. If not, then -- you know, it can't just be
3  some, quote, "suggestion." There is either a policy or
4  there isn't. If you're saying it's a suggestion, then
5  there is no policy and it's not a requirement. So then
6  we can get into all this stuff about what you say on the
7  website to your customers.
8        MR. DEAN: Objection, form.
9        **THE WITNESS: There was at one time a**
10 **piece of paper that could have appeared as if it was a**
11 **policy.**
12       MR. MURAD: Objection, nonresponsive.
13 BY MR. MURAD:
14   Q.   All I'm asking, was there a dress code or
15 uniform policy -- whatever you want to call it -- during
16 the relevant time period that applied to the folks we're
17 interested in, the drivers and couriers?
18       MR. DEAN: Objection, form.
19       **THE WITNESS: I cannot answer your**
20 **question the way you're phrasing it.**
21 BY MR. MURAD:
22   Q.   Okay. And why is that? Why are you having
23 difficulty with the question?
24   **A.   I've given you an answer that, yes, I believe**
25 **there was a piece of paper. I don't recall exactly what**

Page 51

1  was on it, but it was a piece of paper that suggested
2  how they might look. If they didn't have the
3  suggestion, just look nice.
4    Q.   There's either a requirement or there is not.
5  Was there a requirement during the relevant time
6  period?
7        MR. DEAN: Objection, form.
8        **THE WITNESS: It could have been**
9  **perceived as a requirement. It was not enforced.**
10 BY MR. MURAD:
11   Q.   My question is, was there a requirement? I'm
12 not asking if it was enforced or not enforced. I'm not
13 asking if it was perceived or not perceived. I'm
14 asking, was there a requirement?
15       MR. DEAN: Same objection.
16       **THE WITNESS: Again, I'm going to say if**
17 **it wasn't enforced it couldn't have been a requirement.**
18       MR. MURAD: Objection, nonresponsive.
19 BY MR. MURAD:
20   Q.   ==Is there a requirement to have insurance==
21 ==during the relevant time period for the drivers and==
22 ==couriers making deliveries on behalf of Jumpp?==
23   A.   ==Yes.==
24   Q.   ==Okay. That's a requirement?==
25   A.   ==Yes.==

Page 52

1    Q.   Is it enforced a hundred percent of the
2  time?
3    **A.   It should be, yes.**
4    Q.   Is it ever not enforced?
5    **A.   Not to my knowledge.**
6    Q.   Okay. What other requirements apply to the
7  drivers and couriers?
8    **A.   ==They must be able to perform these deliveries==**
9  ==**in their own vehicle**.==
10   Q.   Okay. What else?
11   **A.   They must be able to report to us if they**
12 **accept the delivery, possibly picked up the delivery.**
13 **The customer wants to know the delivery time and**
14 **possibly proof of delivery, depending on the customer.**
15   Q.   Do you keep track of that in your role as the
16 settlement -- dealing with the settlements or is that
17 something else?
18   **A.   Me personally, no.**
19   Q.   Okay. As far as your chain of command as
20 vice president, does your area include that?
21   **A.   I would say that's more of an operational.**
22   Q.   Okay. So let me jump --
23   **A.   But I have some understanding of it.**
24   Q.   Okay. Can I ask you, can we look at item 12
25 on page 6 of Depo Exhibit 1, please?

Page 53

1    **A.   Yes.**
2    Q.   Could you please read that into the record?
3    **A.   "Computer systems, record management systems,**
4  **software, and programs used for payroll and recording of**
5  **delivery routes, delivery assignments, and delivery**
6  **schedules."**
7    Q.   Are you prepared to testify about that
8  today?
9    **A.   I am.**
10   Q.   And what did you do to get ready for that
11 topic?
12   **A.   I considered what that entails and prepared**
13 **myself for it. What question would you like to ask?**
14   Q.   I mean, did you review any documents?
15   **A.   Yes.**
16   Q.   What documents did you review?
17   **A.   As far as computer systems, it would be the X**
18 **Dispatch system by CXT.**
19   Q.   Okay. And did you have any -- did you review
20 any other documents?
21   **A.   Yes.**
22   Q.   What other documents did you review?
23   **A.   Accounting software.**
24   Q.   Okay. Anything else?
25   **A.   The independent contractor payment vessel,**

Page 62

1  A.  The driver can still negotiate it.
2  Q.  And y'all have -- negotiate that in
3  writing?
4  A.  No.
5  Q.  Because there's a uniform-pay policy.  But
6  anyway, what other controls do you have on the
7  drivers?
8  A.  Not anything that's coming to mind
9  specifically.  Tell me what you want to ask.
10  Q.  Do you have a training program for drivers?
11  A.  There is a period that if the IC isn't
12  familiar that they can learn what is needed to do this.
13  Q.  And that training is provided by
14  defendants?
15  A.  Yes.
16  Q.  Okay.  Can you describe the training?
17  A.  I believe there's a video.
18  Q.  Have you watched the video?
19  A.  Yes.
20  Q.  What things are contained in the video?  What
21  information?
22  A.  It's an instruction on how to familiarize
23  themselves with X Dispatch procedures in the phone app
24  and stuff like that.
25  Q.  What's X Dispatch?

Page 63

1  A.  X Dispatch is our dispatching software that
2  we use, provided by CXT, and there's an app they can
3  download.
4  Q.  And so the defendants purchase that license
5  or whatever that software from CXT?
6  A.  Mm-hmm, yes.  Sorry.  So sorry.
7  Q.  Okay.  Defendants receive all the calls from
8  the customers saying "We need a pick up and delivery,"
9  that doesn't go to the drivers, that goes to you,
10  defendants?
11  A.  Correct; that information comes to us first.
12  Q.  You then seek out drivers or a driver to
13  complete that task?
14  A.  Correct.
15  Q.  That task, defendants are being paid by the
16  clients to perform that task?
17  A.  Yes.
18  Q.  And then in turn the only way defendants can
19  perform that task is through the driver?
20  A.  I don't understand why you say "the only
21  way," I mean, we ask the drivers to perform the tasks
22  for our customers.
23  Q.  ==Right.  If you didn't have the drivers, you==
24  ==wouldn't have the business; true?==
25  A.  ==True.==

Page 64

1  Q.  Because you're a delivery business?
2  A.  True.
3  Q.  In order to deliver you have to have delivery
4  people and drivers?
5  A.  True.
6  Q.  Without delivery people and drivers, no more
7  delivery business?
8  A.  True.
9  Q.  Okay.  Could you please look at topic 5 on
10  page 6 of Depo Exhibit 1?
11  A.  Yes.
12  Q.  Could you please read that into the record?
13  A.  Number 5, "Employment agreements, including
14  but not limited to, offer letters and compensation
15  agreements between defendant and individuals in the
16  proposed collective."
17  Q.  And are you prepared to testify about that
18  topic today?
19  A.  Yes.
20  Q.  And what did you do to prepare for that
21  topic?
22  A.  I looked at employment agreements.
23  Q.  And who drafts the employment agreements?
24  A.  I do not know who drafted the one that
25  Mr. Cervenka was involved in.  I know that we have

Page 65

1  another one in place with Openforce now, so there's one
2  from Openforce and one from before.
3  Q.  Okay.  Openforce, I thought was a software
4  deal.  No?  An app?
5  A.  No, it's not an app.
6  Q.  What is Openforce?
7  A.  It's who -- it's a platform but not
8  necessarily an app.
9  Q.  So to be clear, when these independent
10  contractors who you train -- correct, you train them?
11  A.  They may already know, so we don't
12  necessarily -- they may have driven for another delivery
13  service.  They may be delivering for more than one
14  delivery service.
15  Q.  And so you contract with these people, these
16  companies; right?
17  A.  Yes.
18  Q.  And so when they come to you, what agreements
19  do they bring with you for their services that they're
20  providing?
21  A.  When the independent contractors come to us
22  and want to drive, what do we do next?
23  Q.  No, no, no.  I'm assuming you're telling me
24  they're independent contractors, so they're a business
25  is what you're telling me; right?

Page 66

1  A.  Mm-hmm.
2  Q.  Is that a yes?
3  A.  Yes, yes, sorry. I'm so sorry.
4  Q.  So you have read about offer letters and
5  compensation agreements and all that. Tell me about
6  some of the compensation agreements that these
7  independent contractors comet to you with wanting you to
8  sign off on so that y'all can be clients of theirs?
9  A.  Are you asking me if they bring us comp --
10 Q.  Right.
11 A.  If the independent contractors do that?
12 Q.  Yeah.
13 A.  No.
14 Q.  They don't bring you anything?
15 A.  No.
16 Q.  So where do those agreements come from?
17 A.  We provide the agreement that they sign.
18 Q.  Oh, so you draft the agreement?
19     MR. DEAN: Objection, form.
20 BY MR. MURAD:
21 Q.  "You" meaning defendants, I don't mean you
22 personally; is that right? You handle that?
23     MR. DEAN: Same objection.
24     THE WITNESS: I am not sure.
25 BY MR. MURAD:

Page 67

1  Q.  I'm sorry?
2  A.  Still answer?
3  Q.  You can still answer.
4  A.  Okay. Sorry. I don't know.
5  Q.  Okay. But this is a topic that you're ready
6  to testify to; correct?
7  A.  Yes, yes, yes, yes, yes.
8  Q.  Okay.
9  A.  I meant I didn't know if I was still supposed
10 to answer.
11 Q.  Sure. Defendants provide the agreement?
12 A.  Yes, we do provide the agreements. Openforce
13 provides the agreement now; we direct them to Openforce.
14 Q.  I'm talking about the relevant time period.
15 A.  It happened during the relevant time period.
16 Q.  Okay. So what's the connection -- I'm little
17 bit fuzzy -- what's the connection between Openforce and
18 defendants during the relevant time period?
19 A.  We began utilizing Openforce in June of 2021,
20 so it falls in there, and we shifted our agreement at
21 that time to using them for the contracting.
22 Q.  So what do they do for you?
23 A.  They provide the services to pay the
24 independent contractors; instead of us paying them
25 through Gig Wage, we shifted on paying them through

Page 68

1  Openforce.
2  Q.  So they do kind of a payroll thing?
3     MR. DEAN: Objection, form.
4     THE WITNESS: They do the independent
5  contractors' settlement through either direct deposit or
6  a card that -- if the independent contractor doesn't
7  have a bank account, they can use a prepaid card of some
8  sort.
9  BY MR. MURAD:
10 Q.  Just so we're clear, the independent
11 contractor gets paid by the job, right, in this
12 scenario?
13 A.  Correct.
14 Q.  Okay. And that payment comes from the
15 defendants. That's where the money comes from; right?
16 A.  We send it to Openforce, Openforce sends it
17 to the --
18 Q.  We can back this way up; right?
19 A.  I know. I just want to be specific.
20 Q.  At the end of the day -- I know. I know.
21     MR. DEAN: One at a time.
22     THE COURT REPORTER: One at a time,
23 please, guys.
24     MR. DEAN: Let her finish, if you would.
25     MR. MURAD: Sure.

Page 69

1  BY MR. MURAD:
2  Q.  Right. So at the end of the day, if we were
3  to use Tiff's as an example, Tiff's pays defendants,
4  defendants hires drivers, drivers make deliveries,
5  defendant pays drivers, either directly or they give it
6  to a third-party company who then gives it to the
7  driver; fair?
8  A.  Yes, depending on the period of time you were
9  talking about, yes, that all could be correct.
10 Q.  Right. And that was the order; right? The
11 order was either you give it to them, defendants give it
12 to them, or you give it to a third party who then gives
13 it to the driver?
14 A.  Correct.
15 Q.  Okay. And Openforce, during at least some of
16 the period, relevant time period, was signing up these
17 drivers on behalf of defendants?
18 A.  Correct.
19 Q.  Handling paperwork?
20 A.  Correct.
21 Q.  Doing background checks?
22 A.  I don't know if you could construe what they
23 do as a background check.
24 Q.  Okay. So if we depose Tiff's or Zoe's or
25 Anixter or ARC, they will say that, "No, we don't rely

Page 70

1  on Couch Goat or Jumpp to provide any kind of background
2  checks on the folks that they are delivering food for to
3  their customers?"
4          MR. DEAN:  Objection, form.
5  BY MR. MURAD:
6     Q.   No background check?  Five felonies?  No
7  felonies?  Drunk driving?  Whatever, not a problem?
8          MR. DEAN:  Same objection.
9  BY MR. MURAD:
10    Q.   Just asking?
11         MR. DEAN:  Same objection.
12         THE WITNESS:  I would hope that that
13 person would have a driver's license and we are going to
14 verify through Openforce if they have a driver's license
15 and insurance.
16 BY MR. MURAD:
17    Q.   Okay.  Did -- do the defendants represent to
18 their clients such as Tiff's and others that they
19 perform background checks on the people they've got out
20 in the field making deliveries?
21    A.   I don't know the answer to that question.  I
22 do not believe we do.
23    Q.   Don't think so?  Okay.  All right.  So do
24 defendants perform background checks?  I'm a little
25 confused here.

Page 71

1          MR. DEAN:  Objection, form.
2          THE WITNESS:  I do not believe we do.
3  BY MR. MURAD:
4     Q.   Okay.  And so to be clear, if defendant
5  in-house performs a background check, that's a
6  background check, but I'd also like to know if you're
7  saying, "No, no, we don't do it in-house, we have ABC
8  Investigative Service do it," I'd like to know about
9  that.  So you talked about Openforce?
10    A.   Okay.
11    Q.   So I'm just saying, do y'all do anything?
12    A.   We do not do any background checks in-house
13 that I am aware of whatsoever.
14    Q.   Do you cause or pay someone to do any kind of
15 background checks?  Are any background checks done on
16 the people that you're --
17    A.   Openforce has a verification process.
18         MR. DEAN:  Objection, form.
19 BY MR. MURAD:
20    Q.   Is that utilized by the defendants during the
21 relevant time period for the drivers?
22    A.   Yes.
23    Q.   So there are background checks?
24    A.   I don't know that you consider that a
25 background check, that your wording doesn't necessarily

Page 72

1  fit -- I'm trying to answer you.  There is a
2  verification process.  I've never heard it referred to
3  as a "background check."
4     Q.   All right.  Why don't we try this?  I want to
5  open up a restaurant and I'd like for Jumpp to deliver
6  during the relevant time period -- if this were during
7  the relevant time period -- I'd like you to deliver the
8  food that I prepared to my clients.
9     A.   We'd be happy to.
10    Q.   Okay.  Can I trust your drivers?
11         MR. DEAN:  Objection, form.
12 BY MR. MURAD:
13    Q.   How do I know one of your drivers just didn't
14 get out of the big house for robbery?  Do you do any
15 checks to see to make sure you've got upstanding
16 citizens behind the wheel making deliveries of this food
17 I prepared for my clients who value their safety and
18 privacy?
19         MR. DEAN:  Same objection.
20         THE WITNESS:  Our drivers go through the
21 verification process that's in Openforce.
22 BY MR. MURAD:
23    Q.   Perfect.  Tell me about the verification
24 process.  What does that cover?  What does it involve?
25    A.   They sign a contract to perform independent

Page 73

1  contractor services for us, there's several pages in
2  that.  They produce a VIN number for their vehicle that
3  they supposedly drive.  They make sure they have a
4  driver's license, a social security card.
5     Q.   Do they do any kind of criminal check?
6     A.   I am not aware if they do.
7     Q.   References?
8     A.   Do they give references?
9     Q.   Mm-hmm.
10    A.   I do not know if they do.
11    Q.   Have you ever seen any of the reports that
12 come back from Openforce about a driver, one way or the
13 other?
14    A.   Yes.
15    Q.   What do the reports say?  What topics?
16    A.   They get documents rejected.
17    Q.   Can you be more specific, please?
18    A.   We find out that they didn't have a driver's
19 license after all, that they had an identification card.
20    Q.   Okay.  So at any time during your history
21 since the inception of the company, do you have contact
22 with the client company such as Tiff's or any other
23 company?  Are you ever involved in any of that?
24    A.   I don't understand your question.
25    Q.   Okay.  Do you ever deal with any of

Page 102

1      MR. DEAN: That's accurate, unless
2  otherwise indicated by the question.
3      MR. MURAD: Somebody said something --
4  I'm sorry, go ahead.
5      MR. DEAN: If you say "As to Couch Goat"
6  in a question or "As to Jumpp" question.
7      MR. MURAD: Fair.
8      MR. DEAN: But otherwise yes, the
9  representatives have been provided simultaneously for
10 both defendants pursuant to both notices.
11     MR. MURAD: Perfect. Okay. Good.
12 BY MR. MURAD:
13  Q.   The other thing I just wanted to clarify,
14 Ms. Jordan, is you recall that we had a definition of
15 the class which we've already -- it's the same thing,
16 but what I want to clarify is if you notice on Exhibit
17 3, on page 5 under "Definitions and Instructions," and
18 on the Deposition Exhibit Number 1 "Definitions and
19 Instructions" are on page 4?
20  A.   Okay.
21  Q.   And they're essentially the same but -- but
22 in item A on Depo Exhibit 1 it says "Jumpp" and what's
23 meant by "Jumpp." Can you see item A? It says "Jumpp,
24 "you," and "your," means Jumpp Logistics, LLC,
25 defendant.

Page 103

1      Do you see that part?
2  A.   Yes. He's talking about this one?
3  Q.   Right.
4  A.   Okay.
5  Q.   "In the above-captioned case, and includes
6  its officers, directors, employees, partners, corporate
7  parents, subsidiaries, or affiliates"; right?
8  A.   I'm following you, yes.
9  Q.   Did I read it correctly?
10 A.   I think you did. I was kind of lost between
11 the two.
12 Q.   Okay. All right. Then if you'll look at
13 Depo Exhibit 3 and A.
14 A.   Okay.
15 Q.   And correct me if I'm wrong but item A there,
16 it says the same thing but instead of "Jumpp" it says
17 "Couch," talking about Couch Goat Quandary and it's
18 "officers, directors, employees, partners, corporate
19 parents, subsidiaries, or affiliates."
20     Do you see that?
21 A.   Yes.
22 Q.   And I guess I just want to clarify that when
23 you've testified here today and I've been referring to
24 "defendants" meaning Couch Goat and Jumpp; right?
25 A.   Yes.

Page 104

1  Q.   Did you take those definitions to be -- both
2  the ones in Depo Exhibit 1 and Depo Exhibit 3 -- meaning
3  this is who I mean by Couch Goat, this is who I mean by
4  Jumpp?
5  A.   Yes.
6  Q.   And the subsidiaries and affiliates and all
7  that?
8  A.   Yes.
9  Q.   Okay. I just want to make sure we're all on
10 the same page. I think I don't have anything further.
11 Pass the witness.
12     MR. DEAN: Reserve our questions.
13     MR. MURAD: Thank you.
14     MR. DEAN: Thank you.
15     (Off record at 11:54 a.m.)

Page 105

1                WITNESS ERRATA SHEET
2  WITNESS NAME:   WHITNEY JORDAN     DATE:  MAY 5, 2022
3  CASE NAME:   KEVIN CERVANKA, individually and on behalf
   of others similarly situated vs. JUMPP LOGISTICS, LLC
4  and COUCH GOAT QUANDARY, LLC
5  Reason Codes:  (1) to clarify the record; (2) to conform
   to the facts; (3) to correct a transcription error;
6  (4) other (please explain.)
7  PAGE   LINE     CHANGE                       REASON CODE
8  ____   ____     _____
9  ____   ____     _____
10 ____   ____     _____
11 ____   ____     _____
12 ____   ____     _____
13 ____   ____     _____
14 ____   ____     _____
15 ____   ____     _____
16 ____   ____     _____
17 ____   ____     _____
18 ____   ____     _____
19 ____   ____     _____
20 ____   ____     _____
21 ____   ____     _____
22 ____   ____     _____
23 ____   ____     _____
24 ____   ____     _____
25 ____   ____     _____

```
                                                   Page 106                                                        Page 107
 1          I, WHITNEY JORDAN, have read the foregoing         1          I, CHERYL A. DIXON, Registered Professional
 2   deposition and hereby affix my signature that same is        Reporter, Certified Realtime Reporter and Notary Public,
 3   true and correct, except as noted above.                  2  do hereby declare:
 4                                                             3          That, prior to being examined, the witness
 5                   _____                named in the foregoing deposition was by me duly sworn
                     WHITNEY JORDAN                            4  pursuant to Section 30(f)(1) of the Federal Rules of
 6                                                                Civil Procedure and the deposition is a true record of
 7                                                             5  the testimony given by the witness.
 8   THE STATE OF _____)                              6          That said deposition was taken down by me in
 9   COUNTY OF _____)                                 shorthand at the time and place therein named and
10          Before me, _____, on     7  thereafter reduced to text under my direction.
11   this day personally appeared WHITNEY JORDAN, known to me  8  _____    That the witness was requested to review the
12   (or proved to me under oath or through _____)              transcript and make any changes to the
13   [description of identity card or other document] to be    9         transcript as a result of that review pursuant
14   the person whose name is subscribed to the foregoing                to Section 30(e) of the Federal Rules of Civil
15   instrument and acknowledged to me that they executed the 10         Procedure.
16   same for the purposes and consideration therein          11  _____    Signature is waived.
17   expressed.                                               12  _____    The changes made by the witness are appended
18          Given under my hand and seal of office this _____           to the transcript.
19   day of _____, _____.               13
20                                                                _____    No request was made that the transcript be
21                                                            14         reviewed pursuant to Section 30(e) of the
22                                                                       Federal Rules of Civil Procedure.
23                                                            15
                     _____                        I further declare that I have no interest in
24                   NOTARY PUBLIC IN AND FOR                 16  the event or the action.
                     THE STATE OF _____            17          I declare under penalty of perjury under the
25                   COMMISSION EXPIRES:_____                laws of the United States of America that the foregoing
                                                              18  is true and correct.
                                                              19          Witness my hand this 27th day of May, 2022.
                                                              20
                                                              21
                                                              22         *Cheryl Dixon*
                                                              23         _____
                                                                         Cheryl A. Dixon, RPR, CRR
                                                              24
                                                              25
```