UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| KEVIN CERVENKA, *individually and on behalf of all others similarly situated* | § § § § | |
| v. | § § | CIVIL NO. 4:21-CV-813-SDJ |
| JUMPP LOGISTICS, LLC, ET AL. | § § | |

**MEMORANDUM OPINION AND ORDER**

This is a proposed collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Before the Court is Named Plaintiff Kevin Cervenka's Motion for Court-Authorized Notice. (Dkt. #30). Cervenka asks that the Court authorize notice of this collective action to a group of potential opt-in plaintiffs. (Dkt. #30 at 2). Defendants Jumpp Logistics, LLC and Couch Goat Quandary, LLC oppose the motion. (Dkt. #31). Having considered the motion, Defendants' response, and the applicable law, the Court will deny the motion.

**I. BACKGROUND**

Defendants Jumpp Logistics, LLC and Couch Goat Quandary, LLC[1] are in the business of coordinating deliveries of goods between their clients and those clients' customers. (Dkt. #31 at 3). When a client contacts Defendants with a delivery request, Defendants' "dispatchers" send the delivery request via a software program to independently contracted "couriers" (i.e., delivery drivers), who can choose to accept or reject the delivery. (Dkt. #31 at 3). When a courier rejects a delivery, the dispatcher

---

[1] Jumpp Logistics, LLC is the parent company of Couch Goat Quandary, LLC. (Dkt. #31 at 3).

1

proposes the delivery to different couriers until one accepts the request and makes the delivery. (Dkt. #31 at 3). Couriers use their own vehicles to make deliveries, (Dkt. #30 at 8), and pay for their own gas, insurance, and maintenance, (Dkt. #31 at 5). Couriers are paid on a per-delivery or "piece-rate" basis, based in part on distance traveled—regardless of hours worked or time spent making deliveries. (Dkt. #30 at 8–9); (Dkt. #30-1 at 15).

Named Plaintiff Kevin Cervenka worked for Defendants as a courier for one year. (Dkt. #1 ¶ 32). Cervenka alleges that Defendants misclassified him and its other couriers as independent contractors, instead of non-exempt employees, and failed to pay overtime compensation as required by the FLSA. (Dkt. #1 ¶¶ 1, 6). Cervenka sued Defendants on behalf of "similarly situated" couriers, and now asks that the Court authorize notice of this collective action to the following group of couriers:

> All individuals who worked for Defendants as delivery drivers in Texas, were classified as independent contractors, and compensated via a piece-rate compensation structure within the three-year period preceding the filing of this lawsuit.

(Dkt. #30 at 2).

In support of his motion for court-authorized notice, Cervenka identifies several employment characteristics common to all of Defendants' couriers. All couriers were recruited to fill the same job position with the same job description and qualifications. (Dkt. #30 at 7). All couriers signed the same "independent contractor" agreement, went through the same onboarding process, and were assigned a driver number. (Dkt. #30 at 6–7). Once onboarded, all couriers received work instructions from the same dispatchers, used their own vehicles to make deliveries, and received

"driver settlement" reports memorializing their completed deliveries and compensation. (Dkt. #30 at 8–9). And most importantly, all couriers were classified as independent contractors and paid pursuant to the same compensation policy—on a per-delivery basis, regardless of hours worked. (Dkt. #30 at 8–9).

In response, Defendants argue that their couriers—or at least the subset of couriers Cervenka seeks to notify—are not "similarly situated" in several important respects. First, couriers do not work similar hours. "Couriers have the discretion to work only for specific customers or in specific regions and have the option to accept or reject deliveries at their own sole discretion." (Dkt. #31 at 6). Thus, "[c]ouriers at their individual election can treat the relationship with Defendants as a reliable source of pocket change or as a significant source of income." (Dkt. #31 at 6–7). Some work a significant number of hours each week; others just a few. Second, the length of couriers' relationships with Defendants varies widely from courier to courier. "While one Courier may have a short-term relationship with Defendants spanning a single two-week settlement period, another Courier may perform deliveries over multiple years." (Dkt. #31 at 6).

Third, Defendants dispute that all couriers were required to "sign the same 'independent contractor' agreement." (Dkt. #31 at 11) (quoting (Dkt. #30 at 7)). For starters, neither party has identified or produced *Cervenka's* particular contract. In fact, "the available evidence reflects that [Cervenka] did not sign the written independent contractor agreement that the majority of Defendants' Couriers executed." (Dkt. #31 at 11). Even among couriers who signed written agreements,

those agreements differed in important respects. Some agreements included arbitration provisions; others did not. *See* (Dkt. #31 at 11–12). And some couriers, rather than directly contracting with Defendants, contracted with Defendants via a limited liability company or other separate legal entity. (Dkt. #31 at 10). For these reasons, Defendants contend that members of the proposed collective are not similarly situated and that this case should not proceed as a collective action.[2]

## II. LEGAL STANDARD

"The FLSA requires employers to pay employees at least one-and-one-half times the regular hourly rate for hours worked in excess of forty hours per week." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 829 (5th Cir. 2020) (citing 29 U.S.C. § 207(a)(1)). Employers who violate the overtime-pay requirement are liable to the affected employee(s) in the amount of their unpaid overtime compensation and an additional equal amount as liquidated damages. 29 U.S.C. § 216(b). "The FLSA permits employees to bring an overtime action individually or, alternatively, as a collective action on behalf of a group of 'similarly situated' employees." *Aghatise v. Royal Guards Sol. LLC*, No. 4:24-CV-102, 2025 WL 964226, at *2 (E.D. Tex. Mar. 31, 2025) (citing 29 U.S.C. § 216(b)). But it does not define "similarly situated." *See* 29 U.S.C. § 216(b). "Accordingly, it is up to the district court to define the contours of the term 'similarly situated' as it determines who may be included in a collective action." *Aghatise*, 2025 WL 964226, at *2.

---

[2] Cervenka did not file a reply to Defendants' response, despite being granted two extensions of time to do so. *See* (Dkt. #33, #36).

4

District courts must determine whether putative plaintiffs are similarly situated "at the outset of litigation, *before* notice is sent to potential opt-ins." *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 433 (5th Cir. 2021). "Only then can the district court determine whether the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Id.* at 434. The Supreme Court and Fifth Circuit have cautioned district courts not to "stir up litigation" by authorizing notice to "those who cannot ultimately participate in the collective" action. *Id.* at 441 (cleaned up). Instead, "the district court's job is ensuring that notice goes out to those who are 'similarly situated,' in a way that scrupulously avoids endorsing the merits of the case." *Id.* at 440.

In determining whether putative plaintiffs are similarly situated, the relevant inquiry is "whether merits questions can be answered collectively." *Id.* at 442. Courts in the Fifth Circuit typically consider three factors (the "*Lusardi* factors") to make this determination: (1) the disparate factual and employment settings of the proposed plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each proposed plaintiff; and (3) fairness and procedural considerations. *See Fuller v. Jumpstar Enters., LLC*, No. CV H-20-1027, 2021 WL 5771935, at *3 (S.D. Tex. Dec. 6, 2021) (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987)); *Loy v. Rehab Synergies, L.L.C.*, 71 F.4th 329, 336–37 (5th Cir. 2023) ("While *Swales* rejected *Lusardi*'s two-step method of 'conditional certification' and notice followed by a motion to decertify, courts may still find it useful to consider the *Lusardi* factors to help inform or guide the similarly situated analysis[.]"). Plaintiffs have the

burden of showing that the proposed collective members are similarly situated. *Fuller*, 2021 WL 5771935, at *3.

"After considering all available evidence, the district court may conclude that the Plaintiffs and Opt-ins are too diverse a group to be 'similarly situated' for purposes of answering [merits questions], or at least that Plaintiffs have not met their burden of establishing similarity." *Swales*, 985 F.3d at 443. Put differently, the district court may conclude that answering merits questions would "require a highly individualized inquiry into each potential opt-in's circumstances" such that "the collective action would quickly devolve into a cacophony of individual actions." *Id.* at 442 (cleaned up). If that is the case, the district court—exercising its "broad, litigation-management discretion"—may decide that the case cannot proceed on a collective basis. *Id.* at 443.

### III. DISCUSSION

To resolve this motion, the Court must ultimately determine whether Cervenka and the proposed collective are similarly situated "for purposes of answering [merits questions.]" *Swales*, 985 F.3d at 443. Thus, as an initial matter, the Court must determine what the relevant merits questions are.

The natural starting point for identifying merits questions is the elements of the plaintiff's cause of action. *See Valdery-Hughes v. Care & Dev. Ctr., Inc.*, No. CV 24-1708, 2025 WL 1068258, at *3–4 (E.D. La. Apr. 9, 2025). To succeed on an FLSA overtime-pay claim, a plaintiff must prove: (1) that there existed an employer–employee relationship during the unpaid overtime periods claimed; (2) that the

employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due. *Gray v. Killick Grp., L.L.C.*, 113 F.4th 543, 549 (5th Cir. 2024).

Per the first element, the FLSA only covers "employees"—not independent contractors. *Hobbs*, 946 F.3d at 829. The Fifth Circuit uses the "economic-realities test" to decide whether an individual is an employee or independent contractor. That test asks whether "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Gray*, 113 F.4th at 549 (cleaned up). Courts consider five factors in making that determination: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.*

A review of the pleadings in this case indicates that two merits questions will be particularly relevant: First, were collective members properly classified as independent contractors such that they are exempt from the FLSA's overtime-pay requirement? That is, did an employer–employee relationship exist between Defendants and collective members? *Compare* (Dkt. #1 ¶ 1) (alleging that collective members "were all misclassified by Defendants as independent contractors, instead of non-exempt employees"), *with* (Dkt. #6 ¶ 7) (alleging that collective members "were not employees of Defendants, instead being independent contractors"). Second, did

collective members work more than 40 hours in a single week such that they are entitled to overtime compensation? *Compare* (Dkt. #1 ¶ 36) (alleging that collective members "worked between forty (40) and fifty (50) hours a week and would even work as many as sixty (60) hours in a single workweek"), *with* (Dkt. #6 ¶ 36) (denying that collective members worked more than 40 hours a week).

Having determined the relevant merits questions at issue here, the Court now considers whether the proposed collective members are similarly situated. To guide that inquiry, the Court structures its discussion around the three *Lusardi* factors.

**A. Disparate Factual and Employment Settings**

The first factor is "the disparate factual and employment settings of the proposed plaintiffs." *Fuller*, 2021 WL 5771935, at *3 (cleaned up). Here, members of the proposed collective are dissimilar in three important respects—all of which are relevant to answering merits questions: First, their weekly hours vary widely; second, their contractual arrangements with Defendants differ; and third, the length and exclusivity of their working relationships with Defendants vary. The Court discusses each dissimilarity below and explains how that dissimilarity precludes collective determination of the merits.

   **i. Hours**

The central merits question in any FLSA overtime-pay case is simple: How many hours did the plaintiff work for the defendant? Only after determining the plaintiff's hours can a court or jury determine whether the plaintiff is entitled to recover overtime wages and the total amount of overtime wages due. *Valdery-Hughes*,

2025 WL 1068258, at *6 (explaining that the third and fourth elements of an FLSA overtime-pay claim "require plaintiff to establish the number of hours that plaintiff worked"). At the notice stage, then, the question is whether putative plaintiffs' hours can be determined on a collective basis. Named plaintiffs must therefore "put forth some evidence that [they] and the proposed class members are similarly situated . . . in their work hours." *Fuller*, 2021 WL 5771935, at *7.

Courts in the Fifth Circuit consistently refuse to authorize notice of collective actions where (1) members of the proposed collective did not work similar hours and (2) calculating members' hours would require individualized, fact-intensive determinations. *See id.* at *7 (refusing to authorize notice where "[i]ndividual testimony would be needed from each driver to clarify if, and when, they worked overtime"); *Valdery-Hughes*, 2025 WL 1068258, at *6 (concluding that "certification would be inappropriate in light of the highly individualized determinations required to compute the hours worked by [proposed collective members]").

Here, Cervenka has not shown that he and the proposed collective members are similarly situated in their work hours. In fact, the evidence suggests the opposite. Couriers may accept or reject deliveries at their sole discretion, so hours vary widely from courier to courier. *See* (Dkt. #31 at 6–7). Additionally, Cervenka has presented no evidence that all or any members of the proposed collective worked more than 40 hours a week, and he makes no attempt to exclude from the collective couriers who never worked more than 40 hours in a week. *See* (Dkt. #30 at 2) (proposed collective includes "all" couriers, regardless of hours worked). Thus, Cervenka has not shown

9

to any degree of certainty that members of the proposed collective have valid claims. Were the Court to grant Cervenka's motion, it would be doing precisely what the Fifth Circuit and Supreme Court forbid: stirring up litigation by authorizing notice to those who cannot ultimately participate in the collective action. *See Swales*, 985 F.3d at 441 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 174, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)); *see also Lorenzo v. ZF Collective, LLC*, No. 4:24-CV-03881, 2025 WL 3491635, at *3 (S.D. Tex. July 15, 2025) (refusing to authorize notice where "the record [was] devoid of evidence that the Putative Collective Members worked overtime").

The evidence also suggests that couriers' hours are not easily calculable, making this merits question particularly unsuited for collective determination. Because couriers are not paid by the hour, it appears that couriers do not track or log their hours with any precision. Defendants' brief suggests that a courier's hours could be pieced together via delivery records—e.g., using packages' pick-up and drop-off times—but that method is fraught with uncertainty and would likely invite individualized disputes. *See* (Dkt. #31 at 9–10) (attempting to calculate couriers' hours using pick-up and drop-off times). For example, what if a courier made a personal trip, outside the scope of his duties, after picking up a package but before delivering it? Calculating that courier's hours "may well require litigation over . . . whether [the courier] was authorized to take a particular trip or was acting within the scope of their duties in doing so, and how much time must be deducted for a trip." *Valdery-Hughes*, 2025 WL 1068258, at *6. "Such a coil of individualized

10

determinations 'would quickly devolve into a cacophony of individual actions' that would defeat the purpose of [the] collective action mechanism." *Id.* (quoting *Swales*, 985 F.3d at 442).

### ii. Contractual Arrangements

Members of the proposed collective are also dissimilar with respect to their contractual arrangements with Defendants. Cervenka alleges that all couriers "sign the same 'independent contractor' agreement," (Dkt. #30 at 7), but that appears not to be true. Indeed, Cervenka has failed to produce his own alleged written agreement. According to Defendants, "the available evidence reflects that [Cervenka] did not sign the written independent contractor agreement that the majority of Defendants' Couriers executed." (Dkt. #31 at 11); (Dkt. #31-1 ¶ 9) (declaration of Defendants' representative stating that "[n]o Independent Contractor Agreement for Kevin Cervenka can be found"). Even among couriers who signed written agreements, those agreements differed in important respects. Some agreements included arbitration provisions; others did not. *See* (Dkt. #31 at 11–12). And some couriers, rather than directly contracting with Defendants, contracted with Defendants via a limited liability company or other separate legal entity. (Dkt. #31 at 10).

This lack of uniformity in couriers' contractual arrangements precludes collective determination of the merits. Couriers with valid arbitration agreements, for example, are not similarly situated to those without such agreements. That is because a valid arbitration agreement "bars an employee from bringing a lawsuit" or joining a collective action. *Swales*, 985 F.3d at 441. Thus, individuals with valid

arbitration agreements are "not potential participants of [an] FLSA collective action," *id.* at 440, and "district courts may not send notice" to those individuals, *In re JPMorgan Chase & Co.*, 916 F.3d 494, 501 (5th Cir. 2019). Because it appears that some (but not all) members of Cervenka's proposed collective are subject to valid arbitration agreements, the Court cannot authorize notice to that collective.

Couriers' contracts implicate other merits issues, too. For example, a courier's contract, though not dispositive of independent-contractor status, is relevant to that inquiry. *See, e.g., Haskett v. Percheron, LLC*, No. CV G-14-257, 2016 WL 1054396, at *4 (S.D. Tex. Mar. 9, 2016) (analyzing the terms of plaintiff's contract in determining whether plaintiff was properly classified as an independent contractor). That is, the substance of a courier's contract may indicate whether "as a matter of economic reality, [he] is economically dependent upon the alleged employer or is instead in business for himself." *Gray*, 113 F.4th at 549 (cleaned up). For instance, the "Independent Contractor Agreement" attached to Cervenka's motion speaks directly to the second element of the economic-realities test—"the extent of the relative investments of the worker and the alleged employer." *Id.* (cleaned up). It provides that couriers "shall supply, at [their] sole expense, all equipment, vehicles, tools, materials and/or supplies" necessary for the job. (Dkt. #30-5 ¶ 8). Should a courier use any of Defendants' materials or supplies, Defendants may deduct "the appropriate charges" from the courier's compensation. (Dkt. #30-5 ¶ 8). The agreement also provides that couriers are not eligible for any pension, health, or other

12

benefit plans, (Dkt. #30-5 ¶ 4), and must maintain their own insurance, (Dkt. #30-5 ¶ 2).

In sum, couriers' contracts are relevant to the merits of this case. Because those contracts were not uniform—and some couriers did not have written contracts at all—the proposed collective is not similarly situated for purposes of answering merits questions.

### iii. Length and Exclusivity of Relationships

Finally, members of the proposed collective are dissimilar with respect to the length and exclusivity of their working relationships with Defendants. Some couriers work for Defendants for many years; others for just a few weeks. *See* (Dkt. #31 at 6). The evidence also suggests that couriers are free to work for other companies while working for Defendants. *See* (Dkt. #31-3 at 15). So some couriers work exclusively for Defendants, while others don't.

The length and exclusivity of a courier's relationship with Defendants is relevant to the first element of an FLSA overtime-pay claim—that plaintiff is an employee, rather than an independent contractor. As explained above, the economic-realities test governs that inquiry. It asks whether "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Gray*, 113 F.4th at 549 (cleaned up). The fifth factor of that test looks to "the permanency of the relationship" between the worker and alleged employer. *Id.* (cleaned up). In evaluating this factor, courts consider (1) whether a plaintiff worked exclusively for defendant; (2) the total length of the relationship

13

between the plaintiff and defendant; and (3) whether the work was on a project-by-project basis. *Brunet v. GB Premium Octg Servs. LLC*, No. 4:21-CV-1600, 2022 WL 17730576, at *9 (S.D. Tex. Dec. 1, 2022), *report and recommendation adopted sub nom. Brunet v. GB Premium OCTC Servs., LLC*, No. 4:21-CV-01600, 2023 WL 2186441 (S.D. Tex. Feb. 22, 2023).

Members of the proposed collective are not similarly situated for purposes of answering these questions. The evidence here suggests that some couriers worked exclusively for Defendants, while others didn't. The evidence also suggests that the total length of couriers' relationships with Defendants varied widely from courier to courier. Thus, the economic-realities test cannot be applied on a collective basis.

This conclusion is consistent with the weight of authority. In *Swales*, the Fifth Circuit acknowledged that "the individualized nature of the economic-realities test is why misclassification cases rarely make it to trial on a collective basis." 985 F.3d at 442. Accordingly, district courts post-*Swales* rarely allow misclassification cases to proceed on a collective basis. *See, e.g., Valdery-Hughes*, 2025 WL 1068258, at *5 ("[T]his lawsuit is not the rare misclassification case that may be resolved on a collective basis.").

## B. Defenses Available to the Defendants

The second *Lusardi* factor is "the various defenses available to the defendant which appear to be individual to each proposed plaintiff." *Fuller*, 2021 WL 5771935, at *3 (cleaned up). Defendants' primary defense is that they properly classified their couriers as independent contractors, which are not subject to the FLSA's overtime-

14

pay requirement. As explained above, *supra* Part III.A.ii.–iii., determining whether couriers were properly classified as independent contractors would require individualized inquiries into each courier's circumstances. Thus, this factor weighs against proceeding on a collective basis.

**C. Fairness and Procedural Considerations**

The final *Lusardi* factor is "fairness and procedural considerations." *Fuller*, 2021 WL 5771935, at *3 (cleaned up). Because this case requires individualized inquiries into each courier's circumstances, "there is no efficiency gained by trying all factual questions and defenses in a single trial." *Brunet*, 2022 WL 17730576, at *10. Thus, this factor weighs against proceeding on a collective basis.

* * *

For these reasons, the Court finds that Cervenka has not met his burden of establishing that members of the proposed collective are similarly situated. The question remains, however, whether the Court should deny Cervenka's motion without prejudice, and authorize further discovery, or deny the motion with prejudice. District courts may authorize "further discovery" where necessary to determine whether members of the proposed collective are similarly situated. *See Swales*, 985 F.3d at 443.

The Court finds that further discovery is not warranted here. Cervenka has already deposed Defendants' representatives, (Dkt. #30-1, #30-2), and otherwise conducted substantial discovery in support of his motion. *See Eshelman v. MPFP, LLC*, No. 4:20-CV-3119, 2022 WL 2655821, at *4 (S.D. Tex. June 22, 2022) (refusing

15

to authorize further discovery where plaintiffs "have undertaken substantial discovery, including depositions of Defendants' representatives"), *report and recommendation adopted,* No. 4:20-CV-03119, 2022 WL 2652021 (S.D. Tex. July 8, 2022). Thus, further discovery would likely be futile, and the Court need not give Cervenka a second chance.

### IV. Conclusion

It is therefore **ORDERED** that Plaintiff's Motion for Court-Authorized Notice, (Dkt. #30), is **DENIED with prejudice**.

**So ORDERED and SIGNED this 10th day of February, 2026.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE